1
2
3
4
5
6
7        IN THE UNITED STATES DISTRICT COURT FOR THE
8              EASTERN DISTRICT OF CALIFORNIA
9
10   VIOLA COPPOLA, et al.,              )    1:11-cv-1257  AWI DLB
                                         )
11              Plaintiffs,              )
       v.                               )    ORDER ON DEFENDANTS'
12                                       )    MOTIONS TO DISMISS &
     GREGORY SMITH, et. al.,             )    MOTION TO JOIN
13                                       )    NECESSARY PART
               Defendants.               )
14   _____)    (Doc. Nos. 53, 54, 71, 78)
15
16
17        This is an environmental law case that arises from the chemical contamination of property

18   associated with a dry cleaning business.  Plaintiffs (collectively "Coppola") have brought suit

19   against the City of Visalia ("the City"), and the California Water Service Company ("Cal

20   Water"), and owners and former owners of nearby properties, including Martin and Martin

21   Properties ("Martin").  The active complaint is the Third Amended Complaint ("TAC").  The

22   TAC alleges 15 causes of action: (1) the federal Comprehensive Environmental Response,

23   Compensation, and Liability Act (42 U.S.C. § 9601 et seq.) ("CERCLA"); (2) the California

24   Carpenter-Presley-Tanner Hazardous Substance Account Act (California Health and Safety Code

25   § 25300 et seq.) ("HSAA"); (3) negligence; (4) negligence per se; (5) private nuisance; (6)

26   nuisance per se; (7) contribution; (8) indemnification; (9) continuing trespass; (10) Water Code §

27   13350; (11) waste; (12) public nuisance; (13) public nuisance per se; (14) declaratory relief; and

28   (15) dangerous condition of public property.  Before the Court are three motions to dismiss and

1  one motion to join a necessary party, which have been brought by three defendants – the City,

2  Cal Water, and Martin.  For the reasons stated below, the motions to dismiss will be granted, but

3  the motion to join will be denied.

4                                                     **BACKGROUND**

5           From the TAC, Coppola owns the real property and the dry cleaning business, One Hour

6  Martinizing, located at 717 West Main Street ("717 W. Main"), Visalia, California.

7           Since 1995, Martin has owned the real property located at 110 North Willis Street ("110

8  N. Willis"), Visalia, California.  110 N. Willis currently houses office space and is located within

9  0.08 miles of 717 W. Main.  Millers Dry Cleaners previously operated at 110 N. Willis and was

10 owned by Defendants Harley and Cheryl Miller.  Based on judicially noticed documents, Millers

11 Dry Cleaners began operation in 1959.  See Martin Request For Judicial Notice ("Martin RJN")

12 Ex. C § 2.3.  Millers Dry Cleaners is no longer in operation at 110 N. Willis.

13          At 119 South Willis Street ("119 S. Willis"), Visalia, California is another dry cleaning

14 facility, Paragon Cleaners.  119 S. Willis is located 0.1 miles from 717 W. Main.[1]

15          Cal Water owns and operates public drinking water systems throughout California,

16 including the City.  Cal Water owned and operated Well CWS 02-03 ("the Well") until 2005, at

17 which time it was  abandoned by Cal Water.  The Well is adjacent to 717 W. Main.

18          On October 28, 2009, the California Department of Toxic Substances Control ("DTSC")

19 informed Coppola that it was investigating the occurrence of tetrachloroethylene, also known as

20 perchloroethylene ("PCE"), in the soil and groundwater at 717 W. Main.  PCE is a hazardous

21 substance.[2]  Apparently, it was later determined that the soil and groundwater both at and near

22 717 W. Main was contaminated with PCE.

23          Coppola alleges that the PCE was released due to the dry cleaning activities at 119 S.

24 Willis and 110 N. Willis.  Coppola also alleges that the City owns and operates the sewer system

25 at and around 717 W. Main.  The operation of the sewer system led to the release of PCE.  The

26

27          [1]The current and former owners of 119 S. Willis and Paragon Cleaners are named as defendants.

28          [2]PCE is a non-naturally-occurring, chlorinated, liquid chemical solvent that is commonly used in the dry
cleaning industry.  See Vine St., LLC v. Keeling, 460 F.Supp.2d 728, 733 (E.D. Tex. 2006); Magistrini v. One Hour
Martinizing Dry Cleaning, 18 F.Supp.2d 584, 589 n.3 (D. N.J. 2002).

sewer main and appurtenances from 717 W. Main have breaks, cracks, leaks, sags, and/or defective joints, which permitted the PCE to escape and spread into the environment.  Finally, Coppola contends that Cal Water's operation of the Well led to the release of PCE.  Prior to Cal Water abandoning the Well, PCE concentrations were above the Method Detection Limit.  Cal Water's operation of the Well caused PCE to move to previously uncontaminated areas beneath the water table, which exacerbated the contamination plume.

Coppola seeks damages from the Defendants, including contribution and indemnification, associated with soil and groundwater contamination.

## **LEGAL FRAMEWORK**

Under Federal Rule of Civil Procedure 12(b)(6)**,** a claim may be dismissed because of the plaintiff's "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  A dismissal under Rule 12(b)(6) may be based on the lack of a cognizable legal theory or on the absence of sufficient facts alleged under a cognizable legal theory.  Johnson v. Riverside Healthcare Sys., 534 F.3d 1116, 1121 (9th Cir. 2008); Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  In reviewing a complaint under Rule 12(b)(6), all allegations of material fact are taken as true and construed in the light most favorable to the non-moving party.  Marceau v. Blackfeet Hous. Auth., 540 F.3d 916, 919 (9th Cir. 2008); Vignolo v. Miller, 120 F.3d 1075, 1077 (9th Cir. 1999).  However, the Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  In re Gilead Scis. Sec. Litig., 536 F.3d 1049, 1056-57 (9th Cir. 2008); Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001).  To "avoid a Rule 12(b)(6) dismissal, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009); see Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 129 S.Ct. at 1949.  The Ninth Circuit has explained *Iqbal* and *Twombly*:

First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must

> contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively.  Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.

Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).  In deciding whether to dismiss a claim under Rule 12(b)(6), the Court is generally limited to reviewing only the complaint, but it may take judicial notice of public records outside the pleadings, review materials which are properly submitted as part of the complaint, and review documents that are incorporated by reference in the Complaint if no party questions their authenticity.  See Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005); Lee v. City of Los Angeles, 250 F.3d 668, 688-89 (9th Cir. 2001).  If a Rule 12(b)(6) motion is granted, "[the] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."  Lopez v. Smith, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc).  In other words, leave to amend need not be granted where amendment would be futile.  Gompper v. VISX, Inc., 298 F.3d 893, 898 (9th Cir. 2002).

**I.**      **Martin's Motion To Dismiss**

    1.      1st Cause of Action – CERCLA

    *Defendant's Argument*

       Martin argues that Coppola has failed to properly allege a CERCLA § 9607(a) claim for several reasons.  First, there are no facts alleged that show a release or a threatened release of any hazardous substance from Martin's property.[3]  Second, Coppola has not alleged that a release or threatened release caused Coppola to incur response costs that were necessary and consistent with the national contingency plan.  That is, there is no nexus between any release from the Martin property and the costs incurred by Coppola.  Third, the TAC is little more than a bare recitation of legal elements that do not show what, where, or when hazardous substances were released from the Martin property.  Fourth, Coppola is barred from asserting a cause of action

---

[3] Martin also argues that, after an investigation, the EPA determined that there was no evidence to establish that a release of hazardous substances occurred from Martin's property.  The Court will address the EPA determination in its discussion of the negligence cause of action.

4

under § 9607(a), but instead is limited to contribution under § 9613(f), because the costs incurred by Coppola were compelled by a settlement/administrative order. Finally, because the § 9607(a) claim fails, the dependent § 9613(g)(2) claim also fails.

*Plaintiff's Opposition*

Coppola argues that a prima facie § 9607(a) case has been properly alleged. The TAC alleges that 110 N. Willis is a facility. The TAC alleges that a release of hazardous substances occurred during the operations of Cheryl and Harley Miller. The TAC alleges that DTSC was investigating the presence of hazardous substances at 717 W. Main and that necessary response costs, including investigative and remediation expenses, were incurred pursuant to DTSC oversight. Martin is the current owner of 110 N. Willis. Finally, because the TAC properly alleges a § 9607(a) claim, a claim for declaratory relief under § 9613(g) is proper.

Coppola also argues that they voluntarily entered into the administrative order with DTSC and without resolution of their liability. Because the order was voluntary and no liability was resolved, § 9613(f) does not apply.

*Legal Standards*

a.   CERCLA § 9613(f)(3)(B)

Section 9613(f)(3)(B) permits a "'person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement' to seek contribution from any person who has not so resolved their liability." Morrison Enters., LLC v. Dravo Corp., 638 F.3d 594, 603 (8th Cir. 2011). Although the Ninth Circuit does not appear to have addressed the issue, most courts hold that persons who have resolved their CERCLA liability to the United States or a State in an administrative or judicially approved settlement may only bring a contribution claim under § 9613(f), and may not bring a claim under § 9607(a). E.g. Bernstein v. Bankert, 702 F.3d 964, 978-79 (7th Cir. 2012). However, in order for § 9613(f)(3)(B) to apply, the purported settlement must resolve CERCLA liability, resolution of only state law liability is insufficient. See W.R. Grace & Co. -- Conn. v. Zotos Int'l, Inc., 559 F.3d 85, 91 (2d Cir. 2009); Consol. Edison Co. of N.Y., Inc. v. UGI Utils., Inc., 423 F.3d 90, 95-96 (2d Cir. 2005); Trinity Indus. v. Chi. Bridge &

Iron Co., 867 F. Supp. 2d 754, 761 (W.D. Pa. 2012); Differential Development-1994, Ltd. v. Harkrider Distrib. Co., 470 F. Supp. 2d 727, 739 & n.13 (S.D. Tex. 2007).

  b. CERCLA § 9607(a)

  To establish a prima facie claim for recovery of response costs under § 9607(a), a private-party plaintiff must demonstrate: (1) the site on which the hazardous substances are contained is a "facility," as defined by  CERCLA § 9601(9); (2) a "release" or "threatened release" of any "hazardous substance" from the facility has occurred; (3) such "release" or "threatened release" has caused the plaintiff to incur response costs that were "necessary" and "consistent with the national contingency plan"; and (4) the defendant is within one of four classes of persons subject to the liability provisions of § 9607(a).  City of Colton v. Am. Promotional Events, Inc.-West, 614 F.3d 998, 1002-03 (9th Cir. 2010); Carson Harbor Village, Ltd. v. Unocal Corp., 270 F.3d 863, 870-71 (9th Cir. 2001).  A "release" means "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment . . . ."  42 U.S.C. § 9601(22).  CERCLA imposes strict liability for environmental contamination upon four broad classes of "potentially responsible parties":

  (1) the owner and operator of a vessel or a facility;

  (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of;

  (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances; and

  (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . . .

42 U.S.C. § 9607(a)(1)-(4); Burlington Northern & Santa Fe Ry. v. United States, 556 U.S. 599, 608-09 (2009).  CERCLA's provisions are to be given a liberal construction and interpretation. See Hanford Downwinders Coalition v. Dowdle, 71 F.3d 1469, 1481 (9th Cir. 1995); 3550

6

1    Stevens Creek Assocs. v. Barclays Bank, 915 F.2d 1355, 1363 (9th Cir. 1990).

2           A plaintiff need not allege the particular manner in which a "release" or "threatened

3    release" has occurred, but a plaintiff must describe the specific response costs that have been

4    incurred.  Ascon Properties, Inc. v. Mobil Oil Co., 866 F.2d 1149, 1153-54 (9th Cir. 1989).  A

5    private plaintiff (i.e. not the United States, a State, or an Indian Tribe) must prove that the

6    response costs are consistent with the national contingency plan.  Fireman's Fund Ins. Co. v. City

7    of Lodi, 302 F.3d 928, 950 (9th Cir. 2002); Washington Dept. of Transp. v. Washington Natural

8    Gas Co., 59 F.3d 793, 799-800 (9th Cir. 1995).  "Response costs are considered 'necessary'

9    when 'an actual and real threat to human health or the environment exists,'" and are considered

10   "'consistent with the [national contingency plan] if the action, when evaluated as a whole, is in

11   substantial compliance with it."  City of Colton, 614 F.3d at 1003.  Further, a complaint should

12   include a description of the "facility" (including the location and activity of the "facility"), the

13   kind(s) of hazardous substances that were "released" or are "threatened to be released" from the

14   "facility," the time frame of any releases, arrangements, or disposals, and, if known, whether a

15   site has been declared a hazardous waste site.  See 42 U.S.C. § 9607(a); Ascon Properties, 866

16   F.2d at 1156; Arkema, Inc. v. Anderson Roofing Co., 719 F.Supp.2d 1318, 1332 (D. Or. 2010).

17   Finally, the complaint should allege sufficient facts to show that a defendant is one of the four

18   classes of "potentially responsible parties."  See Long Beach Unified Sch. Dist. v. Dorothy B.

19   Godwin Living Trust, 32 F.3d 1364, 1366-70 (9th Cir. 1994) (upholding Rule 12(b)(6) dismissal

20   where the owner of an easement was not one of the four types of potentially responsible parties).

21           *Discussion*

22                a.      Application of § 9613(g)(2)

23           Coppola entered into an Imminent and Substantial Endangerment Order ("Consent

24   Order") with DTSC in June 2011.  See Martin RJN Ex. A.  The Consent Order explains the

25   DTSC's statutory authority, identifies PCE as a hazardous substance that is endangering the area,

26   requires studies and clean up efforts by Coppola, and provides for penalties for non-compliance.

27   Nevertheless, the Consent Order does not appear to resolve or even address CERCLA liability.

28

7

1  See id.  It appears that the Consent Order mentions CERCLA twice.  See id. at ¶¶ 5.2, 7.0.[4]

2  Those paragraphs deal with either required studies (¶ 5.2) or the contents of defenses to be

3  included as part of a notice of intent to comply (¶ 7.0).  Neither paragraph addresses CERCLA

4  liability.  See id.  Further, the Consent Order states that it does not constitute "a satisfaction or

5  release from liability," and that DTSC expressly does not waive the right to take "any further

6  actions authorized by law."  See id. at ¶¶ 6.9, 6.15.  Without language that actually deals with

7  CERCLA liability, the Consent Order at best appears to address only state law issues.[5]  Because

8  Martin has not shown that the Consent Order settles any CERCLA liability to the state of

9  California, § 9613(f)(3)(B) does not apply and dismissal is inappropriate.  See W.R. Grace, 559

10  F.3d at 91; Trinity Indus., 867 F.Supp. 2d at 761.

11                    b.        Sufficiency of Allegations for § 9607(a) Liability

12            With respect to the first element, the TAC alleges that 110 N. Willis was once an

13  operational dry cleaning business, and is a "facility" as defined by § 9601(14).  See TAC ¶¶ 24,

14  25, 42.  The term "facility" is broadly defined and includes "any building, structure, installation,

15  equipment, pipe, pipeline (including any pipe into a sewer or publicly owned treatment works),

16  well, pit, pond, etc."  42 U.S.C. § 9601(9).  Martin does not challenge the adequacy of these

17  allegations, nor does Martin argue that 110 N. Willis is not a "facility."  Accordingly, the first

18  element has been adequately pled.[6]  See Ascon Properties, 866 F.2d at 1156.

19            As to the second element, the TAC alleges that hazardous substances were released at 110

20  N. Willis and that those hazardous substances spread to 717 N. Main.  See TAC ¶¶ 50, 51.

21

22        [4]The Consent Order is 27 pages, and the parties have cited only a handful of paragraphs.  The paragraphs
    cited by the Court do not deal with CERCLA liability, and the Court's limited review of the Consent Order did not
23  reveal a paragraph that resolved CERCLA liability.  It is the parties' obligation to point the Court to all relevant
    paragraphs.  Cf. Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003).

24        [5]In light of Paragraphs 6.9 and 6.15, it is doubtful that the Consent Order settles state law liability.  Be that
    as it may, because the relevant issue is whether CERCLA liability is settled, the Court need not interpret the Consent
25  Order at this time.

26        [6]The Court notes that the Consent Order also shows that 717 W. Main is the subject of a regulatory
    endangerment determination.  Cf. Martin RJN Ex. A with Ascon Properties, 866 F.2d at 1156 (noting that the
27  plaintiff had alleged that the "facility" had been declared a hazardous waste site).  There is no indication that a
    similar determination has been made as to 110 N. Willis.  If Coppola knows that a similar determination has been
28  made as to 110 N. Willis, or to any other of the relevant "facility" in this case, then Coppola should so allege in an
    amended complaint.  See Ascon Properties, 866 F.2d at 1156.

                                                        8

Coppola need not allege the precise manner of the release. See Ascon Properties, 866 F.2d at 1153. However, there is no time frame alleged for when the releases occurred. At the pleading stage, a time frame need not be alleged with pinpoint precision, but a general time frame, to the best of Coppola's ability, should be included. Cf. id. at 1156. Additionally, the TAC alleges that Coppola received a letter about PCE contamination, that PCE is located at 110 N. Willis, and that PCE is a hazardous substance. See TAC ¶¶ 19, 42. The only hazardous substance identified in the Consent Order is PCE. See Martin RJN Ex. A at §§ 2.4, 2.5. Despite this, the first cause of action contains numerous allegations about releases and disposal of "hazardous substances." The use of the plural "substances," without any identification of what other hazardous substance(s) may be at issue, is insufficient. It is entirely unclear what other hazardous substances could be at issue. Although the Court has no difficulty in determining that PCE is a hazardous substance that is at issue, that is all that can be said. In other words, PCE is the only hazardous substance in the TAC for which there is fair notice. If Coppola has reason to believe that hazardous substances other than PCE are it issue, then they should expressly identify those substances. Without further identification, the plural term "hazardous substances" is ambiguous and an insufficient legal conclusion. For these reasons, the second element is inadequately pled.

With respect to the third element, the TAC alleges that hazardous substances spread from 110 N. Willis to 717 N. Main, and that Coppola has incurred and will incur response costs. See TAC ¶¶ 50, 51, 56. The TAC identifies the response costs as including fees for removal, clean up, and investigation, see TAC ¶ 56, each of which are among the costs that are recoverable under CERCLA. See 42 U.S.C. § 9601(23); Ascon Properties, 866 F.2d at 1154; Wikland Oil Terminals v. Asarco, Inc., 792 F.2d 887, 892 (9th Cir. 1986). The TAC also alleges that the response costs are a result of contamination to Coppola's property by the defendants, and that the response costs are necessary and consistent with the national contingency plan. See id. at ¶¶ 56, 57. Finally, the TAC alleges that Coppola was informed of the PCE contamination by the DTSC in October 2009, and the Consent Order shows that Coppola agreed to remediation efforts at

what appears to be 717 W. Main.[7]  See id. at ¶ 19; Martin RJN Ex. A §§ 1.2, 5.1.1.  These

allegations, combined with the Consent Order, are sufficient to allege that Coppola has incurred

response costs that are necessary and consistent with the national contingency plan, and that

those response costs were undertaken due to releases that occurred at 110 N. Willis.  The third

element has been adequately pled.

　　　As to the fourth element, the First Cause of Action generally states that each defendant

owns or operates a facility, arranged for the disposal or treatment of hazardous substances, and/or

accepted hazardous substances for transport.  See TAC ¶ 45.  Specifically as to Martin, the First

Cause of Action alleges that Martin owned 110 N. Willis at the time hazardous substances were

released, arranged for the disposal and release of hazardous substances, and was in a position to

prevent tenants from releasing hazardous substances.  See id. at ¶ 53.  These allegations seem to

indicate that Coppola is alleging that Martin is a potentially responsible party under § 9607(a)(2)

and § 9607(a)(3).  However, as part of the general allegations, the TAC also alleges that Martin

owned 110 N. Willis from 1995 to the present.  See id.  at ¶ 13.  That allegation could support

liability under § 9607(a)(1).  See California Dep't of Toxic Substances Control v. Hearthside

Residential Corp., 613 F.3d 910, 912-13 (9th Cir. 2010) (holding that § 9607(a)(1) applies only

to current owners or operators).  The TAC's allegations are somewhat ambiguous as to which

category or categories of potentially responsible persons Martin may be.  In its motion to dismiss,

Martin argued that Coppola had not alleged a prima facie CERCLA case and, of particular

relevance, that there were no facts alleged to show that Martin arranged for or consented to the

disposal of any hazardous substance.  In opposition, Coppola only argued that Martin was a

potentially responsible person under § 9607(a)(1) as an owner of a facility.  See Doc. No. 100 at

5:26-6:12.  Coppola did not attempt to classify Martin as any other type of potentially responsible

person, or to defend any other allegations regarding disposal or arrangement by Martin.  The

Court takes Coppola's opposition to mean that they are only attempting to utilize § 9607(a)(1)

against Martin.  Cf. Cortez v. New Century Mortg. Corp., 2012 U.S. Dist. LEXIS 13469, *12 n.3

---

[7]The "body" of the Consent Order does not give an address, but the style of the Consent Order identifies 717 W. Main, the "site" is described through an APN number, and the site is further described as being on the southeast corner of W. Main.  See Martin RJN Ex. A.

(N.D. Cal. Feb. 3, 2012) (holding that the plaintiff's failure to respond to an argument that characterized the nature of a claim was a concession of the defendant's argument); In re Fresh & Process Potatoes Antitrust Litig., 834 F.Supp.2d 1141, 1169 (D. Idaho 2011) (same).  With this understanding of the TAC, the allegation that Martin has owned 110 N. Willis from 1995 to the present is sufficient to allege liability under § 9607(a)(1).  See Hearthside, 613 F.3d at 912-13. Nevertheless, there remains the problem of the allegations in ¶ 53.  Because this cause of action has not been adequately pled irrespective of ¶ 53, the Court will require Coppola to eliminate the allegations that do not actually reflect the potentially responsible person theories that are being pursued against Martin (and all other defendants).  In particular, ¶ 53 should be changed to allege liability under § 9607(a)(1), and not liability under §§ 9607(a)(2) or (a)(3).[8]

In sum, the TAC does not sufficiently allege the second element of a prima facie case, and there are extraneous allegations pertaining to the fourth element.  Martin's motion to dismiss this first cause of action will be granted.  Because it is not apparent that amendment would be futile, dismissal will be with leave to amend.[9]  See Gompper, 298 F.3d at 898.

c.    Declaratory Relief Under § 9613(g)

Coppola defends the request for declaratory relief by contending that it has adequately alleged a CERCLA claim under § 9607(a).  However, as discussed above, Coppola has not adequately alleged a § 9607(a) claim.  In the absence of a valid § 9607(a) claim, declaratory relief under § 9613(g)(2) is unavailable.  Union Station Assocs. LLC v. Puget Sound Energy, Inc., 238 F.Supp.2d 1226, 1230 (W.D. Wash. 2002); see also Chevron Envl. Mgmt. Co. v. BKK Corp., 880 F.Supp.2d 1083, 1091 (E.D. Cal. 2012).  Dismissal of the request for declaratory relief is appropriate.  See id.

2.    2nd Cause of Action – HSAA

---

[8]If Coppola intends to pursue liability through either § 9607(a)(2) or § 9607(a)(3), then an amended complaint should expressly state the potentially responsible person theory relied upon, and also contain sufficient factual allegations that plausibly support the theory and are consistent with this order.

[9]As part of its opposition, Coppola requests leave to amend if dismissal is granted.  Coppola states that it has further information from a former employee of Miller Dry Cleaners, and know the nature of spills, the equipment used, and the disposal practices at issue.  See Doc. No. 100 at 19:6-13.  To further the litigation process, Coppola should include this new information in an amended complaint.

1        *Defendant's Argument*

2        Martin argues that each of its CERCLA arguments also applies to the HSAA cause of

3   action.  Further, CERCLA precludes a double recovery.  Because Coppola's HSAA claims do

4   not have a separate and independent basis from the CERCLA claims, no recovery is permitted

5   under the HSAA.  The HSAA claims should be dismissed without leave to amend.

6        *Plaintiff's Opposition*

7        Coppola argues that, because its § 9607(a) claim is properly alleged, so too is the HSAA

8   cause of action.  As to Martin's double recovery argument, the case relied upon by Martin dealt

9   with a findings of fact and conclusions of law following a bench trial, it did not deal with the

10  sufficiency of a complaint.  At the pleading stage, a party is entitled to allege as many separate

11  claims as may exist, irrespective of consistency.  Alternative pleading is permitted.  The

12  prohibition against double recovery does not apply at this stage of the proceedings.

13       *Discussion*

14        The HSAA is "California's versions of [CERCLA]."  <u>Ameron Inter'l Corp. v. Insurance

15  Co. of Pa.</u>, 50 Cal.4th 1370, 1379 (2010).  Although the HSAA is not identical to CERCLA,

16  <u>Foster-Gardner, Inc. v. National Union Fire Ins. Co.</u>, 18 Cal.4th 857, 865 n.4 (1998), the HSAA

17  expressly incorporates the same liability standards, defenses, and classes of responsible persons

18  as those set forth in CERCLA.  <u>See</u> <u>Gregory Vill. Partners, L.P. v. Chevron U.S.A., Inc.</u>, 805

19  F.Supp.2d 888, 898 (N.D. Cal. 2011); <u>United Alloys, Inc. v. Baker</u>, 797 F.Supp.2d 974, 1004-05

20  (C.D. Cal. 2011); <u>Adobe Lumber, Inc. v. Hellman</u>, 658 F.Supp.2d 1188, 1192-93 (E.D. Cal.

21  2009).  As such, the HSAA is generally interpreted consistent with CERCLA.  <u>Untied Alloys</u>,

22  797 F.Supp.2d at 1004-05; <u>Adobe Lumber</u>, 658 F.Supp.2d at 1192-93.  Here, for the same

23  reasons that Coppola's CERCLA cause of action fails, so too fails the HSAA.

24        As for Martin's request that dismissal be without leave to amend, CERCLA prohibits a

25  person from recovering compensation for the same removal costs or damages or claims pursuant

26  to other state or federal law.  42 U.S.C. § 9614(b); <u>Boeing Co. v. Cascade Corp.</u>, 207 F.3d 1177,

27  1189 (9th Cir. 2000).  That is, CERCLA prohibits a party from obtaining a double recovery.

28  <u>United Alloys</u>, 797 F.Supp.2d at 1005.  Courts appear to be split on the issue of whether

12

CERCLA's double recovery bar requires dismissal of related state causes of action under Rule 12(b)(6).  Cf. Board of County Comm'rs of La Plata Cnty v. Brown Group Retail, Inc., 598 F.Supp.2d 1185, 1193 (D. Colo. 2009) (denying Rule 12(b)(6) motion and permitting the plaintiff to plead both state and CERCLA claims) with Ashtabula River Corp. Group II v. Conrail, Inc., 549 F.Supp.2d 981, 985-86 (N.D. Ohio 2008) (granting Rule 12(b)(6) motion and prohibiting state law claim due to operation of CERCLA's double recovery bar).  However, where a plaintiff seeks damages/costs under state law that do not overlap and are separate from CERCLA damages/costs, courts will not dismiss the state law claims .  See City of Waukegan v. National Gypsum Co., 587 F.Supp.2d 997, 1011 (N.D. Ill. 2008); New York v. Ametek, Inc., 473 F.Supp.2d 432, 433-34 (S.D. N.Y. 2007).

Coppola recognizes that it cannot obtain a double recovery for the same recoverable costs under both CERCLA and HSAA.  See Doc. No. 100 at 12:12-19.  However, neither Martin nor Coppola explain whether Coppola is seeking damages under HSAA that are different from those sought under CERCLA.  In the absence of clarification on the damages issue, the Court will not permanently dismiss the HSAA claims due to CERCLA's double recovery bar.  For now, because it is unclear whether Coppola is seeking a recovery for separate, non-overlapping costs/damages, the Court will dismiss the HSAA claim with leave to amend.

### 3.    3rd Cause of Action – Negligence

*Defendant's Argument*

Martin makes several arguments against this cause of action.  First, Coppola has not alleged any facts to show that Martin owed them a duty or that Martin somehow breached that duty.  There are no facts alleged that show when, how, or in what way Martin acted negligently.  Second, Coppola has not adequately addressed an EPA report that shows that there was no discharge from the 110 N. Willis.  Third, Coppola seeks damages for the cost of remediation efforts, which is pure economic loss.  Thus, the economic loss doctrine bars Coppola from recovering damages.

*Plaintiff's Opposition*

Coppola argues that the TAC alleges that Millers Dry Cleaners discharged hazardous

substances.  There has been down gradient migration to 717 N. Main.  Martin was in a position to prevent the release of hazardous substances.  Martin knew or should have known that PCE is hazardous and dangerous and that there was a plume under the City.  Martin had a duty to ensure proper clean up of spilled solvents and to ensure that contamination discharged from the 110 N. Willis did not escape.  However, Martin was negligent in its operation of 110 N. Willis because it allowed hazardous substances to escape, which caused injury to the environment and to Coppola.

With respect to the EPA determination, the EPA states that PCE was found in groundwater samples collected from 110 N. Willis's down gradient well significantly above background.  Further, in the Preliminary Assessment of 110 N. Willis by Weston Solutions, PCE was detected at 9.1 micrograms per liter (a concentration above "actionable limits") within 50 feet west of the site.  This indicates a release from 110 N. Willis above action levels.  Although the EPA disclaims the findings of the Preliminary Assessment, EPA acknowledged that no additional steps were necessary unless new information that warranted further review was discovered.  Although unknown to EPA, Coppola has discovered evidence that former Millers Dry Cleaners employees used and disposed of PCE at 110 N. Willis.  The EPA opinion does not by itself warrant dismissal as it appears that the inaction by EPA is at odds with its data.

### *Legal Standard*

"Negligence is the failure to use reasonable care to prevent harm to oneself or to others. . . .  A person is negligent if he or she does something that a reasonably careful person would not do in the same situation or fails to do something that a reasonably careful person would do in the same situation."  Raven H. v. Gamette, 157 Cal.App.4th 1017, 1025 (2007); Judicial Council of California Civil Jury Instructions ("CACI") (Fall 2012 Ed.) – § 401.  Thus, the elements of actionable negligence are: (1) a legal duty to use due care; (2) a breach of that duty; (3) causation; and (4) damages.  See Ladd v. County of San Mateo, 12 Cal.4th 913, 917 (1996); Brown v. Ransweiler, 171 Cal.App.4th 516, 534 (2009).  Further, "economic loss alone, without physical injury, does not amount to the type of damage that will cause a negligence or strict liability cause of action to accrue."  County of Santa Clara v. Atlantic Richfield Co., 137 Cal.App.4th 292, 318

(2006); see also Zamora v. Shell Oil Co., 55 Cal.App.4th 204, 210 (1997).

*Discussion*

　　　　a.　　EPA Documents

　　The parties have submitted reports, letters, and assessments from the EPA related to 110 N. Willis. Both parties request that the Court take judicial notice of the documents as government records. Because neither side objects to the requests for judicial notice, the Court will grant the motions and take judicial notices of the EPA documents.

　　Coppola's RJN Ex. A is a July 2008 Preliminary Assessment and a September 2008 Remedial Site Assessment Decision relating to 110 N. Willis that was performed by Weston Solutions. See Coppola RJN Ex. A. The Preliminary Assessment indicates that a groundwater sample collected 50 feet from 110 N. Willis contained 9.1 micrograms per liter of PCE. See id. at p. 7. Based in part on the 9.1 reading, the Remedial Site Assessment Decision concluded that an additional assessment was needed under CERCLA and that the matter was a "higher priority." See id. at p. 11. It is unknown whether Martin ever saw the Preliminary Assessment or corresponding Remedial Site Assessment Decision.

　　Martin's RJN Ex. B is an October 2009 letter from EPA to Martin. See Martin's RJN Ex. B. In pertinent part, the letter stated, "Based on currently available information contained in the enclosed report, EPA has determined that no further assessment is warranted. Although EPA has determined that this site does not qualify for Superfund listing, the State of California may require further assessment or cleanup of this site under State law." Id. The letter enclosed an August 2009 Remedial Site Assessment Decision. See id. at p. 4. The Assessment Decision indicates that further remedial site assessment under CERCLA is not required because no further remedial action is planned. See id. In pertinent part, the Assessment Decision stated that samples were taken at 110 N. Willis in 2009. See id. PCE was detected at concentrations below background in soil samples drilled from the site, there was no evidence of a release of PCE from the site to surface water, and although PCE was detected from the onsite down-gradient well, the concentration was below the regulatory limit for drinking water. See id. The Assessment Decision concluded in part, "no additional remedial steps under the Federal Superfund program

15

1   will be taken at the site unless new information warranting superfund consideration . . . are

2   disclosed. . . .   Archived sites may be returned to the CERCLIS site inventory if new information

3   necessitating further Superfund consideration is discovered."  Id.

4        Martin argues that the 2009 EPA letter determined that there were no PCE discharges

5   from 110 N. Willis, and that this finding should preclude not only the negligence claim, but the

6   lawsuit as a whole.  See Martin RJN Ex. B.  There is no doubt that the 2009 EPA letter is

7   significant.  The letter raises substantial questions about whether Martin should have known of

8   PCE releases, whether a failure to act prior to October 2009 was reasonable given the low and

9   acceptable levels of PCE actually detected, and whether Martin was reasonable in not acting after

10  October 2009 because the EPA determined that the detected PCE at 110 N. Willis was below

11  regulatory limits.  However, the parties have not adequately established what precise effect the

12  2009 EPA letter (or any EPA document) should have in this case.  Citation to the EPA

13  documents, coupled with arguments that are unsupported by citation to authority, is not helpful.

14       In the absence of cited authority, the Court will not hold that the 2009 EPA letter *per se*

15  precludes litigation against Martin.  The 2009 EPA letter's final paragraph stated that the

16  decision was based on "the currently available information," and the 2009 Assessment Decision

17  states that sites may be returned for consideration "if new information necessitating further

18  Superfund consideration is discovered."  See Martin RJN Ex. B.  This indicates that EPA's

19  determination is subject to change if new information is discovered.  Additionally, the 2009

20  Assessment Decision indicated that PCE was detected in both soil samples and samples from the

21  down-gradient well collected at 110 N. Willis.  Only with respect to the surface water was there

22  no evidence of PCE.  See id.  Although the levels of PCE were not sufficient to warrant further

23  assessment and were within regulatory limits, see id., PCE was nevertheless found, meaning that

24  PCE was released to some degree at 110 N. Willis.

25       Given that the 2009 EPA letter indicates that its determinations are subject to

26  reconsideration based on new information, and considering the absence of any authority as to the

27  effect or authority that the 2009 EPA letter has, the Court will not preclude litigation *per se* based

28  on that letter.  Dismissal without leave to amend based on the 2009 EPA letter is inappropriate.

Nevertheless, the 2009 EPA letter appears quite significant and the Court will consider all of the EPA documents in evaluating the TAC's allegations.

### b.   Negligence Allegations

The TAC alleges sudden and accidental releases of PCE occurred that resulted in the contamination of 717 N. Main.  See TAC ¶ 66.  The TAC alleges that these releases are attributable to all Defendants' negligence in failing to properly use solvents, supervise operation of equipment, and clean up spilled solvents.  See id.  The TAC also alleges that all defendants breached a duty by causing, permitting, and/or contributing to the contamination at 717 N. Main and other nearby land and water.  See TAC ¶ 67.  Finally, the TAC alleges that, as a proximate result of all Defendants' negligence, Coppola has been damaged, including costs to respond to the hazardous substance contamination in and around 717 N. Main.  See id. at 68.

A fair reading of these allegations indicates that Coppola is identifying duties to use due care to not contaminate 717 N. Main and surrounding land and water, and also duties to use due care to properly dispose of and clean up hazardous substances.  See TAC ¶ 66; see also Walnut Creek Manor, LLC v. Mayhew Center, LLC, 2010 U.S. Dist. LEXIS 22988, *4-*5 (N.D. Cal. Feb. 22, 2010).  Thus, the Court disagrees with Martin that the TAC fails to identify any duty.  Further, the TAC fairly alleges that Coppola suffered damages as a proximate result of Defendants' conduct.  See TAC ¶ 68.  Despite Martin's argument that there is only economic loss and not physical injury alleged, the negligence cause of action indicates that there is PCE "contamination in" 717 N. Main, and allegations incorporated by reference discuss contamination of soil and groundwater spreading to other properties, including 717 N. Main.  TAC ¶¶ 24, 25, 66, 68.  A fair reading of these allegations is that the land of 717 N. Main has been contaminated.  The chemical contamination of a person's land is sufficient to show a physical injury to the land.  See California Dept. of Toxic Substances Control v. Payless Cleaners, 368 F.Supp.2d 1069, 1084 (E.D. Cal. 2005); San Francisco Unified Sch. Dist. v. W.R. Grace & Co., 37 Cal.App.4th 1318, 1327 (1995).  Nevertheless, there are problems with the breach of duty element.

The TAC and the opposition indicate that dry cleaning activities led to the release of PCE

and the contamination of 717 N. Main.  See TAC ¶¶ 24, 25; Doc. No. 100 at 13:9-10.  In one of the paragraphs incorporated by reference, Coppola alleges that Martin was in a position to stop its tenants' disposal of hazardous substances.  See TAC ¶ 53.  Martin's reply indicates that Millers Dry Cleaners had ceased operations years prior to Martin's acquisition of 110 N. Willis, but does not cite anything in support of that assertion.  The TAC does not allege when Millers Dry Cleaners actually ceased operations, nor does it expressly allege that Millers Dry Cleaners or Harley Miller or Cheryl Miller were tenants of Martin.  Nevertheless, the TAC does state that Martin did not acquire 110 N. Willis until 1995, and judicially noticed documents show that 110 N. Willis is currently just office space and that Millers began their dry cleaning business in 1959.  See Martin RJN Ex. C § 2.4.  The judicially noticed documents, combined with Martin's assertion that it acquired the building after Millers Dry Cleaners ceased operations, raise questions about whether Millers Dry Cleaners or Harley Miller or Cheryl Miller were ever tenants of Martin.  If the Millers were never tenants, then there is no dry cleaning activity that Martin could have monitored.  Additionally, the 2009 EPA letter to Martin indicated that no further assessment of 110 N. Willis was warranted and that the site did not qualify for Superfund listing.  See Martin RJN Ex. B.  The 2009 EPA determination appears to be based on the fact the levels of PCE detected at 110 N. Willis were within regulatory limits.  See id. at p.4.

The 2009 EPA letter and the uncertain relationship between Martin and Millers Dry Cleaner raise the legitimate question of whether Martin knew or should have known that PCE was escaping from 110 N. Willis.  Upon first blush, doing nothing further regarding PCE in reliance on the 2009 EPA letter would appear to be reasonable because the levels detected at 110 N. Willis were within regulatory limits.[10]  Without more allegations indicating that Martin knew or should have known that PCE was escaping from 110 N. Willis and that Martin did not act

---

[10]It is true that the 2008 Preliminary Assessment by Weston found 9.1 micrograms 50 feet away from the site, and an additional assessment was ordered.  See Coppola RJN Ex. A.  However, the 2009 EPA decision was brought about directly by the 2008 Preliminary Assessment, was based on samples taken at the site and not 50 feet away (like the 2008 Assessment), the 2009 decision was also prepared by Weston, and there is no indication that Martin ever saw the 2008 Preliminary Assessment and corresponding decision.  See Martin RJN Exs. B, C.

reasonably to stop the escape, the TAC does not adequately allege a breach of duty.[11]   Further,

assuming that Millers were tenants of Martin, the TAC only indicates that Martin was in a

position to stop release.   Negligence is essentially the failure to act reasonably under the

circumstances.   See Raven H., 157 Cal.App.4th at 1025; CACI § 401.   Simply because an injury

occurs does not mean that a defendant acted unreasonably.   If Coppola intends to pursue a theory

that the Millers were tenants of Martin, it needs to expressly allege that fact, as well as

allegations that Martin retained sufficient control over 110 N. Willis that it could have, but did

not, reasonably monitor Millers.   Cf. Sisters of Notre Dame De Namur v. Garnett-Murray, 2012

U.S. Dist. LEXIS 78747, *24-*25 (N.D. Cal. June 6, 2012).   As it stands, the TAC does not

adequately allege a breach of the duty of due care by Martin.

In sum, the TAC does not adequately allege a breach of the duty of due care.   The Court

will not dismiss this cause of action, or the lawsuit as a whole, against Martin without leave to

amend.   However, any amended complaint should include allegations that plausibly indicate

unreasonable conduct by Martin, and that address the 2009 EPA letter.

4.   4th Cause of Action – Negligence Per Se

*Defendant's Argument*

Martin argues that Coppola fails to allege that they belong to a class of persons for which

the relevant statutes were designed to protect.   Further, there are no facts to show that Martin

caused the contamination of Coppola's property.   There are no allegations of how, what, or when

Martin contaminate 717 W. Main.

*Plaintiff's Opposition*

Coppola argues that they have properly alleged a negligence per se claim.   Coppola

argues that they are part of the class of persons the statutes were adopted to protect because the

statutes prohibit releasing hazardous substances into the environment.   Martin breached the

statutory duty when it released hazardous substances and allowed the continued release of PCE.

---

[11]Mental states may be alleged generally.   See Fed. R. Civ. Pro. 9(b); Reinhardt v. Gemini Motor Transp., 879 F.Supp.2d 1138, 1142 (E.D. Cal. 2012).   However, the levels of PCE detected in 2009 by the EPA/Weston tend to indicate that a reasonable person would not have known that significant amounts of PCE were escaping.   An amended complaint should include allegations that address the content and/or significance of the 2009 EPA letter.

19

*Legal Standard*

Negligence per se is not a separate cause of action, but is the application of an evidentiary presumption provided by California Evidence Code § 669.  Carson v. Depuy Spine, Inc., 365 Fed.Appx. 812, 815 (9th Cir. 2010); Quiroz v. Seventh Ave. Ctr., 140 Cal.App.4th 1256, 1285-86 (2006).  Under the negligence per se doctrine, "violation of a statute gives rise to a presumption of negligence in the absence of justification or excuse . . . ." Ramirez v. Nelson, 44 Cal.4th 908, 918 (2008).  To invoke the negligence per se doctrine, a plaintiff must allege that: (1) the defendant violated a statute, ordinance, or regulation; (2) the violation proximately caused injury; (3) the injury resulted from an occurrence that the enactment was designed to prevent; and (4) the plaintiff fits within the class of persons for whose protection the enactment was adopted. See Cal. Evid. Code § 669; Ramirez, 44 Cal.4th at 917-18; Newhall Land and Farming Co. v. Superior Court, 19 Cal. App. 4th 334, 347 (1993).  Even if the four requirements are satisfied, "this alone does not entitle a plaintiff to a presumption of negligence in the absence of an underlying negligence action." Quiroz, 140 Cal.App.4th at 1285; Rosales v. City of L.A., 82 Cal.App.4th 419, 429 (2000).

*Discussion*

There are problems with this claim.  First, there is not a viable negligence cause of action alleged against Martin.  As discussed above, the conduct that would constitute a breach of the duty of care is not adequately described.  In the parlance of the negligence per se doctrine, the TAC fails to adequately allege conduct that violates a particular enactment, i.e. a statute, regulation, or ordinance.  Second, the TAC identifies several statutes, but does not allege that Coppola is within the class of persons for whose protection the statutes were adopted.  Because the TAC does not contain factual allegations that demonstrate a violation of the particular statute relied upon, nor does it allege Coppola fits within the class intended to be protected by the statutes, dismissal with leave to amend is appropriate.

5.   5th, 6th, 9th, 12th, and 13th Causes of Action – Public & Private Nuisance Claims and Continuing Trespass

*Defendant's Argument*

Martin argues that there are no allegations that show it affirmatively created or assisted in

1   the creation of the alleged contamination.  Without such conduct, Martin cannot be liable for any

2   form of nuisance.

3       *Plaintiff's Opposition*

4       Citing *Leslie Salt Co. v. San Francisco*, 153 Cal.App.3d 605 (1984), Coppola argues that

5   their nuisance claims have been sufficiently pled.  The TAC alleges that the contamination is

6   abatable and Martin's failure to abate resulted in the spread of contamination.  Martin was in

7   sufficient control of 110 N. Willis and knew of the risks associated with PCE, and also knew of

8   the PCE plume under Visalia.  The nuisance was created by Martin when it failed to abate

9   contamination and let it migrate into the environment.

10      *Legal Standard*

11      California law defines a nuisance, in part, as "[a]nything which is injurious to  health . . .

12  or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to

13  interfere with the comfortable enjoyment of life or property . . . ."  Cal. Civ. Code § 3479.  A

14  public nuisance is "one which affects at the same time an entire community or neighborhood, or

15  any considerable number of persons, although the extent of the annoyance or damage inflicted

16  upon individuals may be unequal."  Cal. Civ. Code § 3480.  "A private person may maintain an

17  action for public nuisance, if it is specially injurious to himself, but not otherwise."  Cal. Civ.

18  Code § 3493.  A private nuisance is "a non-trespassory interference with the private use and

19  enjoyment of land."  San Diego Gas & Elec. Co. v. Superior Court, 13 Cal.4th 893, 937 (1996);

20  see also Monks v. City of Rancho Palos Verdes, 167 Cal.App.4th 263, 302 (2008).  "A nuisance

21  may be both public and private, but to proceed on a private nuisance theory, the plaintiff must

22  prove an injury specifically referable to the use and enjoyment of his or her land.  The injury,

23  however, need not be different in kind from that suffered by the general public."  Monks, 167

24  Cal.App.4th at 302; Koll-Irvine Center Property Owners Assn. v. County of Orange, 24

25  Cal.App.4th 1036, 1041 (1994).  "Where the nuisance alleged is not also a private nuisance as to

26  a private individual, [i.e.] where there is no allegation of an interference with a known property

27  right, he does not have a cause of action on account of a public nuisance unless he alleges facts

28  showing special injury to himself in person or property of a character different in kind from that

1   suffered by the general public." Birke v. Oakwood Worldwide, 169 Cal.App.4th 1540, 1549-50

2   (2009); see Venuto v. Owens-Corning Fiberglass Corp., 22 Cal.App.3d 116, 124 (1971).  Both

3   public and private nuisance claims require a showing of substantial and unreasonable

4   interference, either with a public right or with the enjoyment of a plaintiff's property.  City of Los

5   Angeles v. San Pedro Boat Works, 635 F.3d 440, 452 (9th Cir. 2011); People ex rel. Gallo v.

6   Acuna, 14 Cal.4th 1090 (1997) (public nuisance); San Diego Gas & Elec., 13 Cal.4th at 938

7   (private nuisance).  "[I]t is established that trespass and nuisance claims may include wrongful

8   entry or invasion by pollutants," including the migration of pollutants.  Martin Marietta Corp. v.

9   Insurance Co. of N.A., 40 Cal.App.4th 1113, 1132 (1995).

10         A defendant may be liable for a nuisance under one of three theories.  First, the defendant

11   creates or assists in the creation of the nuisance.  See Redevelopment Agency v. BNSF Ry., 643

12   F.3d 668, 673-77 (9th Cir. 2011); see also City of Modesto Redev. Agency v. Superior Ct., 119

13   Cal.App.4th 28, 38 (2006). "[C]onduct cannot be said to 'create' a nuisance unless it more

14   actively or knowingly generates or permits the specific nuisance condition."  BNSF, 643 F.3d at

15   674.  For liability based on creating or assisting in the creation of a nuisance, a defendant must

16   engage in active, affirmative, or knowing conduct, merely being a "but-for" cause of the nuisance

17   will not suffice.  Id. (discussing City of Modesto, 119 Cal.App.4th at 43 and Selma Pressure

18   Treating Co. v. Osmose Wood Preserving Co. of Am., 221 Cal.App.3d 1601, 1620 (1990)).

19   Second, the defendant unreasonably fails to abate a nuisance when he is in possession of land.

20   See BNSF, 643 F.3d at 675-77; San Pedro, 635 F.3d at 452-53; Restatement (Second) of Torts §

21   839.  Under this theory, the defendant must: (1) be in possession of the land; (2) know or should

22   know of an artificial condition and the nuisance (or an unreasonable risk of nuisance); (3) know

23   or should know that the nuisance exists without the consent of the afflicted persons; and (4) after

24   a reasonable opportunity, fail to take reasonable steps to abate the condition or protect those

25   afflicted against the nuisance.  See BNSF, 643 F.3d at 675-77; San Pedro, 635 F.3d at 452-53;

26   Restatement (Second) of Torts § 839.  Third, the defendant has a right of possession in land and

27   consents or unreasonably permits a third party to create a nuisance on the land.  See San Pedro,

28   635 F.3d at 452-53; Restatement (Second) of Torts § 838.  This theory relates to a defendant who

leases land to third parties.  See San Pedro, 635 F.3d at 453.  For liability under this theory, a plaintiff must show: (1) a third party is conducting an activity on the land that causes a nuisance; (2) the defendant knows or has reason to know that the activity is occurring and that it is causing a nuisance (or involves an unreasonable risk of nuisance); (3) the defendant consents to the activity of the third party or fails to exercise reasonable care to prevent the nuisance; and (4) the defendant has a right of possession in the land.  See id. Restatement (Second) of Torts § 838.

*Discussion*

Coppola relies on a citation to *Leslie Salt* that discussed nuisance liability under Restatement (Second) of Torts § 839.  See Leslie Salt, 153 Cal.App.3d at 619-20.  Section 839 reads:

> A possessor of land is subject to liability for a nuisance caused while he is in possession by an abatable artificial condition on the land, if the nuisance is otherwise actionable, and
>
> (a) the possessor knows or should know of the condition and the nuisance or unreasonable risk of nuisance involved, and
>
> (b) he knows or should know that it exists without the consent of those affected by it, and
>
> (c) he has failed after a reasonable opportunity to take reasonable steps to abate the condition or to protect the affected persons against it.

Restatement (Second) of Torts § 839 (1979); BNSF, 643 F.3d at 675; San Pedro, 635 F.3d at 453; Leslie Salt, 153 Cal.App.3d at 619-20.  This is a species of "possessor" liability that is separate from liability for creating or assisting in the creation of a nuisance.  See BNSF, 643 F.3d at 673-77.  Although the TAC sufficiently alleges that contamination is abatable,[12] the TAC does not otherwise support nuisance liability under Restatement § 839.

Section 839 "applies only when the defendant is 'in possession' of the subject property." San Pedro, 635 F.3d at 453.  Coppola appears to contend that the nuisance, i.e. contamination, was created due to dry cleaning activities.  However, there are no allegations that Martin was in

---

[12] Whether the contamination is actually abatable is unknown.  "Abatable" means "reasonably abatable" given considerations of cost and practicality.  BNSF, 643 F.3d at 675; Mangini v. Aerojet-Gen. Corp., 12 Cal.4th 1087, 1099-1100 (1996).  For purpose of Rule 8, an allegation that the contamination is abatable is sufficient.

23

1  possession of 110 N. Willis at any time while dry cleaning operations were occurring.  Martin is

2  not currently in possession of 110 N. Willis, rather the property is being used only for office

3  space.  While Millers Dry Cleaners at one time operated at 110 N. Willis, there are no allegations

4  that Martin was actually in possession of 110 N. Willis with Miller Dry Cleaners, and the TAC

5  does not actually allege that Miller Dry Cleaners was a tenant of Martin.  For purposes of

6  Restatement § 839, the TAC needs to allege that Martin was actually in possession of 110 N.

7  Willis while the nuisance was created.  See id.

8         Further, the TAC does not allege that Martin knew or reasonably should have known of

9  the nuisance or an unreasonable risk of nuisance, nor does the TAC allege that Martin had a

10  reasonable opportunity to abate the contamination nuisance or that Martin failed to take

11  reasonable steps to abate or protect against the nuisance.  See Restatement (Second) of Torts

12  § 839(a), (c).  Allegations that cover these aspects of § 839 are needed.  See id.; cf.  BNSF, 643

13  F.3d at 676-77 (finding no liability under this theory when defendant neither knew nor

14  reasonably should have known about the nuisance).  However, given the nature of the nuisance at

15  issue, and because Coppola has brought this lawsuit, it can reasonably be assumed that Coppola

16  did not consent to the creation of the nuisance.[13]

17         As for the continuing trespass cause of action, the failure to clean up contamination that

18  causes ongoing damage to property can constitute a continuing nuisance and a continuing

19  trespass.  See Rancho Viejo v. Tres Amigos Viejos, 100 Cal.App.4th 550, 561-62 (2002);

20  Resolution Trust Corp. v. Rossmoor Corp., 34 Cal.App.4th 93, 99 (1995).  Neither party makes

21  arguments that separate the two causes of action, and thus both parties intend that the same

22  arguments apply to both causes of action.  Therefore, for the same reason that the nuisance

23  claims fail, so too fail the continuing trespass claims.  Cf. Gregory Vill. Partners, L.P. v. Chevron

24  U.S.A., Inc., 2012 U.S. Dist. LEXIS 32644, **19-21 (N.D. Cal. Mar. 12, 2012) (dismissing

25  trespass and nuisance claims for substantially the same reasons).

26         Dismissal of these causes of action with leave to amend is appropriate.

27

28  [13] To the extent that Coppola may intend to argue that Martin created or assisted in the creation of the
nuisance, any amended complaint needs to include allegations that show active, affirmative, or knowing conduct by
Martin.  See BNSF, 643 F.3d at 674.

6.    <u>10th & 11th Causes of Action – Porter-Cologne Act & Waste.</u>

Coppola states that it does not oppose dismissal of these two causes of action.  <u>See</u> Doc. No. 100 at 18:9-14.  Given Coppola's express non-opposition, the tenth and eleventh causes of action will be dismissed.

7.    <u>7th & 8th Causes of Action – Contribution & Indemnification</u>

*Defendant's Argument*

Martin argues that dismissal of both causes of action is appropriate.  Because there are no allegations that show how Martin is liable for cleanup costs, there is no viable claim for contribution.  Because there are no allegations that Coppola has a loss suffered through payment of an adverse judgement or settlement, there is no viable claim for indemnification.

*Plaintiff's Opposition*

Coppola states that an equitable contribution claim lies if both Coppola and Martin are liable.  Such a claim is derivative of the other substantive claims in this case and should remain.

*Discussion*

Coppola concedes that these causes of action are derivative of the other pled causes of action.  Because the Court is dismissing the other causes of action, the causes of action for equitable indemnity and contribution will also be dismissed.

Additionally, "a fundamental prerequisite to an action for partial or total equitable indemnity is an actual monetary loss through payment of a judgment or settlement."  <u>Western Steamship Lines, Inc. v. San Pedro Peninsula Hosp.</u>, 8 Cal.4th 100, 110 (1994); <u>Forensis Group, Inc. v. Frantz, Townsend, & Foldenauer</u>, 130 Cal.App.4th 14, 28 (2005); <u>see also</u> <u>City of San Diego v. U.S. Gypsum Co.</u>, 30 Cal.App.4th 575, 587 (1994).  The TAC does not allege that Coppola has actually paid a judgment or settlement.  Without such an allegation, there is no claim for equitable indemnity.  <u>See</u> <u>id.</u>

8.    <u>14th Cause of Action – Declaratory Relief</u>

*Parties' Arguments*

Martin argues that Coppola's claim for declaratory relief fails because it is dependent on the other causes of action, which all fail.  Coppola argues that this cause of action is derivative of

the other claims and thus, it survives.

*Discussion*

The parties appear to agree that this cause of action is derivative of the prior causes of action.  As discussed above, because each of the other causes of action against Martin will be dismissed, the claim for declaratory relief will also be dismissed.

**II.     Cal Water's Motion To Dismiss**

   1.     CERCLA & HSAA Causes of Action

*Defendant's Argument*

Cal Water argues that Coppola's CERCLA and HSAA claims should be dismissed because Cal Water is not a "potentially responsible party" under § 9607(a).  Cal Water is not the current owner of the Well.  Cal Water did not engage in "disposal" activities when it did own the well.  Cal Water was not an "operator" at the time it owned the Well because water was being extracted and flowing into the Well for productive use as drinking water.  Finally, Cal Water was not an "arranger" or "transporter" because there are no allegations that it intended to:  dispose of PCE, accept PCE for transportation or disposal, or select a site for PCE disposal.

*Plaintiffs' Opposition*

Coppola argues that their CERCLA and HSAA claims should not be dismissed.  Cal Water is an operator of the Well, and the operation of the Well led to the movement of contaminated water into uncontaminated areas.  This movement of contaminated water constitutes a disposal.  Further, because Cal Water knew in 2000 that the Well tested above the Federal Maximum Contamination Levels, but did not abandon the Well until 2005, Cal Water is an arranger.

*Legal standard*

Part of a plaintiff's prima facie case under § 9607(a) requires a showing that the defendant falls within one of four classes of persons who are subject to liability as "potentially responsible parties."  Carson Harbor Village, Ltd. v. Unocal Corp., 270 F.3d 863, 874 (9th Cir.

1    2001); Kaiser Aluminum & Chem. Co. v. Catellus Dev. Corp., 976 F.2d 1338, 1340 (9th Cir.

2    1992).  One of those classes is "any person who at the time of disposal of any hazardous

3    substance owned or operated any facility at which such hazardous substances were disposed of."

4    42 U.S.C. § 9607(a)(2).  An "owner" is someone who holds title to the facility.  BNSF, 643 F.3d

5    at 679-81; Wells Fargo, N.A. v. Renz, 795 F.Supp.2d 898, 915 (N.D. Cal. 2011).  An "operator"

6    is one who "manage[s], direct[s], or conduct[s] operations specifically related to the pollution,

7    that is, operations having to do with the leakage or disposal of the hazardous waste."  United

8    States v. Bestfoods, 524 U.S. 51, 66-67 (1998); BNSF, 643 F.3d at 680.  The term "disposal"

9    means: "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid

10   waste or hazardous waste into or on any land or water so that such [waste] or any constituent

11   thereof may enter the environment or be emitted into the air or discharged into any waters,

12   including ground waters."  42 U.S.C. § 9601(29).  Thus, for liability under § 9607(a)(2), "there

13   must have been a 'discharge, deposit, injection, dumping, spilling, leaking, or placing' of

14   contaminants [at the facility] during [the defendant's] ownership."  Carson Harbor, 270 F.3d at

15   875; Coeur D'Alene Tribe v. Asarco, Inc., 280 F.Supp.2d 1094, 1112 (D. Idaho 2004).

16   "Disposal" generally refers to the "affirmative act of discarding a substance as waste, and not to

17   the productive use of the substance."  Carson Harbor, 270 F.3d at 877; 3550 Stevens Creek

18   Assocs. v. Barclays Bank, 915 F.2d 1355, 1362 (9th Cir. 1990).  "Disposal" includes a

19   defendant's "movement and spreading of contaminated soil to uncontaminated portions of

20   property," and is not limited "to the initial introduction of hazardous material onto property."

21   Carson Harbor, 270 F.3d at 877 (parenthetically describing Kaiser Aluminum, 976 F.2d at 1342);

22   see also United States v. CDMG Realty Co., 96 F.3d 706, 719 (3d Cir. 1996).  In determining

23   whether there has been a "disposal," the Ninth Circuit does not employ an "absolute binary

24   'active/passive' distinction," but instead requires courts to examine "each of the terms [used by §

25   9601(29)] in relation to the facts of the case and determine whether the movement of

26   contaminants is, under the plain meaning of [those] terms, a 'disposal.'"  Carson Harbor, 270

27   F.3d at 879; see Niagra Mohawk Power Corp. v. Jones Chem. Inc., 315 F.3d 171, 178 (2d Cir.

28   2003).  Under this approach, the Ninth Circuit has found that the passive migration of

contaminants through soil does not constitute a "disposal" because it does not fit within the plain meaning of § 9601(29)'s terms.  Carson Harbor, 270 F.3d at 879-81.  In contrast, the movement of contamination that results from human conduct is a "disposal."  Carson Harbor, 270 F.3d at 877; Kaiser Aluminum, 976 F.2d at 1342; Coeur D'Alene, 280 F.Supp.2d at 1112.

*Relevant Allegations*

In pertinent part, the TAC alleges:

Plaintiffs are informed and believe, and thereon allege, that Cal Water has, at all times relevant to this complaint, owned, operated, maintained, supervised and/or controlled the drinking water supply well, CWS 02-03, adjacent to the Property. The operation of this well by Cal Water led to the release of hazardous substances, including PCE.

Plaintiffs first learned of the factual basis for its claims against Cal Water in February 2012.

CWS 02-03 was abandoned in 2005.  Before it was abandoned, CWS 02-03 contained concentrations of PCE above the Method Detection Limit.

Plaintiffs are informed and believe, and thereon allege, Cal Water's operation of CWS 02-03 caused PCE to move to previously uncontaminated areas beneath the groundwater table, exacerbating the contamination plume.

As a direct and proximate result of Defendants' conduct and failure to act, hazardous substances, including PCE, were released and spread in soil and groundwater at and near the Property.

TAC ¶¶ 34-38.

*Discussion*

Initially, the allegations against Cal Water suffer from two of the same defects as the CERCLA claims against Martin.  First, the TAC does not allege a general time frame of when a disposal occurred at the Well.  Although exact precision is not needed, an allegation regarding a general time frame of disposal is necessary.  See Ascon Properties, 866 F.2d at 1156.  Second, the use of the plural "hazardous substances," when only PCE appears to be at issue, creates an ambiguity and does not provide adequate notice to Cal Water.

As for the grounds of dismissal raised by Cal Water, the TAC is somewhat vague as to which class(es) of potentially responsible persons Cal Water fits.  The opposition clarifies that liability is premised on § 9607(a)(2), an individual who owned or operated a facility at the time a

disposal occurred.[14]  With that clarification in mind, the TAC does not adequately allege past

owner or operator liability.

There is no doubt that the Well is a "facility" and that, prior to sometime in 2005, the

Well was owned and operated by Cal Water.  However, there are insufficient facts alleged to

plausibly indicate that a "disposal" occurred.  As described above, the TAC alleges that the

operation of the Well caused PCE to move to previously uncontaminated areas beneath the

groundwater table and exacerbated the contamination plume.  See TAC ¶¶ 34-38.  There is no

description of the actual operations involved, nor, for that matter, is there an allegation that

indicates how the operations may have caused the movement.  Because the "facility" at issue is a

well, there is the potential for purely passive migration of contaminated water.  While it is true

that contaminants actually move during passive migration, passive migration is not a "disposal"

under CERCLA.  See BNSF, 643 F.3d at 678 n.3 (recognizing that passive migration is not a

"disposal" and expressing doubt whether migration of contamination onto a property from a

french drain constitutes a "disposal").  Without additional factual allegations that describe the

operation of, or conduct at, the Well that caused PCE movement, the Court cannot determine

whether there was a "disposal" for purposes of § 9607(a)(2).

In their opposition, Coppola explains that Cal Water pumped contaminated water and that

the pumping process caused the spreading and movement of contaminated water.  This

explanation identifies the nature of the operation and identifies activity that appears to be beyond

a natural and passive movement.  The explanation suggests that the contaminated water moved to

uncontaminated areas because of the pumping process, not because of the Well's mere presence

or the water's natural tendency to flow.  Stated differently, the explanation indicates a movement

of contamination by human conduct, which is a "disposal."  See Carson Harbor, 270 F.3d at 877;

Kaiser Aluminum, 976 F.2d at 1342; Coeur D'Alene, 280 F.Supp.2d at 1112.  Nevertheless,

Coppola's explanation is not part of the TAC and it is not enough to prevent dismissal.  The

explanation does, however, indicate that amendment would not be futile at this time.  See Broam

[14]Judicially noticeable documents indicate that Cal Water sold the Well in 2006, which would preclude
liability under § 9607(a)(1).  See Hearthside Residential Corp., 613 F.3d at 912-13; Cal Water RJN Ex. 1.

v. Bogan, 320 F.3d 1023, 1026 n.2 (9th Cir. 2003).

The Court is not convinced by Cal Water's arguments that amendment should not be permitted. First, Cal Water spends much of its briefing arguing that only passive migration occurred at or through the Well. However, it is not clear from the TAC or the opposition that only passive migration occurred at the Well. To be sure there is ambiguity in the TAC, but the opposition indicates movement from human conduct because the contamination moved as part of Cal Water's pumping process. Cal Water has not cited any authority that holds that water that moves in the pumping process constitutes passive migration.[15]  The Court knows little of the operation of utility wells, much less about the operation of this particular Well. As the case develops, the evidence may show only passive migration, which would defeat liability under § 9607(a)(2). See Carson Harbor, 270 F.3d at 879-81; see also BNSF, 643 F.3d at 678 n.3. For now, the only information before the Court does not indicate mere passive migration.

Second, Cal Water has not shown that *Vernon Village* or the "useful product defense" applies in this case. The Ninth Circuit has recognized that "disposal" does not refer to the productive use of a hazardous substance. See Carson Harbor, 270 F.3d at 877; 3550 Stevens Creek, 915 F.2d at 1362. Under the "useful product defense," a defendant is not subject to liability if the material in question is a useful product and not waste. Team Enters., LLC v. Western Inv. Real Estate Trust, 647 F.3d 901, 908 (9th Cir. 2011). In this case, the hazardous substance in question is not water, it is PCE. There is no indication that Cal Water used PCE as a component of its water. The TAC indicates that the PCE is a byproduct of dry cleaning activity. Once the dry cleaners finished with the PCE or the PCE escaped, the PCE was not a useful product. Cal Water has not established that the "useful product defense" applies. As for *Vernon Village*, that case found that water delivered to a consumer from a contaminated well constituted a "useful consumer product" and was not a "facility" under CERCLA, thus precluding liability. See Vernon Village, Inc. v. Gottier, 755 F.Supp. 1142, 1149-51 (D. Conn.

---

[15]The closest cited case on the issue is *Southern Cal. Water Co. v. Aerojet-Gen. Corp.*, 2003 U.S. Dist. LEXIS 26534, *15 n.2 (C.D. Cal. Apr. 1, 2003). Footnote 2 in that case stated that Southern Cal. Water Co. could not be an arranger or a transporter based on its pumping activities because it had not accepted or arranged for Aerojet's contamination to be disposed of. The footnote did not address whether a "disposal" actually occurred at Southern Cal. Water's well.

1990).  In this case, the Well is alleged to be a "facility," and wells are expressly included in the

CERCLA definition of a "facility."  See 42 U.S.C. § 9601(9).  Also, unlike *Vernon Village*, this

case is not brought by a plaintiff who had been delivered contaminated drinking water from the

well owning defendant.  See Castaic Lake Water Agency v. Whittaker Corp., 272 F.Supp.2d

1053, 1074-74 (C.D. Cal. 2003).  That is, "[t]his case is not brought by parties who actually

receive [Cal Water's Well] water as a consumer product; unlike the contaminated water that

sparked the *Vernon Village* suit, here the water is not a product currently made available to

consumers for their use."  Id. at 1074.  What is at issue in this case is PCE spreading to the soil

and groundwater from the Well, not the water that was actually delivered from the Well to

consumers.  Cal Water has not shown how the fact that drinking water is a useful product shields

it from § 9607(a)(2) liability in this case.  See id.

Third, Cal Water's argument that no "disposal" occurred because it was engaged in

conduct under the direction of the California Department of Public Health ("CDPH") is not

adequately supported or developed.  First, no regulations or directives from the CDPH are

identified by Cal Water.  The Court is left to guess completely at what directions, regulations, or

instructions required Cal Water to act, or whether the relevant regulatory agency was aware of

the PCE contamination moving through the Well because of the pumping process.[16]  Second, the

only case cited by Cal Water appears to be distinguishable.  In *Weigmann & Rose Int'l Corp. v.

NL Industries, Inc.*, 1991 U.S. Dist. LEXIS 20181, *40-*41 (N.D. July 24, 1991), the district

court was faced with a situation were one party had moved contaminated soil from one part of

property to another part.  The contaminated soil had been moved because the Department of

Health and Safety ("DHS") had ordered that, because there was traces of contamination, soil was

to be moved from the eastern part of the property to the western part.  See id.  The district court

held that defendant had not "disposed" of hazardous substances because the defendant had

followed the DHS's orders/direction.  See id.  Here, there is no evidence that any governmental

agency ordered Cal Water's actions or that Cal Water was acting pursuant to a regulatory

---

[16]As discussed *infra*, there is an indication that Cal Water knew that there was PCE contamination at levels
above regulatory limits.

remediation effort.  At this point, Cal Water has not shown that *Weigmann* applies.

Finally, Cal Water states that permitting this case to go forward would create a new and dangerous precedent against public utilities.  However, as Coppola points out, this is not the first time that Cal Water has been sued under CERCLA with respect to the operation of its wells. *Employers Ins. of Wausau v. California Water Serv. Co.*, 2008 U.S. Dist. LEXIS 65433 (N.D. Cal. Aug. 25, 2008), was an insurance coverage dispute between Cal Water and its insurer.  Cal Water was a defendant in three separate CERCLA cases brought by the DTSC, all involving the spread of PCE through Cal Water's wells in the City of Chico.  The Northern District described the underlying suits by DTSC against Cal Water as follows:

> The complaints in the underlying suits allege that several dry cleaning businesses and property owners released. . . [PCE] into the soil and groundwater beneath the central business district of Chico.  Cal Water's activities of pumping water and operating, monitoring and shutting down of certain wells affecting the Chico city water supply all purportedly contributed to the dispersal of the contamination in the groundwater.  Cal Water is named as a defendant in each of these actions, and the DTSC seeks to hold the defendants in the actions jointly and severally liable under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., for all costs incurred in response to the alleged releases of hazardous substances.
> . . . .
>
> As to Cal Water, [one of the actions by DTSC] alleged, 'public waters supply wells owned and/or operated by [Cal Water], including but not limited to wells known as CWS-2, CWS-10, and CWS-21 contained water contaminated with hazardous substances and released hazardous substances to surrounding groundwater.'  As to its claim under CERCLA, DTSC alleged that 'each defendant owned and/or operated a facility from which there were releases of hazardous substances with the meaning of [CERCLA].'

Id. at *5, *12-*13.  The allegations in *Employers Ins.* are similar to the allegations in this case.  Coppola cited *Employers Ins.* as part of their opposition, but Cal Water did not address that case.  *Employers Ins.*, and the absence of a response by Cal Water to that case, show that Coppola's claims against Cal Water are not novel.

In sum, the Court will dismiss the CERCLA and HSAA causes of action against Cal Water.  Because it is not clear at this time that amendment would be futile, the dismissal will be with leave to amend.

Additionally, like the claims against Martin, the TAC contains theories of potentially responsible persons against Cal Water that were not pursued in opposition, and thus are not

actually applicable.  It is not appropriate for Coppola to make blanket allegations that are not

actually applicable to a defendant.  If Coppola intends to pursue only one CERCLA theory of

recovery against a defendant, then the allegations against that defendant should be confined to

that single theory.  Allegations against a defendant that have no application to that defendant, or

that are false as to that defendant, are inappropriate.  See Fed. R. Civ. Pro. 11(b).  An amended

complaint shall delete any non-applicable allegations and theories with respect to each

defendant.[17]

> 2.     *Hartwell* Preemption of State Law Claims

*Defendant's Argument*

Cal Water argues that, per *Hartwell Corp. v. Superior Court*, 27 Cal.4th 256 (2002) and

Public Utilities Code § 1759, each of Coppola's state law claims are preempted.  A public water

utility can only be sued to the extent that it fails to comply with regulations and standards.  Here,

there are no allegations that Cal Water breached an applicable regulation.  Further, individual

exceedances of a particular regulation or standard is insufficient to bypass *Hartwell*'s immunity.

*Plaintiff's Opposition*

Coppola argues that their claims are not based on the quality of municipal water supplies,

nor are they claiming that their drinking water caused them harm.  Accordingly, *Hartwell* and

§ 1759 do not apply.  In any event, contrary to Cal Water's assertions, the TAC identifies many

statutory violations by Cal Water.  Further, judicially noticeable documents show an exceedance

of the regulatory limits for PCE.

---

[17]Coppola's opposition indicates that Cal Water might be liable as an "arranger" under § 9607(a)(3) because Cal Water had knowledge of high PCE levels in the Well.  The Court is not convinced.  "Arranger liability ensures that owners of hazardous substances may not free themselves from liability by selling or otherwise transferring a hazardous substance to another party for the purpose of disposal."  Team Enters., 647 F.3d at 907. Knowledge that a hazardous substance will be "disposed" is insufficient by itself for "arranger" liability.  See Burlington Northern, 556 U.S. at 612.  "[T]he word 'arrange' implies action directed to a specific purpose," and "an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance."  Id. at 610-11.  Neither the TAC nor the opposition indicate that Cal Water took intentional steps to arrange with another for the disposal of PCE.  Cf. Kaiser Aluminum, 976 F.2d at 1341 (finding no liability under § 9607(a)(3) where the defendant disposed of the substance and did not arrange for another party to dispose); Southern Cal. Water Co., 2003 U.S. Dist. LEXIS 26534 at *15 n.2 (holding that well owner was not an arranger or transporter because it had not agreed to dispose or arranged to dispose of contamination).  At best, there is an indication that a disposal of PCE actually occurred, not that Cal Water made arrangements to dispose of PCE.  See Kaiser Aluminum, 976 F.2d at 1341.

1        *Discussion*

2        California Public Utilities Code § 1759 "precludes superior court jurisdiction to review

3 any order or decision of the California Public Utilities Commission or to interfere with the

4 [Commission] in the performance of its official duties."  Hartwell Corp. v. Superior Court, 27

5 Cal.4th 256, 260 (2002).  In *Hartwell*, the California Supreme Court dealt with the application of

6 § 1759 to various water providers, some of whom were regulated by the Public Utilities

7 Commission ("PUC") and some were not.  Hartwell, 27 Cal.4th at 260.  The *Hartwell* plaintiffs

8 had alleged that contaminated well water caused wrongful death, personal injury and property

9 damage, and they sought injunctive relief and monetary damages.  See id.  The California

10 Supreme Court held that § 1759 prevented plaintiffs from: (1) challenging the adequacy of water

11 standards that had been approved by PUC; (2) seeking damages on the theory that the regulated

12 utilities provided unhealthy water despite meeting regulatory water standards; and (3) obtaining

13 injunctive relief.  See id. at 276-79; see also People ex. rel. Thomas J. Orloff v. Pacific Bell, 31

14 Cal.4th 1132, 1147 (2003).  The California Supreme Court explained its rationale in *Hartwell*:

15          The decision concluded, for example, that because the PUC relied upon certain
            water quality standards as a benchmark in approving water rates charged by public
16          utilities, challenges in the civil action to the adequacy of those standards, and
            claims for damages allegedly caused by unhealthy water permitted by the
17          standards, would interfere with broad and continuing regulatory programs of the
            PUC such as ratemaking for public utilities. In addition, the PUC had provided a
18          safe harbor for utilities meeting these water quality standards, and our decision
            observed that a determination by the superior court that the existing standards
19          were inadequate would undermine this policy of the PUC by holding the utilities
            liable for damages caused by their failure to undertake action that the PUC
20          repeatedly had determined was not required. Similarly, claims in the civil action
            seeking injunctive relief for current violations of water quality standards were
21          precluded by section 1759, because an injunction predicated upon a finding of
            such violations would conflict with the decision of the PUC that the defendant
22          utilities presently were in compliance with the standards, and that no further
            inquiries or evidentiary hearings regarding compliance were required.
23
24 Orloff, 31 Cal.4th at 1147.  Thus, there is a "safe harbor" for water providers who comply with

25 the applicable regulatory water standards.  See id.; Hartwell, 27 Cal.4th at 276.  However,

26 § 1759's "safe harbor" does not apply to water providers who are not subject to PUC regulation.

27 See Orloff, 31 Cal.4th at 1148 n.11; Hartwell, 27 Cal.4th at 261-62, 282.  Also, there is no "safe

28 harbor" for damages claims that are based on water contamination that violated and exceeded

federal and state drinking water standards.  Orloff, 31 Cal.4th at 1147-48; Hartwell, 27 Cal.4th at

1  279.  Case law has clarified further that the violation of the regulatory water standard must be

2  persistent; isolated and individual violations are not actionable.  See Abarca v. Franklin County

3  Water Dist., 2011 U.S. Dist. LEXIS 2713, *30-*35 (E.D. Cal. Jan. 5, 2011); In re Groundwater

4  Cases, 154 Cal.App.4th 659, 685-86 (2007).

5       Here, dismissal of the state law claims on the basis of Hartwell and § 1759 is not

6  appropriate at this time.  As explained, Hartwell and § 1759 do not apply to every entity that

7  supplies water, it only applies to those entities that are subject to the regulation of PUC.  See

8  Orloff, 31 Cal.4th at 1148 n.11; Hartwell, 27 Cal.4th at 261-62, 282.  The TAC does not allege

9  that Cal Water is subject to PUC regulation.  Although Cal Water implicitly asserts that it is

10  subject to PUC regulation, it cites no cases, statutes, or judicially noticeable documents.  Such

11  unsupported assertions cannot form the basis of dismissal.

12       Assuming that Cal Water is subject to PUC regulation, the Court is not convinced that

13  Hartwell and § 1759 is limited to cases in which contaminated drinking water was actually

14  provided to a consumer plaintiff.  To be sure, the preempted lawsuits in Hartwell were those that

15  involved contaminated water that had been delivered to the plaintiffs' homes and properties.

16  Nevertheless, the concern of Hartwell was that lawsuits which are based on water contamination

17  levels that are within regulatory limits would improperly disrupt and interfere with PUC's ability

18  to regulate public utilities, including setting standards and water rates.  See Orloff, 31 Cal.4th at

19  1147; Hartwell, 27 Cal.4th at 276.  The water contamination in Hartwell happened to be at one

20  end of the drinking water supply chain.  It is unclear why a different result would be required for

21  lawsuits involving other points along the drinking water supply chain.  Regardless of the precise

22  point in the supply chain, if a lawsuit is based on contamination levels that are within PUC's

23  regulatory water standards, then the adequacy of the water standard is at issue and the disruption

24  and interference prohibited by Hartwell would likely occur.[18]

25       Again, assuming that Cal Water is subject to PUC regulation, this lawsuit appears to

26  implicate the concerns of Hartwell, just at a different and earlier point in the drinking water

27

28      [18]The parties' briefing on this issue is not particularly extensive.  If the parties are aware of additional or
contrary authority, they may present that authority in subsequent proceedings in this case.

supply chain.  The November 2008 EPA letter references a regulatory contamination level for PCE, and the parties agree that such regulatory limit exists.  See Cal Water RJN Ex. 6.  However, the TAC itself does not allege that any regulatory standards were violated.  Although Coppola argues that the TAC identifies statutory violations by Cal Water, the identified statutes deal with nuisance and general water contamination - none set regulatory limits for PCE.  Thus, this would make the state law claims subject to dismissal.

However, an attachment to a November 2008 EPA letter to Coppola states that, in March 2000, PCE was detected in the Well at the limit of the Maximum Contamination Level.  See Cal Water RJN Ex. 6.  Another attachment to the November 2008 EPA letter indicates that the Well "is currently shut down due to PCE contamination above" the Maximum Contamination Level. See id.  Further, the TAC alleges that the Well was abandoned by Cal Water in 2005, and that the Well contained PCE at levels above the Method Detection Limit.[19]  See TAC ¶ 38.  While isolated instances of contamination levels above regulatory limits are insufficient to get past Hartwell, the TAC and the judicially noticed November 2008 EPA letter appear to support an inference of persistent violations.  Specifically, it appears that there may have been systematic violations of the regulatory PCE limits at the Well from at least 2000 to 2005.  If Coppola files an amended complaint, and has reason to believe that Cal Water is subject to PUC regulation, then any amended complaint must include express allegations that Cal Water regularly violated the applicable regulatory limits for PCE.

In sum, because Cal Water has not established that it is subject to PUC regulation, dismissal is not appropriate.  Nevertheless, if Coppola has reason to believe that Cal Water is subject to PUC regulation, then allegations that show regular violations of the regulatory PCE limits should be included in an amended complaint.

3.   Statute of Limitations

*Defendant's Argument*

---

[19]"In general terms, the method detection limit is the minimum concentration of a pollutant in a discharge that can be detected with 99% certainty by analysis of a discharge sample." Palmisano v. Olin Corp., 2005 U.S. Dist. LEXIS 48006, *17 (N.D. Cal. June 24, 2005).  Cal Water argues that there is no applicable regulatory standard for the Minimum Detection Limit.  Coppola does not respond to this assertion.  The Court will not view the method detection limit as setting an applicable regulatory limit.

1    Cal Water argues that Coppola's negligence, nuisance, and waste claims are barred by the

2    applicable 3 year statute of limitations.  The statute of limitations normally begins to run when

3    the plaintiff sustains damage.  Here, the TAC alleges that the Well was abandoned by Cal Water

4    in 2005.  Although the discovery rule will delay the running of the statute of limitations, in

5    November 2008, Coppola was informed by the EPA that 717 W. Main was contaminated with

6    PCE and that the Well was shut down as a result of PCE contamination.[20]  The November 2008

7    EPA letter put Coppola on notice of their claims.  Because Coppola did not bring suit against Cal

8    Water until June 2012, the statute of limitations bars the non-continuing claims.

9       *Plaintiff's Opposition*

10      Coppola argues that its claims are not barred by the 3 year statute of limitations.

11   CERCLA preempts state statute of limitations in environmental damage cases.  The limitations

12   period would not have begun until Coppola suspected both the injury and the injury's cause.  Cal

13   Water was added to this litigation on June 29, 2012.  The TAC alleges that Coppola did not have

14   reason to know of Cal Water's involvement until March 2012, and that DTSC informed Coppola

15   of an investigation of PCE at 717 W. Main in October 2009.  The November 2008 EPA letter

16   was a preliminary assessment by EPA, and is not conclusive of when the statute began to run.

17   The issue of when there was reasonable notice of Cal Water's contribution to the contamination

18   is an issue of fact that is not suitable for decision on a motion to dismiss.[21]

19      *Legal Standard*

20       "CERCLA does not create a federal statute of limitations.  Rather, it retains the state

21   statute of limitations, and establishes a federal standard that governs when delayed discovery of a

22   plaintiff's claims will toll the statute of limitations.  This federal standard trumps a less generous

23   state rule that would start the limitations period earlier."  O'Connor v. Boeing N. Am., Inc., 311

24   _____

25      [20]Cal Water requests that the Court take judicial notice of various deeds, maps, and official government
     correspondences/letters.  See Cal Water Request for Judicial Notice ("RJN").  The letters are from either EPA or
26   DTSC.  Coppola does not object to the RJN, and in fact relies in part on Cal Water's RJN Exhibit 6.  In the absence
     of an opposition, the Court will grant Cal's RJN and consider those documents in resolving this motion.

27
        [21]Coppola also contends that, in prior complaints, it made allegations against Doe Defendants, which would
28   include Cal Water.  Because the Court it is not dismissing the state law claims without leave to amend, and the "doe
     pleading" argument is not the primary opposition, the Court will not address the adequacy of prior "doe pleadings."

F.3d 1139, 1143-44 (9th Cir. 2002).  CERCLA's delayed discovery rule applies to "any action

brought under State law for personal injury . . . which [is] caused or contributed to be exposure to

any hazardous substance, or pollutant or contaminant, released into the environment from a

facility . . .," if the federal discovery rule is more generous than the particular State's discovery

rule.  See 42 U.S.C. § 9658(a)(1); O'Connor, 311 F.3d at 1146; Lewis v. Russell, 2012 U.S. Dist.

LEXIS 143501, *18 (E.D. Cal. Oct. 2, 2012).  "Section 9658 applies to actions that assert state

law claims without an accompanying CERCLA claim."  O'Connor, 311 F.3d at 1149; Lewis,

2012 U.S. LEXIS 143501 at *18-*19.  Under California law, trespass and injuries to real

property are subject to a 3 year statute of limitations period.  Cal. Code Civ. Pro. 338(b).  "The

orthodox rule in tort actions is that the applicable limitation period will run from accrual of the

action upon the occurrence of the last element essential to the cause of action."  Siegel v.

Anderson Homes, Inc., 118 Cal.App.4th 994, 1005 (2004); CAMSI IV v. Hunter Tech. Corp.,

230 Cal.App.3d 1525, 1534 (1991).  To avoid the "harshness" of the orthodox rule, California

has adopted the delayed discovery rule.  Mangini v. Aerojet-Gen. Corp., 230 Cal.App.3d 1125,

1150 (1991).  However, "because the federal standard under CERCLA is more generous than

California law in tolling the statute of limitations when a plaintiff's discovery of her claims is

delayed, the federal commencement date preempts California's discovery rule."  O'Connor, 311

F.3d at 1147; Lewis, 2012 U.S. Dist. LEXIS 143501 at *18-*19.  Under the federal discovery

rule, the "California limitations period [does] not commence until Plaintiff[] knew or should

have known of [his or her] claim."  O'Connor, 311 F.3d at 1146.  "A plaintiff knows or

reasonably should know of a claim when he or she knows both the existence and the cause of his

injury."  Id. at 1147; see also Avila v. Willits Envtl. Remediation Trust, 633 F.3d 828, 841 (9th

Cir. 2011).

_Discussion_

Dismissal of the non-continuing California tort claims is appropriate.  The TAC indicates

that Cal Water abandoned the Well in 2005.  Coppola does not dispute that, absent the discovery

rule, the 3 year limitations period began to run at that time in 2005.  This would give Coppola

until 2008 to file a claim against Cal Water.  Because Coppola did not file suit against Cal Water

until June 2012, the 3 year limitations period is at issue.  Recognizing this, the TAC alleges that Coppola first learned of the factual basis of the claims against Cal Water in March 2012.  See TAC ¶ 29.  However, Cal Water is correct that there are no facts alleged that reasonably support this assertion.  See Iqbal, 129 S.Ct. at 1949-50.  Without more, the TAC is making an unadorned legal conclusion as to the date the statute of limitations actually began to run.  In the absence of factual allegations that plausibly support application of the discovery rule, dismissal is appropriate.

However, the TAC alleges that, on October 28, 2009, DTSC informed Coppola that PCE contamination was found in soil and groundwater samples at 717 W. Main.  See TAC ¶ 19.  The October 2009 DTSC letter would clearly inform Coppola that their property was damaged by PCE.  Assuming the October 2009 letter also indicated that Cal Water was a cause of the PCE contamination, under the applicable 3 year limitation period, Coppola would have had until October 2012 to bring suit against Cal Water.  Because Cal Water was added as a party within that 3 year period in June 2012, it is possible that the complaint could be amended to allege commencement of the limitations period in October 2009.[22]

The Court disagrees with Cal Water that amendment would be futile at this point.  Cal Water's position is dependent upon a November 12, 2008 EPA letter to Coppola.  The 2008 EPA letter informs Coppola that a "Preliminary Assessment" had determined that a further assessment of 717 W. Main was necessary.  See Cal Water RJN Ex. 6.  The letter explains that the next step in the process is a site inspection that will involve the collection of soil, water, air, and/or waste samples, and that DTSC will contact Coppola prior to any on-site inspection and sampling.  See id.  The letter included the "Preliminary Assessment" as an attachment.  See id.  The Preliminary Assessment states that there was an uncharacterized PCE plume afflicting Visalia and that the Well, which is within .25 mile of 717 W. Main, was currently shut down due to PCE contamination.  See id.  The Preliminary Assessment states that various types of samples were taken around several dry cleaning sites (including 717 W. Main) that may be contributing to the

---

[22]It is possible for Coppola include factual allegations that plausibly support the commencement of the limitations period in March 2012.  The Court focuses on October 2009 because of the TAC's description of the October 2009 letter and the opposition's reference to that letter.

1  PCE plume.  See id.  PCE was detected in soil vapor and groundwater "near" 717 W. Main.  See

2  id.  The "Preliminary Assessment" does not state that any samples were collected "from" 717 W.

3  Main.  See id.

4          A reasonable reading of the 2008 EPA letter and the Preliminary Assessment is that dry

5  cleaning activities were causing PCE contamination of drinking water and wells.  To use

6  CERCLA terminology, the "facility" injured by PCE contamination is the Well, not 717 W.

7  Main.  Neither the letter nor the Preliminary Assessment indicate that the Well is causing PCE

8  contamination to spread to 717 W. Main.  Further, the letter does not definitively indicate that

9  PCE had contaminated 717 W. Main.  The purpose of the letter was to inform Coppola that

10 samples needed to be collected from 717 W. Main in order to confirm PCE's presence, and that

11 Coppola would be contacted in preparation for obtaining those samples.  See id.

12         It is reasonable to read the letter as informing Coppolas that they may be contributing to

13 the PCE plume and that more testing of their property was needed to confirm the presence of

14 PCE.  It is also reasonable to read the letter as indicating that Coppola would be informed of the

15 results of further investigation and testing.  Such a reading of the November 2008 letter, which

16 does not definitively state that there is PCE contamination at 717 W. Main, would not necessarily

17 start the 3 year limitations period in November 2008.  At this stage in the proceedings, the Court

18 cannot hold that the November 2008 EPA was sufficient to start the 3 year limitations period.

19 See O'Connor, 311 F.3d at 1146-47.

20         While there is a statute of limitations issue, dismissal without leave to amend is not

21 proper at this time.[23]

22         4.       Negligence & Negligence Per Se Causes of Action

23         *Defendant's Argument*

24         Cal Water argues that Coppola has not alleged facts that show a breach of duty.  Cal

25

26 ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
   [23]Cal Water does not cite *O'Connor* or acknowledge that CERCLA preempts the California discovery rule.
   Instead, Cal Water cites a 2001 unpublished opinion from the Western District of Washington for the proposition
27 that CERCLA does not preempt the state discovery rule.  *In re ASARCO/Vashon-Maury Island Litig.*, 2001 U.S.
   Dist. LEXIS 7154 (W.D. Was. May 23, 2001), dealt with Washington law, not California law, and, to the extent that
28 California law might have been implicated, *ASARCO* is directly contrary to the binding law of *O'Connor*.  The Court
   is troubled by Cal Water.  At best, there is only poor briefing, at worst, there is an attempt to deceive the Court and a
   violation of the duty of candor.  Similar briefing in the future by Cal Water may well form the basis for sanctions.

Water is not alleged to have operated a dry cleaners, improperly used solvents, supervised the operation of equipment at 717 W. Main, or failed to clean up spilled solvents. As to negligence per se, there is no indication that Cal Water violated any of the statutes identified, and Coppola does not allege that it is within the class of persons whom the statutes are designed to protect.

### *Plaintiff's Opposition*

Coppola argues that the cases Cal Water relies on are distinguishable because they involved instances of no active involvement in causing the migration of contamination. Here, the issue is not passive activity, it is active pumping of contamination. Cal Water had notice for years that it was pumping contaminated water and it knew or should have known that its activities were causing the discharge of PCE. With respect to negligence per se, the statutes relied upon require a "deposit," "permit to pass," or "placement" of contamination. The active pumping is equivalent to permitting, placing, or depositing contamination.

### *Discussion*

The relevant allegation under the third cause of action is Paragraph 66, which reads: ". . . during Defendants' ownership of the Property [i.e. 717 W. Main] and/or operation of a dry cleaner on surrounding properties, sudden and accidental releases are attributable to Defendants' negligence in failing to: properly use solvents, supervise the operation of equipment on the Property, and cleanup spilled solvents." TAC ¶ 66.

This paragraph does not adequately show a breach of any duty by Cal Water. There appears to be some form of typo with the allegation that Defendants owned 717 W. Main. Nevertheless, Paragraph 66 appears to be focused on the operation of dry cleaning businesses. There is no indication that Cal Water owned any dry cleaner business or participated in any dry cleaning activities. Cal Water is alleged to have owned and operated the Well, and that is all. Without factual allegations that indicate a breach of a duty of care by Cal Water, there is no viable negligence claim alleged. See Ladd, 12 Cal.4th at 917.

Similarly, with respect to the negligence per se cause of action, there is only a bare allegation that all Defendants violated five statutes. The Court is left to guess how the activities

1  of Cal Water violated any of the statutes.  Further, there are no allegations that Coppola is within

2  the class of persons that the statutes are designed to protect.[24]  As currently pled, there is no

3  viable negligence per se claim against Cal Water.[25]  See Cal. Evid. Code § 669; Ramirez, 44

4  Cal.4th at 917-18; Quiroz, 140 Cal.App.4th at 1285.

5      The Court will dismiss the negligence causes of action with leave to amend.[26]

6      5.      Private, Public, Continuing & Per Se Nuisance Causes of Action

7      *Defendant's Argument*

8      Cal Water argues that the mere existence of the Well and its relation to the underlying

9  plume is insufficient to establish nuisance liability.  A mere conduit for contamination to move

10  from one location to another creates no nuisance liability.  The Well was not designed to move or

11  dispose of hazardous substances, it was merely designed to move water.  Further, in terms of

12  public nuisance, there are no facts alleged that show the nuisance affects an entire community,

13  neighborhood, or considerable number of persons.

14     *Plaintiff's Opposition*

15     Coppola argues that Cal Water knew that the Well was pumping water that was

16  contaminated with PCE.  As a result, Cal Water knew or should have known that its actions were

17  creating a nuisance.  Cal Water caused or permitted the PCE contamination through its negligent

18  or intentional conduct.  Cal Water knew that PCE was above the Maximum Contamination Level

19  since March 2000.  The possessor of land has a duty to ensure that activities on the land do not

20  produce a nuisance.  With respect to the public nuisance claims, Paragraph 97 of the TAC

21

22  [24]The Court notes that Coppola alleges violations California Civil Code §§ 3281 and 3282.  Those statutes

23  define the word "detriment" and state that a person may obtain damages for suffering a "detriment."  "Essentially,
   application of the doctrine of negligence per se means that he court has adopted the conduct prescribed by the statute

24  as the standard of care for a reasonable person in the circumstances."  Casey v. Russell, 138 Cal.App.3d 379, 383
   (1982).  No duty of care is apparent in Civil Code § 3281 or § 3282.

25  [25]The TAC identifies California Water Code § 1300 et seq., California Health & Safety Code § 5411 et

26  seq., and California Fish & Wildlife Code § 5650 et seq.  See TAC ¶ 70.  Use of "et seq." provides a significant
   range of statutes that might be at issue.  In order to provide fair notice, if Coppola amends the negligence per se

27  claim, then they are to eliminate use of "et seq." and cite the particular statute that creates the duty of care.

28  [26]Again, the opposition indicates that Cal Water's pumping activities at the Well caused movement of PCE,
   and that Cal Water knew about PCE contamination above regulatory limits.  The opposition cannot save the
   complaint, but does indicate that amendment is not necessarily futile.  Broam, 320 F.3d at 1026 n.2

indicates that the public have been harmed by the nuisance.  Also, Exhibit 6 to Cal Water's RJN

states the areas impacted by the PCE plume.

*Discussion*

The TAC does not adequately describe culpable conduct by Cal Water.  The TAC alleges

that Cal Water operated the Well and that the operation led to the spread of hazardous

substances.  This allegation could help establish liability against one who creates or aids in the

creation of a nuisance, or for one who acts unreasonably when in possession of property by

failing to discover and abate a nuisance.  Cf. BNSF, 643 F.3d at 673-77.  However, "conduct

cannot be said to 'create' a nuisance unless it more actively or knowingly generates or permits

the specific nuisance condition."  Id. at 674.  The allegation that Cal Water operated the Well is

too vague to reasonably indicate the active or knowing generation of the contamination nuisance.

Similarly, the TAC does not allege facts that show Cal Water acted unreasonably when it failed

to discover and abate the spread of contamination.  Cf. Id. at 675-77; San Pedro, 635 F.3d at 452-

53.  In fact, there are no factual allegations that show Cal Water acted unreasonably as to any

aspect of the Well, let alone in the failure to detect and abate the contamination nuisance.  Cf.

Melton v. Boustred, 183 Cal.App.4th 521, 542 (2011) ("Where the negligence and nuisance

causes of action rely on the same facts about lack of due care . . . the nuisance claim stands or

falls with the determination of the negligence cause of action . . . .").  Without factual allegations

that demonstrate culpable conduct, dismissal of all the nuisance claims is appropriate.

Also, with respect to the public nuisance claims, the Court agrees with Cal Water.  There

are many allegations that Coppola has been injured.  However, for a public nuisance, there must

be an allegation that "an entire community or neighborhood, or any considerable number of

persons" has also been damaged by the nuisance.  Cal. Civ. Code § 3480.  The TAC's reference

to damage by the general public does not sufficiently allege that a "considerable number of

persons" have been affected by the water contamination.  Dismissal of the public nuisance claims

for this additional reason is proper.

Cal Water requests that the Court dismiss the nuisance claims without leave to amend

based on *BNSF*.  Cal Water argues that the Well is similar to the french drain at issue in *BNSF*.

43

Cal Water relies on a portion of *BNSF* that dealt with liability for creating or aiding in the creation of a nuisance.  In pertinent part, the *BNSF* explained:

> While the Railroads may have acted affirmatively with regard to the installation of the french drain, that conduct was wholly unrelated to the contamination. The Railroads did not, for example, install the french drain as part of a system designed to move or dispose of hazardous waste, like the defendants did in Selma. The drainage improvements on the site were designed to move water, not contaminants.
>
> We decline to hold that an otherwise innocent party who builds or installs a conduit or structure for an unrelated purpose which happens to affect the distribution of contamination released by someone else is nonetheless liable for "creating or assisting in the creation" of a nuisance.

BNSF, 643 F.3d at 674-75.  The Court does not believe that *BNSF* requires dismissal without leave to amend.

First, the portion of *BNSF* relied upon by Cal Water addresses nuisance liability for creating or assisting in the creation of a nuisance, it does not address nuisance liability for those in possession of a property.[27]  Second, prior to the quoted language above, *BNSF* explained that there was no evidence of "active, affirmative, or knowing" conduct regarding the contamination. See id. at 674.  Of particular note, the Ninth Circuit explained, "[Defendant] did not spill the petroleum or otherwise release it into the environment. [Defendant] did not affirmatively direct its flow or knowingly permit it to migrate into the french drain and onto the Property." Id.  Here, there are no allegations that show only passive migration at the Well or allegations that indicate that the Well is a mere conduit.  While further allegations are necessary to describe the operation of the Well, the opposition indicates that Cal Water was engaged in human conduct that caused the movement of contamination.  That is, Cal Water's pumping process at the Well caused the movement.  Further, the November 2008 EPA letter indicates PCE contamination above regulatory limits in the Well from at least 2000 through abandonment of the Well in 2005. See Cal Water RJN Ex. 6.  At this point, it is not unreasonable to infer that Cal Water was aware of high levels of PCE contamination from at least 2000.  Considering the pumping activity and Cal Water's possible knowledge of PCE contamination above regulatory limits, at this point it is

---

[27]In a different section, *BNSF* discussed nuisance liability for one in possession of property at the time contamination occurred.  See BNSF, 643 F.3d at 675-77.

possible for Coppola to allege that Cal Water knowingly permitted contamination to spread from the Well. Cf. id.

Because Cal Water has not shown that amendment would be futile, dismissal of these claims will be with leave to amend.

### 6. Continuing Trespass

#### *Defendant's Argument*

Cal Water argues that no cause of action is stated because there are no colorable allegations that it engaged in negligent, reckless, or ultra-hazardous conduct. There is no culpable conduct alleged, other than owning a well. The passive migration of contamination onto or off of property cannot form the basis of a trespass.

#### *Plaintiff's Opposition*

Coppola's arguments with respect to this cause of action are the same as those made with respect to the nuisance causes of action.

#### *Discussion*

The arguments made as to this claim mirror the arguments made with respect to the nuisance claims. The Court agrees that the TAC does not adequately allege culpable conduct by Cal Water. Consistent with the nuisance claims, dismissal with leave to amend is appropriate.

### 7. Porter-Cologne Act & Waste

Coppola states that they do not oppose dismissal of these two causes of action. See Doc. No. 101 at 19:18-21. Given Coppola's express non-opposition, these claims will be dismissed.

### 8. Indemnity, Contribution, & Declaratory Relief

#### *Parties' Arguments*

Cal Water argues that Coppola's claim for declaratory relief fails because it is dependent on the other improperly pled causes of action. Coppola argues that this cause of action is derivative of their other claims and thus, it should survive.

#### *Discussion*

The parties appear to agree that these causes of action are derivative of the prior causes of

45

action.  As discussed above, because each of the other causes of action against Cal Water will be

dismissed, the claims for declaratory relief, indemnity, and contribution will also be dismissed.

Additionally, as discussed above, without an allegation that Coppola has actually paid a

judgment or settlement, there is no claim for equitable indemnity.  See Western Steamship, 8

Cal.4th at 110; Forensis, 130 Cal.App.4th at 28; City of San Diego, 30 Cal.App.4th at 587.


**III.**     **The City's Rule 12(b)(7) Motion To Dismiss The Second Cause of Action – HSAA**

         *Defendant's Argument*

         The City argues that Martin's pursuit of claims under the HSAA requires that the State

Account, which was established by the HSAA, be made a party to the suit.  HSAA § 25361(a)

requires that the State Account be a party in any action for the recovery of costs or expenditures

under HSAA.  Further, under HSAA § 25362, any person who may be liable for costs and

expenditures should be made a party to the lawsuit.  The State Account is liable for any portion

of a judgment in excess of the aggregate amount of costs or expenditures apportioned to the other

liable parties.  Failure to join the State Account prejudices both the Account and the parties

before the court.  The State Account is deprived of an opportunity to argue that other defendants

should be apportioned a greater amount of liability, and the answering parties are deprived of the

opportunity to reduce their proportionate liability by foisting responsibility onto the State

Account.  The potential windfall opens the possibility of new litigation that can be avoided by

joining the State Account now.

         *Plaintiffs' Opposition*

         Coppola argues that joinder of the State Account under Rule 19 is unnecessary.  First, the

legislative intent indicates that the State Account is to be a party when a state, city, county, or

other governmental entity brings a claim for relief.  However, this case is being brought by a

private entity.  Second, the structure of the HSAA does not support the City.  Section 25361(a)

does not help the City because there is no showing that the State Account funds were expended.

Also, HSAA § 25377 states that naming the State Account is not a condition precedent to

bringing a lawsuit, and HSA § 25361(b) permits the Attorney General to recover money in a

1  separate action.  Third, the City essentially wants the State Account joined for purposes of

2  contribution, but Rule 19 does not require joinder of those against whom contribution rights

3  exist.  Finally, the City cites no authority that would justify dismissal of the claims against it if

4  the State Account is not named.  If joinder is necessary, amendment should be permitted.

5       *Legal Standard*

6       Rule 12(b) permits a party to assert as a defense "the failure to join a party under Rule

7  19."  Fed. R. Civ. Pro. 12(b)(7).  Rule 19 deals with the "Required Joinder of Parties."  Fed. R.

8  Civ. Pro. 19.  Rule 19 "imposes a three step inquiry: (1)  Is the absent party necessary (i.e.,

9  required to be joined if feasible) under Rule 19(a)?[28]  (2) If so, is it feasible to order that the

10  absent party be joined?  (3) If joinder is not feasible, can the case proceed without the absent

11  party, or is the absent party indispensable such that the action must be dismissed?"  Salt River

12  Project Agric. Improvement & Power Dist. v. Lee, 672 F.3d 1176, 1179 (9th Cir. 2012).  The

13  party making a Rule 12(b)(7) motion to dismiss bears the burden of demonstrating that dismissal

14  or joinder is appropriate.  See Makah Indian Tribe v. Verity, 910 F.2d 555, 558 (9th Cir. 1990);

15  Asarco LLC v. Shore Terminals LLC, 2011 U.S. Dist. LEXIS 72859, *5 (N.D. Cal. July 7,

16  2011).

17       *Discussion*

18       The State Account, which is the Toxic Substances Control Account, see Cal. Health &

19  Safety Code § 25324, is an account that is designed to disburse monies to various programs and

20  in various situations relating to the control, remediation, or removal of hazardous materials.  See

21  Cal. Health & Safety Code § 25173.6; Morning Star Co. v. Board of Equalization, 201

22  Cal.App.4th 737, 744 (2011).  The HSAA provides for the apportionment of recoverable costs

23  and expenditures between parties based on the portion of costs attributable to each party.  See

24

25       [28]Rule 19(a) reads in pertinent part:
    (1) Required Party. A person who is subject to service of process and whose joinder will not deprive the court of
26  subject-matter jurisdiction must be joined as a party if:
       (A) in that person's absence, the court cannot accord complete relief among existing parties; or
27       (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the
    action in the person's absence may:
28       (i) as a practical matter impair or impede the person's ability to protect the interest; or
       (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent
          obligations because of the interest.

Health & Safety Code §§ 25363(a), (b).  If the aggregate apportionment between the parties is less than 100% of the total costs and expenditures, then the State Account pays the difference so that all costs and expenditures are covered.  See id. at § 25363(c).  Also, the HSAA makes provision for the State Account to be a party in certain litigation.  See Cal. Health & Safety Code § 25361.  Of particular relevance, § 25361(a), reads: "The state account shall be a party in any action for recovery of costs or expenditures under this chapter incurred from the state account."

The basis of the City's motion is § 25361(a).  The Court is unaware of any case to interpret or cite to this statute.  Nevertheless, the plain language of that statute shows a mandatory command for the State Account to be a party in certain types of "actions."  Those actions are ones that seek recovery of HSAA costs or expenditures that were incurred from the State Account itself.  Additionally, the term "action for recovery of costs or expenditures under this subchapter incurred from the state account" appears to the Court to relate to actions brought by the California Attorney General under Health & Safety Code § 25360.  Citing to § 25360, California Jurisprudence 3d has explained, "*Any costs incurred and payable from* the hazardous substance account or the hazardous substance cleanup fund must be recovered by the Attorney General in a civil action, upon the request of the Department or regional board, from the persons liable."  50 Cal. Jurisprudence 3d – Pollution & Conservation Laws § 188 (emphasis added).

As applied to this case, the TAC does not allege that the State Account incurred HSAA costs or expenditures, nor does the TAC allege that Coppola is seeking to recover HSAA costs or expenditures that were incurred by the State Account.  Further, it goes without saying that this action is not being brought by the Attorney General.  As such, the City has not met its burden of showing that the State Account is a necessary party through operation of § 25361(a).[29]

The City is understandably attempting to shift costs/liability away from itself and towards the State Account.  However, the City has not shown that § 25361(a) applies in this case.

---

[29]The Court notes that a quick on-line search discovered a number of HSAA cases in which the State Account was not a named party.  E.g. Kfd Enters. v. City of Eureka, 2012 U.S. Dist. LEXIS 177551 (N.D. Cal. Dec. 14, 2012); City of San Diego v. National Steel & Shipbuilding Co., 2012 U.S. Dist. LEXIS 105149 (S.D. Cal. July 27, 2012); United Alloys, Inc. v. Baker, 797 F.Supp.2d 974 (C.D. Cal. 2011); Team Enters., LLC v. Western Inv. Real Estate Trust, 2010 U.S. Dist. LEXIS 79912 (E.D. Cal. Aug. 9, 2010); Moore v. IMCO Recycling of CA, Inc., 2005 U.S. Dist. LEXIS 45779 (C.D. Cal. June 29, 2005).

1  Without application of § 25361(a), there is no apparent basis for joining the State Account.  The

2  City's Rule 12(b)(7) motion will be denied.

3

4  **IV.     The City's Motion To Dismiss The Third Cause of Action – Negligence**

5       The City moves to dismiss the third cause of action for negligence.  Coppola states that

6  they do not oppose dismissal of this cause of action against the City.

7       The City's motion was filed when the Second Amended Complaint was operative.

8  However, with the filing of the TAC, the Second Amended Complaint lost its legal effect.  <u>See</u>

9  <u>Lacey v. Maricopa County</u>, 693 F.3d 896, 927 (9th Cir. 2012).  The TAC now expressly states

10 that the negligence cause of action is not alleged against the City.  Because the TAC is the

11 operative pleading, the City's motion is now unnecessary.  However, in light of Coppola's non-

12 opposition, and in order to avoid possible confusion, the Court will grant the City's motion.

13

14                              **CONCLUSION**

15      The Defendants have filed three Rule 12(b)(6) motions and one Rule 12(b)(7) motion.

16 As to the three motions to dismiss by the City, Martin, and Cal Water, the Court has by and large

17 found merit to most the arguments in these motions.  As currently pled, the TAC does not

18 contain sufficient factual allegations to support plausible causes of action.  There are either an

19 absence of allegations altogether, reliance on mere legal conclusions, or only partially supportive

20 allegations.  Because it does not appear that amendment would be futile, as discussed above, the

21 claims will be dismissed with leave to amend.  As for the motion to join a necessary party, the

22 City has not met its burden of showing that the State Account is in fact a necessary party to this

23 litigation.  Joinder of the State Account will be denied

24

25                                **ORDER**

26      Accordingly, IT IS HEREBY ORDERED that:

27 1.    Defendant Martin and Martin Property's motion to dismiss is GRANTED;

28 2.    Defendant Cal Water Service Co.'s motion to dismiss is GRANTED;

    3.    Defendant the City of Visalia's motion to dismiss is GRANTED;

                              49

4.    Defendant the City of Visalia's motion to join a necessary party is DENIED; and

5.    Plaintiffs have thirty (30) days from the service of this order to file an amended complaint that is consistent with this order.

IT IS SO ORDERED.

Dated:   March 26, 2013   

_____

SENIOR  DISTRICT  JUDGE

50