UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIOLA COPPOLA, et al., <br><br> Plaintiffs <br><br> v. <br><br> GREGORY SMITH, et al., <br><br> Defendants <br><br> AND RELATED CLAIMS | CASE NO. 1:11-CV-1257  AWI BAM <br><br> ORDER ON DEFENDANT CAL WATER'S MOTION TO DISMISS <br><br> (Doc. No. 174) |

This is an environmental law case that arises from the chemical contamination of property surrounding a dry cleaning business in Visalia, California.  Plaintiffs (collectively "Coppola") have brought suit against *inter alia* the California Water Service Company ("Cal Water").  The Court previously dismissed the Third and Fourth Amended Complaints under Rule 12(b)(6) following motions filed by *inter alia* Cal Water.  The active complaint is the Fifth Amended Complaint ("FAC").  Now before the Court is Cal Water's motion to dismiss the FAC.  For the reasons that follow, the motion will be granted in part and denied in part.

**GENERAL BACKGROUND**

From the FAC, Coppola owns the real property and the dry cleaning business, One Hour Martinizing, located at 717 West Main Street ("717 W. Main"), Visalia, California.

Since 1995, Martin has owned the real property located at 110 North Willis Street ("110 N. Willis"), Visalia, California. 110 N. Willis currently houses office space and is located within 0.08 miles of 717 W. Main. Millers Dry Cleaners previously operated at 110 N. Willis and was owned

1  by Defendants Harley and Cheryl Miller. Based on judicially noticed documents, Millers Dry
2  Cleaners began operation in 1959. Millers Dry Cleaners is no longer in operation.
3       At 119 South Willis Street ("119 S. Willis"), Visalia, California is another dry cleaning
4  facility, Paragon Cleaners. 119 S. Willis is located 0.1 miles from 717 W. Main.
5       Cal Water owns and operates public drinking water systems throughout California,
6  including the City. Cal Water owned and operated Well CWS 02-03 ("the Well") until 2005, at
7  which time it was abandoned by Cal Water. In 2000, however, Cal Water stopped operating the
8  Well because of increasing levels of PCE. The Well is located 20 feet east of 717 W. Main.
9       On October 28, 2009, the California Department of Toxic Substances Control ("DTSC")
10  informed Coppola that it was investigating the occurrence of tetrachloroethylene, also known as
11  perchloroethylene ("PCE"), in the soil and groundwater at 717 W. Main. PCE is a hazardous
12  substance. Apparently, it was later determined that the soil and groundwater both at and near 717
13  W. Main was contaminated with PCE.
14       Coppola alleges that the PCE was released due to the dry cleaning activities at 119 S.
15  Willis and 110 N. Willis. Coppola also alleges that Cal Water's operation of the Well led to the
16  release of PCE. Coppola seeks damages from the Defendants, including contribution and
17  indemnification, associated with soil and groundwater contamination.
18
19  **RULE 12(b)(6) FRAMEWORK**
20       Under Federal Rule of Civil Procedure 12(b)(6), a claim may be dismissed because of the
21  plaintiff's "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A
22  dismissal under Rule 12(b)(6) may be based on the lack of a cognizable legal theory or on the
23  absence of sufficient facts alleged under a cognizable legal theory. Conservation Force v. Salazar,
24  646 F.3d 1240, 1242 (9th Cir. 2011); Johnson v. Riverside Healthcare Sys., 534 F.3d 1116, 1121
25  (9th Cir. 2008). In reviewing a complaint under Rule 12(b)(6), all allegations of material fact are
26  taken as true and construed in the light most favorable to the non-moving party. Faulkner v. ADT
27  Sec. Servs., 706 F.3d 1017, 1019 (9th Cir. 2013); Johnson, 534 F.3d at 1122. However,
28  complaints that offer no more than "labels and conclusions" or "a formulaic recitation of the

elements of action will not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Dichter-Mad Family Partners. LLP v. United States, 709 F.3d 749, 761 (9th Cir. 2013). The Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." Wilson v. Hewlett-Packard Co., 668 F.3d 1136, 1145 n.4 (9th Cir. 2012); Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001). To avoid a Rule 12(b)(6) dismissal, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678; see Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678; Dichter-Mad, 709 F.3d at 761. "Plausibility" means "more than a sheer possibility," but less than a probability, and facts that are "merely consistent" with liability fall short of "plausibility." Iqbal, 556 U.S. at 678; Li v. Kerry, 710 F.3d 995, 999 (9th Cir. 2013). Complaints that offer no more than "labels and conclusions" or "a formulaic recitation of the elements of action will not do." Iqbal, 556 U.S. at 678; Dichter-Mad, 709 F.3d at 761. The Ninth Circuit has distilled the following principles from *Iqbal* and *Twombly*: (1) to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively; (2) the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation. Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011). In assessing a motion to dismiss, courts may consider documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice. Dichter-Mad, 709 F.3d at 761. If a motion to dismiss is granted, "[the] district court should grant leave to amend even if no request to amend the pleading was made . . . ." Henry A. v. Willden, 678 F.3d 991, 1005 (9th Cir. 2012). However, leave to amend need not be granted if amendment would be futile or if the plaintiff has failed to cure deficiencies despite repeated opportunities. See Mueller v. Aulker, 700 F.3d 1180, 1191 (9th Cir. 2012); Telesaurus VPC. LLC v. Power, 623 F.3d 998, 1003 (9th Cir. 2010).

**CAL WATER'S MOTION TO DISMISS**

*Defendant's Argument*

Cal Water argues that CERCLA claims based on a "transporter" theory should be dismissed. Cal Water argues that, although Coppola's factual allegations almost exclusively focus on a "transporter" theory, in the prior iterations of the Complaint Coppola locked themselves into a "past owner" theory under § 9607(a)(2). Coppola did not defend the "transporter" theory in opposing the first motion to dismiss, and did not make "transporter" allegations in the Third Amended Complaint. However, even if Coppola has not waived its "transporter" theory, the FAC fails to allege the necessary elements. There is no indication that PCE or PCE-contaminated water was "accepted" by Cal Water. Rather, the only manifest intent by Cal Water was to pull groundwater out of the environment. Although the FAC alleges that a disposal occurred while the Well was cycled off, the implication is that contaminants seeped through the Well accidently while the Well was not operating. Such conduct does not represent a volitional and intended acceptance. Finally, the FAC fails to allege that Cal Water actively participated in the selection of where to transport the PCE or that Cal Water had substantial input in that decision. In fact, there are no allegations that Cal Water was involved in any selection process or disposal decision of any kind. At best, the allegations suggest that Cal Water was no more than a mere conduit of the waste, which is insufficient for transporter liability.

Cal Water also argues that CERCLA claims based on a "past owner" theory should be dismissed. Coppola previously admitted that they "are not making a cost recovery claim based on the water in Cal Water's pipes . . . ." Thus, to the extent that Coppola is now trying to make a claim based on movement of water in the Well, they are foreclosed from doing so based on their prior representations. Further, Coppola has failed to correct the defects identified by the Court in the last dismissal order. There must be allegations of a "disposal" at a "facility." However, the FAC contains no factual allegations that the show a disposal occurred at the Well. Further, there are no allegations that suggest any type of discarding occurred at the Well. Instead, Coppola is reasserting the general "pumping theory" that was rejected by the Court in the last dismissal order. There are allegations that contaminated water moved into previously uncontaminated areas, but

1  there is no allegation that the disposal was "at the Well" or that Cal Water owned or operated these
2  previously uncontaminated areas.
3      With respect to the claims for declaratory relief under 42 U.S.C. § 9613, such claims are
4  dependent upon CERCLA liability under 42 U.S.C. § 9607.  Because the FAC fails to allege
5  CERCLA liability under either a "past owner" or "transporter" theory, Coppola's claims for
6  declaratory relief fail.
7      *Plaintiff's Opposition*
8      Coppola argues that dismissal of the transporter theory is inappropriate.  Coppola argues
9  that it has not forfeited any theories.  Parties may make inconsistent and even contradictory
10 allegations in their complaints, and amended complaints completely supersede the originals.
11 Absent a showing of bad faith, a party is not bound by the four corners of a prior complaint.  In
12 terms of the elements of "transporter" liability, this case is similar to the *Kaiser Aluminum* case.
13 *Kaiser Aluminum* held a contractor liable as a transporter because it transported contaminated soil
14 to an uncontaminated portion of a single piece of property, even though the contractor was
15 unaware that the soil contained contaminants.  Nevertheless, the transporter engaged in a
16 deliberate acceptance, movement, and depositing of waste/soil.  That is, the deliberate movement
17 of the contaminated soil constituted acceptance.  Here, the FAC alleges an acceptance, movement,
18 and depositing of waste which resulted in movement of PCE into the previously uncontaminated
19 deeper groundwater zone.  Cal Water acknowledges that its only manifest intent was to pull
20 groundwater out of the environment, and the FAC shows that Cal Water's own sampling and
21 analysis of groundwater revealed increasing concentrations of PCE due to Cal Water's active
22 pumping.  Because Cal Water continued to pump despite knowledge of the increasing PCE levels,
23 Cal Water "accepted" the PCE.  Cal Water was not a mere conduit of waste, rather it actively
24 participated in and had complete control of the selection decision.  Cal Water's prior invocation of
25 the "useful product" defense is tantamount to an admission that Cal Water selected where the
26 contaminated groundwater would be transported after Cal Water accepted it into the Well.
27     Coppola also argues that dismissal of the past owner claims are inappropriate.  Coppola
28 argues that it is undisputed that the Well and the surrounding contamination plume constitutes a

"facility" under CERCLA, and the FAC alleges that Cal Water is the former owner and operator of the Well and the surrounding area where Cal Water disposed of PCE. The FAC further alleges that Cal Water's construction and operation of the Well "created a mechanism for the disposal, transport, release, and/or movement of PCE in groundwater, causing PCE to be transported to and disposed of at previously uncontaminated areas." These allegations are in alignment with theories accepted in *Kaiser Aluminum*. Coppola indicates that Cal Water's pumping activities resulted in three distinct outcomes for the PCE that was forcibly drawn downward from the shallow groundwater: (1) some PCE entered into the Well through its openings, was captured by the Well's distribution system, and was distributed to Cal Water's customers; (2) some PCE entered into the Well through its openings, was not captured by the Well's distribution system, was not distributed to Cal Water's customers, but was disposed of (i.e. released, deposited, leaked, and transported back out of the Well openings) into the deeper groundwater zone upon cessation of the Well's active pumping; and (3) some PCE was forcibly lowered from the shallow groundwater to the deeper groundwater zone as affected by the Well's radius of influence, was neither not captured by the Well nor entered the Well through openings, but was disposed of and remains in the deeper groundwater zone.

With respect to the claims for declaratory relief under 42 U.S.C. § 9613, because the FAC properly alleges CERCLA liability under both "past owner" and "transporter" theories, the claims for declaratory relief do not fail.

*Relevant Allegations*

The Well was installed by Cal Water in 1922 and goes about 325 feet below the ground. See FAC ¶¶ 59, 61. Cal Water's operation of the Well created a mechanism for the disposal, transport, release and/or movement of PCE in the groundwater, causing PCE to be transported to and disposed of at previously uncontaminated areas. See FAC ¶ 62. Cal Water's operation of the Well caused PCE to be deposited, stored, disposed of, placed, or otherwise transported to, and come to be located at, previously uncontaminated areas. See FAC ¶ 63. PCE was originally released near the Well from nearby properties, business, or utilities ("the Initial Release Points") and migrated from the surface or near the surface through the soil to the "shallow groundwater,"

which was about 100 feet below ground surface. See FAC ¶ 64. The shallow groundwater at and around the Initial Release Points and the Well naturally migrated horizontally and generally maintained a consistent depth below the ground surface. See FAC ¶ 65. Near the ground surface, and for a limited depth thereafter, the Well's enclosure was solid. See FAC ¶ 66. However, as the Well's casing continued its vertical descent, the casing had openings that allowed water to enter while pumping and to exit when the pump was not on. See id. When the Well was pumping, the water level was lowered and a gradient was created between the water in the shallow groundwater and the water in the Well. See FAC ¶ 67. Because water flows from high to low levels, this gradient caused water from the shallow groundwater zone to flow into the Well, carrying and depositing PCE in the deeper groundwater. See id. The lowering of the groundwater levels around the Well is referred to as the "cone of depression." See id. Cal Water's operation of the Well lowered the groundwater by about 50 feet, and the cone of depression around the Well caused the shallower PCE contaminated groundwater to move down the cone of depression and become deposited in and transported to previously uncontaminated areas. See FAC ¶ 68. Cal Water operated the Well intermittently, and cycled the pump on and off in response to water demand. See FAC ¶ 69. When the Well's pump was cycled off, the PCE-contaminated groundwater that had been pulled into and near the Well, and that would have been pumped into the distribution system if the Well remained on at all times, was released into the environment, i.e. the PCE was transported to and deposited at the deeper groundwater by operation of the Well. See id. Cal Water's operation of the Well forced the shallow PCE-contaminated groundwater to move, disperse, and/or release by way of vertical transport because the natural movement of the shallow groundwater at its original depth was disrupted by the Well's construction and operation. See FAC ¶ 70. Once disrupted, the shallow groundwater and the PCE contained therein were transported down vertically and disposed at previously uncontaminated areas in and around the Well. See id. The pumping at the Well did not collect all the groundwater containing PCE, and the Well operations forcibly caused the contaminated groundwater to migrate vertically downward and come to be located and disposed of at previously uncontaminated areas at deeper depths. See FAC ¶ 71. This conduct created a deeper contamination plume of PCE, which would have

7

otherwise been limited to the shallow groundwater zone. See id. Cal Water's construction and intermittent pumping of the Well caused the PCE-contaminated groundwater to move, disperse, and/or release thereby being placed into previously uncontaminated areas, which is a "disposal" under 42 U.S.C. § 9601(29). See FAC ¶ 73. Cal Water's construction, ownership, and operation of the Well has caused the movement and dispersal of PCE from a contaminated area, i.e. the shallow groundwater zone, to move vertically downward to previously uncontaminated depths, which qualifies as a "transport" within the meaning of 42 U.S.C. § 9601(26), and renders Cal Water a "transporter" under 42 U.S.C. § 9607(4). See FAC ¶ 74.

Prior to 2000, Cal Water tested and detected PCE in increasing concentrations. See FAC ¶ 75. PCE was detected at 0.4 µg/L in 1992, at 1.0 µg/L in 1997, at 4.6 µg/L in 1999, and 4.9 µg/L in 2000. See id. The detection of 4.9 µg/L was found at the intake of the Well, and confirms that PCE of greater than 5 µg/L was dragged into deeper, previously uncontaminated groundwater. See id. Since at least 1992, Cal Water was aware of the risks of the presence of PCE in the Well, but continued to unreasonably supervise, control, and operate the Well, with knowledge that the active cycling of the pump of the Well would cause the release of PCE. See FAC ¶ 76. Cal Water knew or should have known that the increasing levels of PCE in the Well meant that it was moving, dispersing, and releasing PCE into deeper groundwater, which would not have otherwise naturally occurred at that depth. See FAC ¶ 77. Cal Water failed to take reasonable precautions to safely operate the Well to prevent the transport and subsequent release of PCE from the Well into previously uncontaminated areas. See FAC ¶ 79.

*Legal Standard*

CERCLA is a strict liability statute in that it does not require culpable conduct, and it is interpreted liberally in order to achieve the goals of cleaning up hazardous waste sites promptly and ensuring that the responsible parties pay the costs of the clean-up. Voggenthaler v. Maryland Square, LLC, 724 F.3d 1050, 1061, 1064 (9th Cir. 2013). To establish a prima facie claim for recovery of response costs under § 9607(a), a private-party plaintiff must demonstrate: (1) the site on which the hazardous substances are contained is a "facility"' as defined by 42 U.S.C.§ 9601(9); (2) a "release" or "threatened release" of any "hazardous substance" from the facility has

8

occurred; (3) such "release" or "threatened release" has caused the plaintiff to incur response costs that were "necessary" and "consistent with the national contingency plan"; and (4) the defendant is within one of four classes of "potentially responsible parties" subject to the liability provisions of § 9607(a). City of Colton v. Am. Promotional Events, Inc.-West, 614 F.3d 998, 1002-03 (9th Cir. 2010); Carson Harbor Village, Ltd. v. Unocal Corp., 270 F.3d 863, 870-71 (9th Cir. 2001). A "release" is "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment . . . ." 42 U.S.C. § 9601(22). CERCLA imposes strict liability for environmental contamination upon four broad classes of "potentially responsible parties." 42 U.S.C. § 9607(a); Burlington Northern & Santa Fe Ry. v. United States, 556 U.S. 599, 608-09 (2009).

One of the four categories of potentially responsible parties is "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2); Voggenthaler, 724 F.3d at 1064. An "owner" is someone who holds title to the facility. BNSF, 643 F.3d at 679-81. An "operator" is one who "manage[s], direct[s], or conduct[s] operations specifically related to the pollution, that is, operations having to do with the leakage or disposal of the hazardous waste." United States v. Bestfoods, 524 U.S. 51, 66-67 (1998); BNSF, 643 F.3d at 680. The term "disposal" means: "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such [waste] or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 9601(29); Voggenthaler, 724 F.3d at 1064. Thus, for liability under § 9607(a)(2), "there must have been a 'discharge, deposit, injection, dumping, spilling, leaking, or placing' of contaminants [at the facility] during [the defendant's] ownership." Carson Harbor, 270 F.3d at 875; Coeur D'Alene Tribe v. Asarco, Inc., 280 F.Supp.2d 1094, 1112 (D. Idaho 2004); see 42 U.S.C. § 9607(a)(2). "Disposal" generally refers to the "affirmative act of discarding a substance as waste, and not to the productive use of the substance." Carson Harbor, 270 F.3d at 877; 3550 Stevens Creek Assocs. v. Barclays Bank, 915 F.2d 1355, 1362 (9th Cir. 1990). "Disposal" includes a defendant's "movement and spreading of contaminated soil to

9

uncontaminated portions of property," and is not limited "to the initial introduction of hazardous material onto property." Carson Harbor, 270 F.3d at 877 (describing Kaiser Aluminum & Chem. Co. v. Catellus Dev. Corp., 976 F.2d 1338, 1342 (9th Cir. 1992)); see also United States v. CDMG Realty Co., 96 F.3d 706, 719 (3d Cir. 1996). In determining whether there has been a "disposal," the Ninth Circuit does not employ an "absolute binary 'active/passive' distinction," but instead requires courts to examine "each of the terms [used by § 9601(29)] in relation to the facts of the case and determine whether the movement of contaminants is, under the plain meaning of [those] terms, a 'disposal.'" Carson Harbor, 270 F.3d at 879; see Niagara Mohawk Power Corp. v. Jones Chem. Inc., 315 F.3d 171, 178 (2d Cir. 2003). Under this approach, the Ninth Circuit has found that the passive migration of contaminants through soil does not constitute a "disposal" because it does not fit within the plain meaning of § 9601(29)'s terms. Carson Harbor, 270 F.3d at 879-81. In contrast, the movement of contamination that results from human conduct is a "disposal." Carson Harbor, 270 F.3d at 877; Kaiser Aluminum, 976 F.2d at 1342; Coeur D'Alene, 280 F.Supp.2d at 1112; see also Coppola v. Smith, 2013 U.S. Dist. LEXIS 161281, *23 n.1 (E.D. Cal. Nov. 12, 2013).

Another category of potentially responsible parties is "any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs . . . ." 42 U.S.C. § 9607(a)(4); Kaiser Aluminum, 976 F.2d at 1343. "Liability as a 'transporter' is established by showing that a person accepted hazardous substances for transport and either selected the disposal facility or had substantial input into deciding where the hazardous substance should be disposed." United States v. USX Corp., 68 F.3d 811, 820 (3d Cir. 1995). "Transporter" liability may be imposed "for transporting hazardous material to an uncontaminated area of property, regardless of whether the material was conveyed to a separate parcel of land." Kaiser Aluminum, 976 F.2d at 1343. However, a "transporter clearly does not select the disposal site merely by following the directions of the party with which it contracts," since such a transporter acts only as "a mere conduit of the waste." United States v. Davis, 261 F.3d 1, 55-56 (1st Cir. 2001); Tippins Inc. v. USX Corp., 37 F.3d 87, 95 (3d Cir.1994).

10

*Discussion*

1.   "Transporter" Liability Under 42 U.S.C. § 9607(a)(4)

In the order that dismissed the Third Amended Complaint,[1] the Court required Coppola to specify into which category or categories of potentially responsible parties each defendant fit. See Coppola v. Smith, 935 F.Supp.2d 993, 1010 (E.D. Cal. 2013) (". . . the Court will require Coppola to eliminate the allegations that do not actually reflect the potentially responsible person theories that are being pursued against Martin (and all other defendants)."). In discussing Cal Water's particular motion to dismiss, the Court reiterated that if "Coppola intends to pursue only one CERCLA theory of recovery against a defendant, then the allegations against that defendant should be confined to that single theory. . . . An amended complaint shall delete any non-applicable allegations and theories with respect to each defendant." Id. at 1026. The Court also noted that Coppola's opposition clarified that liability under § 9607(a)(2) was being pursued against Cal Water, although there was also a suggestion that Cal Water might also be liable under § 9607(a)(3) as an "arranger." See id. at 1023, 1026 n.17. When Coppola filed the Fourth Amended Complaint, they alleged only prior owner or operator liability against Cal Water. See Doc. No. 120 at ¶ 89. The Court later dismissed the Fourth Amended Complaint and identified deficiencies in the § 9607(a)(2) theory. See Coppola v. Smith, 2013 U.S. Dist. LEXIS 161281, *21-*29 (E.D. Cal. Nov. 12, 2013). Because it was not clear that amendment would be futile, leave to amend was granted. See id. In the FAC, Coppola continues to allege liability under § 9607(a)(2), but for the first time now alleges and actively defends a claim under § 9607(a)(4).

There is a significant procedural problem. In the last dismissal order, the Court did not grant Coppola leave to add the new transporter theory. When the Court granted Coppola leave to amend the Fourth Amended Complaint, it did so in order for Coppola to refine and address the identified deficiencies of the § 9607(a)(2) theory. No mention, either by the Court or by Coppola, was ever made of a transporter theory under § 9607(a)(4). The addition of the § 9607(a)(4) transporter theory is therefore outside the scope of the amendment permitted by the prior dismissal

---

[1] Cal Water and Martin & Martin Properties each filed separate motions to dismiss the Third Amended Complaint. The Court resolved both motions in one order.

11

order. See id. "When a district court grants leave to amend for a specified purpose, it does not thereafter abuse its discretion by dismissing any portions of the amended complaint that were not permitted." Raiser v. City of Los Angeles, 2014 U.S. Dist. LEXIS 26306, *9-*10 (C.D. Cal. Feb. 26, 2014); see also Benton v. Baker Hughes, 2013 U.S. Dist. LEXIS 94988, *8-*10 (C.D. Cal. June 30, 2013) (and cases cited therein).

In addition to the above procedural problem, there are also substantive problems with the § 9607(a)(4) claim. A "transporter" under CERCLA is one who "accepts or has accepted a hazardous substance for transport to disposal or treatment facilities, incineration vessels or sites selected by such person . . . ." 42 U.S.C. § 9607(a)(4). By the plain language of this statute, Coppola's theory would boil down to the proposition that Cal Water accepted the PCE-contaminated water in order to move it to the deeper groundwater zone, which was a site that Cal Water had selected. Such a proposition is not supported by the FAC's allegations. The FAC describes pumping water towards the Well, with some water being collected within the Well, and some water not being collected within the Well. If anything, there may be a colorable argument that water was transported to the Well (not to deeper groundwater zones) in order to be taken to the remaining portions of Cal Water's delivery system. There are significant disconnects, both in terms of Cal Water "accepting" PCE-contaminated water *to be transported to* the deeper groundwater zone, and in terms of Cal Water *selecting* the deeper groundwater zone as the site to which it would be transporting PCE-contaminated water. Moreover, it is doubtful that Cal Water ever "accepted" the PCE-contaminated water for transport. For purposes of § 9607(a)(4), at least two courts have indicated that the owner of a well who pumps contaminated groundwater has not "accepted" a hazardous substance for transport. See KFD Enters. v. City of Eureka, 2010 U.S. Dist. LEXIS 125135, *18-*19 (N.D. Cal. Nov. 12, 2010);[2] Southern Cal. Water Co. v. Aerojet-Gen. Corp., 2003 U.S. Dist. LEXIS 26534, *15 n.2 (C.D. Cal. Apr. 1, 2003). It is true that the FAC uses the term "transport" many times. However, more than actual movement of a hazardous substance is required for "transporter" liability under § 9607(a)(4). The factual allegations must

---

[2] *KFD* noted that the allegations suggested a hazardous substance had seeped through the well by accident. However, *KFD* cited with approval *Southern Cal. Water Co.* for the proposition that a party that pumped contaminated groundwater did not accept the hazardous waste. See KFD, 2010 U.S. Dist. LEXIS 125135 at *18-*19.

12

plausibly suggest that PCE-contaminated water was accepted to be transported to a selected site. Here, the FAC's allegations do not plausibly allege "acceptance" or "selection" by Cal Water.

This is the first time that Coppola has attempted to pursue and defend a "transporter" theory. Generally, the Court would permit amendment. However, this is the Fifth Amended Complaint, the transporter theory was not pursued in the Fourth Amended Complaint despite the Court's admonition in the first dismissal order, the transporter theory exceeds the scope of the amendment permitted by the second dismissal order, and the allegations do not plausibly allege key elements of "transporter" liability. Given these considerations, Coppola's transporter theory will be dismissed without leave to amend. See Royal Ins. Co. of Am. v. Southwest Marine, 194 F.3d 1009, 1017 (9th Cir. 1999); Stein v. United Artists Corp., 691 F.2d 885, 898 (9th Cir. 1982).

2. "Prior Owner or Operator" Liability Under 42 U.S.C. § 9607(2)

a. The Well

Cal Water's motion is based largely on the argument that Coppola did not adequately cure the deficiencies that were noted in the second dismissal order. In the second dismissal order, the Court explained in relevant part:

> Coppola must allege facts that show a 'disposal' occurred 'at the Well' during Cal Water's ownership or operation of the Well. That is, Coppola must allege that Cal Water discharged, deposited, injected, dumped, spilled, leaked, or placed PCE at or into the Well, such that the PCE at or in the Well could enter the environment. Further, given the nature of the term 'disposal,' there must be some indication that the PCE or the water containing the PCE was discarded by Cal Water.

Coppola, 2013 U.S. Dist. LEXIS 161281 at *22-*23.

Coppola has made allegations that touch on the prior order's discussion. Particularly noteworthy are the allegations in Paragraph 69. That paragraph reads:

> Cal Water operated [the Well] intermittently, cycling the pump on and off in response to water demand. When the pump in [the Well] was cycled off, the PCE contaminated groundwater that had been pulled into and near the Well and [that] would have been pumped into the distribution system if the Well remained on at all times and was released into the environment, i.e. the PCE was transported to and deposited at the deeper groundwater by Cal Water's operation of [the Well].

FAC ¶ 69. Additionally, Paragraph 66 confirms that the Well had openings that allowed water to enter the Well during pumping and to exit when not pumping. FAC ¶ 66. Also, a gradient caused

1  water to flow into the Well carrying and depositing PCE in deeper groundwater. FAC ¶ 67.

2  Paragraph 69 is not entirely clear. With respect to water that had been "pulled into . . . the Well," one reasonable reading is that when the Well's pump was turned off, PCE-contaminated water that had entered the well, but had not sufficiently entered the distribution system, "exited" the Well and ended up at the deeper groundwater zone. Such a reading is supported by Coppola's opposition. Coppola's opposition clarifies that one of the three outcomes of the PCE that was forcibly drawn downward from the shallow groundwater was that some PCE entered into the Well through its openings, was not captured by the distribution system, but was disposed of into the deeper groundwater zone upon cessation of pumping. See Doc. No. 195 at 5:18-21. That is, the PCE-contaminated water that was not captured by the distribution system was "released, deposited, leaked, and transported back out through the well openings and into the deeper groundwater zone adjacent to the Well's openings." Id. at 5:5-8. Because the opposition confirms one reasonable interpretation of Paragraph 69, the Court will read that paragraph as alleging that, once the Well stopped pumping, the PCE-contaminated water that had been drawn into the Well would "exit" the Well into the deeper groundwater zone.

With this reading of Paragraph 69, and construing the factual allegations in the light most favorable to Coppola, see Faulkner, 706 F.3d at 1019, the Court is satisfied that Coppola has alleged a violation of § 9607(a)(2). The allegations show that PCE-contaminated water entered the Well during the pumping process. When the pumps stopped, PCE-contaminated water then exited through the Well openings. It is not entirely clear how the PCE-contaminated water exited the Well. However, given the definition of the term "disposal," it is reasonably inferred that the PCE-contaminated water either "leaked" out of the Well openings or was "discharged" out of the Well openings.[3] See 42 U.S.C. § 9601(29); cf. Carson Harbor, 270 F.3d at 879. Therefore, the allegations indicate that a "disposal" occurred "at the Well."

The FAC also adequately indicates "discarding." With respect to "leaking," the term

---

[3] The Court is not holding that the "disposal" at issue can only be either "leaking" or "discharging." Other methods of disposal, as defined by § 9601(29), may apply. The discovery process should reveal into which category of "disposal" the exiting water most accurately fits, if any.

14

"leak" implies that a substance is escaping from a container that was meant in part to contain that substance.[4]  Generally, if a substance is escaping, it is no longer stored and is no longer useful.  Thus, leaking, whether intentional or not, is a type of discarding.  With respect to "discharging," the Well's pump was cycled on and off to meet demand.  See FAC ¶ 69.  Presumably when the Well's pump was off, Cal Water had sufficient water within its distribution system to meet demand, and no further water was needed at that time.  If the water in the Well was then discharged by Cal Water, then the discharge was an expression of not needing the water.  Such conduct is consistent with discarding.[5]

Cal Water is correct that there is more detail alleged in the opposition.  The additional facts identified in the opposition would no doubt have made resolution of this motion easier.  However, the level of detail in the opposition is not needed.  The allegations in the FAC can reasonably be read as describing PCE-contaminated water that had entered the Well during pumping, and then exited the Well when the pump was cycled off.  The opposition clarifies some ambiguities and supports a reading that was already possible.

Cal Water argues that Coppola should be precluded from pursuing the theory that PCE-contaminated water "leaked" or was "discharged" from the Well because Coppola had earlier conceded that their claims were not based on the water in Cal Water's pipes.  This argument was rejected in the Court's second dismissal order.  See Coppola, 2013 U.S. Dist. LEXIS 161281 at *28-*29.  The Court found that Coppola's statements were made in the context of answering a "useful product" argument and distinguishing the case of *Vernon Village, Inc. v. Gottier*, 755 F.Supp. 1142 (D. Conn. 1990), which involved customers who complained about being supplied with contaminated water.  The Court remains unconvinced that Coppola's statements amount to a

---

[4] Merriam-Webster's on-line dictionary defines the verb "leak" in relevant part to mean:  "to enter or escape through an opening usually by a fault or mistake"; "to let a substance or light in or out through an opening"; or "to permit to enter or escape through or as if through a leak."  See www.merriam-webster.com/dictionary/leak.

[5] In its reply, Cal Water also argues that there are insufficient allegations of "discarding" and relies on a Supreme Court decision under the Clean Water Act that pumping polluted water from one part of a water body to another part of the same body is not a "discharge."  This argument should have been made in Cal Water's original motion so that Coppola could have responded.  Because it was first raised in the reply, the Court need not definitively address it at this time.  However, the Court notes that the allegation is that the PCE-contaminated water exited the Well and went to a deeper groundwater zone, i.e. apparently a different body of water.

concession that precludes them from pursuing this theory. See Coppola, 2013 U.S. Dist. LEXIS 161281 at *28-*29. Additionally, CERCLA's definition of the term "facility" is broad and includes both "wells" and "pipelines or pipes." See 42 U.S.C. § 9601(9). Thus, "pipes" are another type of "facility" in addition to "wells." The FAC contains no allegations regarding Cal Water's "pipes" or "pipelines."

In sum, the FAC adequately alleges a disposal at the Well, and dismissal is inappropriate at this time.

### b. Surrounding Area

Paragraph 69 also discusses water that went "near" the Well. Coppola's opposition clarifies that this refers to PCE-contaminated water that was pumped toward the Well but never actually entered the Well, and then went to the deeper groundwater zone. See Doc. No. 195 at pp. 5, 13. Coppola's opposition also clarifies that it is alleging that Cal Water is a former owner and operator of the Well "and the surrounding area," and that the Well and the "surrounding area" or "surrounding contamination plume" is a "facility." See id. at pp. 8, 9. Coppola also states that Cal Water does not disagree that the Well and the surrounding area where PCE has come to be located constitutes a "facility." See id. at p. 8.

It is true that Cal Water's motion did not initially address the "facility" issue. This is likely because the FAC's focus is almost exclusively on "the Well." The FAC alleges that *the Well* was a "facility," and that Cal Water is the past owner and operator of *the Well*. See FAC ¶¶ 87, 96. Paragraph 63 does allege that Cal Water operated a facility that was located at Parcel No. 093-197-003 and included the Well, and that Cal Water's activities extended the facility to previously uncontaminated areas where Cal Water deposited PCE. See FAC ¶ 63. However, this paragraph is unique. At no other point, either in the paragraphs relating to Cal Water or under the first cause of action, does the FAC clearly allege that anything other than the Well is the facility at issue. See FAC ¶¶ 64-104. Given the FAC's clear focus on the Well, it is debatable whether there is sufficient notice of Coppola's claim. Nevertheless, accepting that the "facility" at issue includes the Well and the surrounding area, there are problems.

First, for a "disposal" to be found, there must be some indication that the owner or operator

was discarding the substance at the "facility."  See Coppola, 2013 U.S. Dist. LEXIS 161281 at *22-*23.  As discussed above, the FAC's factual allegations are sufficient to infer a discarding of water that had entered the Well and later exited the Well into the environment.  That is not the case for water that never entered the Well.  No factual allegations have been identified that would indicate that the water that had never entered the Well was nevertheless discarded by Cal Water.

Second, the FAC and Coppola's clarifications indicate that, in addition to the Well, it is actually the groundwater that was being "operated" by Cal Water.  As the Court understands Coppola's theory, it was the pumps that caused the groundwater to flow towards the Well, and then to other groundwater zones.  In other words, the groundwater was manipulated by Cal Water.  There are no allegations that deal with Cal Water operating land, and the factual allegations do not indicate that Cal Water did anything to the areas at which PCE came to rest or came to be located after migration.  At this time, it appears to the Court that the "facility" that would be at issue may actually be a combination of the Well and the groundwater.  However, at least one court has held that groundwater is not a "facility" within the meaning of CERCLA.  See Castaic Lake Water Agency v. Whittaker Corp., 272 F.Supp.2d 1053, 1077 (C.D. Cal. 2003).

Third, Coppola has cited no cases involving wells that support their theory.  In the CERCLA cases involving wells that have been cited, the theory that has been pursued is that the wells contained contamination or that the wells acted as conduits for hazardous substances to pass through into other groundwater zones.  Contaminated water was actually in some part of the wells in these cases.  Cf. Southern Cal. Water, 2003 U.S. Dist. LEXIS 26534 at *16 (wells contaminated with hazardous chemicals); Castaic Lake, 272 F.Supp.2d at 1057-58 (wells contaminated with perchlorate); Lincoln Properties v. Higgins, 823 F.Supp. 1528, 1532, 1538-39 (E.D. Cal. 1992) (wells permitted PCE to travel between water zones through wells' screens and cracks/breaks in the wells);[6] cf. also KFD, 2010 U.S. Dist. LEXIS 125135, *11-*12, *19 (contaminated water

---

[6] The Court notes that in their opposition to the first motion to dismiss, Coppola cited page 1538 of *Lincoln Properties* to support the assertion that "actively running well pumps to cause contamination to move and contaminate other aquifers or groundwater" is sufficient for one to be liable as an "operator."  See Doc. No. 101 at p.6.  However, at page 1538, *Lincoln Properties* discusses how the wells acted as conduits for pollution to travel to deeper groundwater zones, and the wells at issue were no longer used for water supply, but still remained a conduit for the PCE.  See Lincoln Props., 823 F.Supp. at 1538-39.

17

passed through the monitoring wells' screens to deeper groundwater zones, but holding that drilling through different groundwater zones made monitoring well owner an "operator").  No well cases have been cited where liability arose despite no hazardous substances actually entering or passing through the well.

As part of their opposition to the first motion to dismiss, Coppola cited *Employers Ins. of Wausau v. California Water Serv. Co.*, 2008 U.S. Dist. LEXIS 65433 (N.D. Cal. Aug. 25, 2008) to argue that their claims were not new or novel.  See Doc. No. 101 at pp. 7, 9.  Based on the allegations and the information before it, the Court agreed that the claims in *Employers Ins.* appeared to be similar to Coppola's claims.  See Coppola, 935 F.Supp.2d at 1025.  *Employers Ins.* was an insurance coverage dispute between Cal Water and its insurer regarding two underlying lawsuits – *California DTSC v. City of Chico*[7] and *California DTSC v. Payless Cleaners*.  See Employers Ins., 2008 U.S. Dist. LEXIS 65433 at *1.  *Employers Ins.* described the two lawsuits as involving the "activities of pumping water and operating, monitoring, and shutting down of certain wells . . . all purportedly contributed to the dispersal of the contamination in the groundwater." Id. at *5.  DTSC's theory against Cal Water in the *City of Chico* and *Payless* cases was that the wells acted as conduits both while the wells were running and after the wells were taken out of service. See id. at *7.  *Employers Ins.* also noted that the complaints in *City of Chico* and *Payless* each alleged that the wells contained contaminated water and released hazardous substances to the surrounding groundwater.  See id. at *12-*13.  The *City of Chico* and *Payless* complaints expressly alleged that "[h]azardous substances were present in the wells and were released from the wells into the environment."  See Doc. No. 105-2 at ¶ 22 and Doc. No. 412-2 at ¶ 20 in *Employers Ins.*, Northern District of Cal. Case No. 5:06cv3002 RMW.[8]  Thus, the theory actually pursued against Cal Water in *City of Chico* and *Payless* by DTSC was similar to the theory pursued in *Lincoln Properties* – both involved PCE that had actually been in the wells, with the wells acting as conduits for the PCE to reach other groundwater zones.  While aspects of *City of*

---

[7] The *City of Chico* matter had been consolidated with another case.

[8] The Court takes judicial notice of these documents from the docket of the Northern District of California.  See Fed. R. Evid. 201(b); Botelho v. U.S. Bank, N.A., 692 F.Supp.2d 1174, 1178 (N.D. Cal. 2010).

*Chico* and *Payless* are certainly similar to this case, the "surrounding area" theory does not appear to be one of those aspects.

This is the third motion to dismiss that has addressed liability based on § 9607(a)(2). In the last dismissal order, the Court discussed the Fourth Amended Complaint's deficiencies and specifically addressed what was necessary to allege a "disposal" at a "facility." See Coppola, 2013 U.S. Dist. LEXIS 161281 at *22-*26. The Court stated *inter alia* that the allegations must indicate discarding. The Court also expressed its concern over a theory that depended on PCE that "was never at/inside the Well." See id. at *29. The "surrounding area" theory described in Coppola's opposition does not assuage the Court's concerns. Because Coppola has had three chances to properly plead a § 9607(a)(2) claim, and because the opposition has not adequately shown that amendment would be beneficial, dismissal of the "surrounding area theory," i.e. claims based on water that did not enter the Well, will be dismissed without leave to amend.[9] Mueller, 700 F.3d at 1191; Telesaurus, 623 F.3d at 1003.

    3.    Declaratory Relief – 42 U.S.C. § 9613

A claim for declaratory relief under 42 U.S.C. § 9613(g)(2) is dependent upon a valid 42 U.S.C. § 9607 claim. See Chevron Envtl. Mgmt. Co. v. BKK Corp., 880 F.Supp.2d 1083, 1091 (E.D. Cal. 2012); Union Station Assocs., LLC v. Puget Sound Energy, Inc., 238 F.Supp.2d 1226, 1230 (W.D. Wash. 2002). As discussed above, the FAC has alleged a plausible claim under § 9607(a) against Cal Water. Therefore, dismissal of Coppola's § 9613 claim against Cal Water is inappropriate. See id.

## CONCLUSION

Cal Water moves to dismiss the CERCLA claims alleged against it. Dismissal without

---

[9] To the extent that Coppola may be pursuing liability for releases or disposals "at," "from," or "near" the Well when the Well is the "facility" at issue, for CERCLA liability to attach, there must be a "release" that is "from the facility," and in the case of a former owner or operator, there must be a "disposal" that is "at the facility." See 42 U.S.C. § 9607(a)(2); City of Colton, 614 F.3d at 1002-03; Carson Harbor, 270 F.3d at 870. The focus is on "the facility," it is not on the "area near the facility." Coppola has cited no authority that indicates § 9607(a) encompasses liability for activity that occurs "near a 'facility.'" Although some courts have indicated that it may be possible for a "facility" to cross boundary lines, see Louisiana Pac. Corp. v. Beazer Materials & Servs., 811 F.Supp. 1421, 1431 (E.D. Cal. 1990), that does not mean that liability will then extend to activity that occurs in an area that is not within the "facility."

leave to amend of the § 9607(a)(4) transporter liability theory is appropriate because the FAC does not adequately allege "acceptance" or "selection," Coppola did not allege a § 9607(a)(4) theory in their Fourth Amendment Complaint, and inclusion of that claim was beyond the scope of amendment permitted by the second dismissal order.  Dismissal of the § 9607(a)(2) "surrounding area" theory without leave to amend is appropriate because there are inadequate factual allegations that indicate a discarding occurred, it appears that Coppola may be attempting to classify the groundwater as a "facility," no cases involving wells have been cited that support this theory, and Plaintiffs have been given leave to amend on two prior occasions.   Dismissal of the § 9607(a)(2) claim based on contaminated water that entered the well is inappropriate because the FAC has made sufficient factual allegations.  Finally, because one § 9607(a) claim has not been dismissed, it is not appropriate to dismiss the § 9613 claim for declaratory relief.

**ORDER**

  Accordingly, IT IS HEREBY ORDERED that:

1. Cal Water's motion to dismiss the § 9607(a)(4) claim and the § 9607(a)(2) "surrounding area" claim are DISMISSED without leave to amend;

2. Cal Water's motion to dismiss is otherwise DENIED;

3. Cal Water shall file an answer to the Fifth Amended Complaint within ten (10) days of service of this order; and

4. Within fourteen (14) days of service of this order, the parties shall contact Magistrate Judge McAuliffe's chambers for the purpose conducting a scheduling conference.

IT IS SO ORDERED.

Dated:   May 13, 2014                                   _____
                                                                          SENIOR  DISTRICT  JUDGE