# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIOLA COPPOLA, et al., | CASE NO. 1:11-cv-01257-AWI-BAM |
| **Plaintiffs** | |
| v. | **ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| GREGORY SMITH, et al., | |
| **Defendants** | **(Doc. No. 200)** |
| _____ | |
| **AND RELATED CLAIMS** | |

This is an environmental law case that arises from the chemical contamination of property surrounding a dry cleaning business in Visalia, California.  Plaintiffs (collectively "Coppola") have brought suit against *inter alia* Martin and Martin Properties, LLC ("M&M").  The Court previously dismissed the Third and Fourth Amended Complaints under Rule 12(b)(6) following motions filed by various defendants.  The active complaint is the Fifth Amended Complaint ("FAC"), and there are numerous counterclaims and cross-complaints that have been filed by various defendants.  Now before the Court is M&M's motion for summary judgment.  For the reasons that follow, the Court will grant summary adjudication on certain issues but otherwise deny M&M's motion.

# FACTUAL BACKGROUND[1]

Since 1987, Coppola has owned and operated a dry cleaning facility located at 717 W. Main St., Visalia, California ("717 W. Main").  See DUMF 1, 2.  Coppola has used tetrachloroethylene (PCE) in their dry cleaning business since at least 1994.  DUMF 2.  The California Department of Toxic Substances Control ("DTSC") and the United States Environmental Protection Agency ("EPA") have investigated 717 W. Main.  See DUMF 3.  As a result of the investigation, it was concluded that there was a "release" or a "threatened release" of PCE from 717 W. Main into the soil and groundwater.  See FAC Ex. A §§ 2.4, 3.3.  In June 2011, DTSC issued an order ("2011 Order") for Coppola to investigate and remediate the contamination caused by their dry cleaning business.  See DUMF 4; FAC Ex. A.

M&M is a local real estate investment company operated by its managing member, William Martin, and by Joshua Martin, the past Vice President of Martin Enterprises, Inc. (the management company of M&M).  DUMF 5.  In March 2006, Martin and Martin Properties, LP ("Martin LP") filed a Certificate of Conversion with the Delaware Secretary of State in order to convert from an LP to an LLC.  See Hsu Dec. ¶ 3 & Ex. A.  Following the filing of the Certificate of Conversion, Martin LP became M&M in March 2006.  See id.

From 1959 to possibly 1971, a dry cleaning business known as Miller's Dry Cleaners operated at 110 N. Willis St., Visalia, California ("110 N. Willis").  See FAC ¶ 34, Ex. C § 6.0.  However, in the early 1970's, a commercial office building was built at 520 W. Main St., Visalia, California.  See Wm. Martin Dec. ¶ 13; FAC Ex. C § 6.0.  The land parcel for 520 W. Main included 110 N. Willis, and in the construction process, the area that had been known as 110 N. Willis became part of the northern portion of 520 W. Main St.  See FAC Ex. C § 6.0.

In March 1995, Martin LP purchased 520 W. Main ("the Property") for $1.425 million from Benart-Main Street Investors ("Benart").  See Wm. Martin Depo. 19:19-25; Wm. Martin Dec. ¶ 4; DUMF 6.  Prior to purchasing the Property, Martin LP reviewed an October 1991 Preliminary Site Assessment ("PSA") by The Twining Laboratories, Inc. (a geotechnical and

---

[1] "DUMF" refers to "Defendant's Undisputed Material Fact," and "PRDUMF" refers to "Plaintiff's Response to Defendant's Undisputed Material Fact."

environmental consulting company), a November 1991 Subsurface Investigation Report ("SIR") prepared by Environmental Science and Engineering, Inc., and a September 1991 Preliminary Structural Evaluation ("PSE") prepared by Teter Consultants.[2]  See Wm. Martin Dec. ¶ 6.  The PSA, the SIR, and the PSE had been obtained by and prepared for Benart.[3]  See id. & Exs. B, C. Martin LP also made physical inspections of 520 W. Main and "walked the streets" in the area, had discussions and interviews with Benart, local business owners, and consulted with a financial consultant regarding the past use and history of the Property.[4]  See id. at ¶ 5; Wm. Martin Depo. 77:24-78:4.  Martin LP did not retain an engineer, a geologist, or any type of environmental professional to inspect the Property.  See Wm. Martin Depo. 75:14-25.  Martin LP's pre-purchase investigation did not identify any PCE contamination or any past operation of a dry cleaning business at the Property.  See id.

The PSA states that it reports the results of a preliminary site assessment of the environmental condition of the Property.  See DUMF 16; Wm. Martin Dec. Ex. B.  The purpose of the PSA was to evaluate the environmental condition of the Property and adjacent properties based on past and current activities, identify reported soil and groundwater contamination sites and incidents up to 1 mile from the Property, and recommend additional studies as deemed appropriate.  See id. at p.2.  The PSA states that it was prepared in accordance with current standards of professional practice and in accordance with the duties of environmental engineers in 1991.  See Wm. Martin Dec. Ex. B at 27; DUMF 17.  The PSA considered regional geologic and

---

[2] Coppola objects that these reports are "clearly hearsay" and moves to strike them.  M&M responds that the reports are not hearsay, rather they are offered to show the effect they had on William Martin.  M&M is correct.  Hearsay is an out of court statement that a "party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c).  Statements that are offered to show a person's knowledge, notice or awareness, or to show the impact or effect that they had on a listener, or to show that information was received, are not offered for the truth of the matter asserted, and thus, are not hearsay.  See United States v. Rogers, 321 F.3d 1226, 1229 (9th Cir. 2003); United States v. Kirk, 844 F.2d 660, 663 (9th Cir. 1988); United States v. Giese, 597 F.2d 1170, 1194 (9th Cir. 1979); Gibbs v. State Farm Mut. Ins. Co., 544 F.2d 423, 428 (9th Cir. 1976).  Coppola's objections are overruled, and the Court will consider the reports to demonstrate awareness, effect, and impact on William Martin/M&M.  See id.

[3] Martin LP did not discuss the PSA with Twining, and did not know the specific agreement between Twining and Benart regarding the PSA.  See Wm. Martin Depo. 88:13-90:19.

[4] Coppola objects that evidence about conversations William Martin had with other "old timers" regarding 520 W. Main is hearsay.  Coppola's objection is overruled.  For the same reasons that the three reports are not hearsay, the conversations that William Martin had with other business owners is not hearsay.

hydrological factors including soil type and groundwater characteristics.  See Wm. Martin Dec.

Ex. B at pp. 2-12; DUMF 18.  The PSA reviewed a preliminary title report for existing

environmental liens, conducted a visual reconnaissance of the Property, conducted a

reconnaissance of the area within a quarter mile radius, reviewed aerial photographs to evaluate

past history and use, searched and reviewed regulatory agency records to identify environmental

issues, and interviewed governmental agency personnel and others who may have knowledge of

the Property's condition and past use.  See id.  The PSA indicated that from the 1930's to the

1950's, the Property was used as a service station, and after 1973 as a commercial office building.

See Wm. Martin Dec. Ex. B at p.13; DUMF 19.  The PSA indicated that from 1958 to 1972, no

listing for 520 W. Main St. was recorded.  See id.  The PSA contained no finding of any usage

relating to dry cleaning or similar operations.  See Wm. Martin Dec. Ex. B; DUMF 20.  The PSA

stated that the presence of water wells, surface impoundments, soil staining, or evidence of

underground or aboveground storage tanks were neither discovered nor observed on the Property,

and that a review of the area surrounding the Property indicates that no known or suspected

hazardous waste properties are located within 2,000 feet.  See Wm. Martin Dec. Ex. B at pp.14,

23-24; DUMF 21.  The PSA noted that two wells, Well 06-02 and Well 06-03, contained 0.8 parts

per billion and 1.8 parts per billion, respectively, of PCE but that both numbers did not exceed

Maximum Concentration Levels ("MCL").  See Wm. Martin Dec. Ex. B at p.21.  The PSA

concluded that there were some asbestos issues with the building, but mitigation of the asbestos

was made a condition of the purchase, and the asbestos was removed prior to closing the purchase.

See Wm. Martin Dec. Ex. B at pp.14-16, 23-24; DUMF 22.  However, the PSA also stated that

based on information from three sources, "environmental concerns to soil and groundwater at the

Property from on-site sources cannot be evaluated with information made available to Twining . . .

."  Wm. Martin Dec. Ex. B at 23.  Further, environmental concerns to soil and groundwater from 3

of 14 off-site sources within one-half mile of the Property could not be evaluated.  See id. at p.26.

The PSA limited its findings to the conditions that existed at the time, noted that soil and

groundwater samples at the Property for chemical analysis were not included, and explained that

changes in existing conditions at the subject property due to time lapse, natural causes, or

operations adjacent to the Property may render the PSA's conclusions invalid unless the changes are reviewed and the conclusions approved.  See id.  The PSA stated that the applicable standard of care is time sensitive.  See id. at p. 27.  The PSA warned that the work was performed for the sole use of Benart, and others who may rely on the findings have a duty to determine the adequacy of the report for their intended use.  See id.

The PSA was the first report of its kind that M&M had ever reviewed.  See Wm. Martin Depo. 96:22-97:1. Although Martin LP owned other real estate, those properties were all farmland.  See id. at 41:20-42:11.  Martin LP's financial consultant advised Martin LP that if a property has a structure on it, a Phase I environmental report was necessary.  See id. at 42:12-24.

The SIR was designed to investigate the past existence of a fuel service station and possible underground storage tanks, and to identify any contamination of the soil or subsurface. See Wm. Martin Dec. Ex. D at pp.172-173.  The SIR indicated that two soil borings on the Property were taken for analysis.[5]  See id.  No stressed vegetation or petroleum staining was purportedly observed.  See id.  Based on the soil samples, the SIR purportedly concluded that the boring contained no detectable petroleum hydrocarbons.  See id.

Following the purchase of the Property, and in connection with obtaining a real-estate loan, an appraisal was prepared for Martin LP in December 1995.  See DUMF 9.  The appraisal report valued the Property at $1.425 million, and did not identify any PCE contamination, any prior use of the Property as a dry-cleaner, or any reason to suspect PCE contamination.  See id.; Wm. Martin Dec. Ex. D.  The $1.425 million evaluation matched Martin L.P.'s purchase price.  See DUMF 22.  The appraisal included various assessments, inspections, and reviews, including reviewing the PSA and the SIR.  See Wm. Martin Dec. Ex. D; see also DUMF 25.  The appraisal indicated that there were no signs of possible or known toxic or hazardous waste problems, except for the asbestos which had been removed.  See id.

In August 2006, DTSC issued a Site Screening Assessment ("2006 Assessment") for the EPA.  See Boon Dec. Ex. G.  This Assessment identified the site at issue as "Former Miller Dry Cleaners," located at "110 N. Willis Street, Visalia, Tulare, CA."  Id.  The 2006 Assessment states

---

[5] The SIR has been lost but, the Appraisal (Exhibit D to the William Martin Declaration) quoted from the SIR.

in part, "No site visit was performed as part of this site screening.  A site visit previously was conducted as part of the Visalia Dry Cleaner Discovery Project." Id. at p. 21.  The 2006 Assessment does not elaborate in any way on the site visit that was part of the Visalia Dry Cleaner Discovery Project.  See id.  In essence, the Assessment found that further investigation for PCE contamination and migration was appropriate.  See id. at 2.

Sometime following the 2006 Assessment, an entry relating to the Property was made in the Comprehensive Environmental Response, Compensation, and Liability Information System ("CERCLIS").[6]  See Boon Dec. Ex. F; FAC Ex. C § 6.0.  The entry identifies the site as "Former Millers Dry Cleaners," and identifies the address as "110 North Willis Street, Visalia, CA."  Boon Dec. Ex. F.  The address 520 W. Main does not appear on the CERCLIS listing.  See id.

From 1995 to 2007, Martin LP/M&M operated the Property without incident and leased space in the commercial office building that had been on the Property since the 1970's.  See DUMF 11.  M&M had no knowledge of PCE contamination at the Property, and William Martin declares that M&M had no any reason to suspect contamination.  See id.[7]; Wm. Martin Dec. ¶ 13.

In late 2008, M&M received a series of correspondences from EPA and DTSC which indicated that a dry cleaning operation called Millers Dry Cleaning had operated on the Property

---

[6] Coppola argues that Millers Dry Cleaners was added to CERCLIS in 2005 and cites to Exhibit F of the Boon declaration.  Exhibit F indicates that "Discovery" and "Pre-CERCLIS Screening" occurred on November 7, 2005, and that a preliminary assessment was completed on September 12, 2008.  However, Exhibit F does not expressly state when Millers Dry Cleaners was actually added to CERCLIS.  Importantly, the 2006 Assessment has a box to be checked "yes" or "no" for the question:  "Does this site already appear in CERCLIS?"  See Boon Dec. Ex. G.  The "no" box is checked.  See id.  Further, the 2006 Assessment expressly states that the CERCLIS database does not show any information on the site.  See id.  Given the silence of Exhibit F, and the directly contrary information in Exhibit G, there is insufficient evidence to support a conclusion that Millers Dry Cleaners/110 N. Willis was placed on the CERCLIS list in 2005.

[7] Coppola objects to DUMF 11 and argues in part that M&M had contact with regulatory agencies in either 2006 through a site investigation as reflected by the 2006 Assessment, or in 2005 when the Property was added to the CERCLIS list.  First, as discussed in the prior footnote, there is insufficient evidence that the Property or 110 N. Willis was added to CERCLIS in 2005.  Second, the 2006 Assessment does not state that any contact was made with M&M, but does state that a site investigation is necessary in order to determine whether PCE was released from the Property.  See Boon Dec. Ex. G.  Although there is an indication that sampling occurred, Attachment E (the Sampling Event Summary Table) shows that the sampling was actually water samples taken by Cal Water of two wells.  See id.  That is, no sampling at or on the Property occurred as part of the 2006 Assessment.  See id.  The 2006 Assessment also states that there was no site visit conducted, but a site visit had previously occurred as part of the Visalia Dry Cleaners Project.  However, there is no elaboration about that visit, including when it occurred, what it entailed, whether M&M had been contacted, or what M&M was told.  There is nothing that meaningfully describes any site visits either in 2006 or before.  Thus, there is insufficient evidence that M&M had been contacted by EPA or DTSC regarding PCE contamination in either 2005 or 2006.

in the late 1950's or early 1960's, prior to M&M's purchase of the Property.  See DUMF 12.  In response to the correspondences and inquiries by EPA and DTSC, M&M provided its full cooperation with the agencies, including providing written responses to inquiries and copies of its files pertaining to the prior environmental investigations conducted for the Property.  See DUMF 13.[8]  M&M gave EPA and DTSC access to the Property for further investigation.  See DUMF 14.

When M&M was first contacted in 2008 by EPA and DTSC about possible contamination former Millers Dry Cleaners, M&M believed that the agencies had the wrong property because Millers Dry Cleaners bore the street address 110 N. Willis St. and the Property had always been known as 520 W. Main St.  See DUMF 26.[9]  Through further discussions with EPA and DTSC, M&M discovered that the property once known by the street address 110 N. Willis consisted of a small parcel of land located in the northwest corner of the Property; the entirety of the Property was and is known by the street address 520 W. Main St.  See DUMF 27.

In 2009, DTSC and EPA investigated the Property.  See DUMF 15.  In June 2009, EPA considered a Site Inspection Report ("Site Report") for "Former Millers Dry Cleaners."  See FAC Ex. C.  The Site Report was prepared by Weston Solutions, Inc. for the EPA.  See id.  The Site Report found that, based on 2009 sampling, a release from the Property to groundwater had not been established.  See id. at p.27.  PCE was detected at concentrations below background in soil samples collected from borings drilled at the former dry cleaning facility.  See id.  "Groundwater samples collected from the onsite down-gradient well contained PCE concentrations significantly above background and below the MCL for drinking water."  Id.  Following the Site Report, EPA released its Remedial Site Assessment Decision ("Remedial Decision") on June 22, 2009.  See FAC Ex. C at p.6.  The EPA determined that "no further remedial action by the Federal Superfund program is warranted at [the Property] at this time."  FAC Ex. C at p.6.  The Remedial Decision reiterated the Site Report's findings about PCE being detected at concentrations below background

---

[8] Coppola disputes DUMF 13 by reference to Boon Declaration Exhibits F and G.  However, Exhibit F is the CERCLIS listing and Exhibit G is the 2006 Assessment.  Neither document relates to M&M's interactions with EPA and DTSC in 2008.  DUMF 13 is undisputed.

[9] Coppola disputes DUMF 26 by referencing Boon Declaration Exhibits F and G.  As explained above, Exhibits F and G do not show that M&M was made aware of PCE contamination by EPA or DTSC in 2005 or 2006, and it does not refute the assertion that the Property had always been known as 520 W. Main St.  DUMF 26 is undisputed.

1  in soil samples and PCE being found in concentrations below MCL in water samples taken in the

2  down-gradient well.  See id.  The Remedial Decision concluded that there was "no evidence of a

3  release of PCE from the site to surface water," and unless new information is obtained, no

4  additional remedial steps would be taken under the Federal Superfund program.  Id.

5    On October 14, 2009, EPA sent a correspondence to M&M.  See Wm. Martin Dec. Ex. F.

6  In relevant part, the EPA letter states:  "Based on currently available information contained in the

7  enclosed report, EPA has determined that no further assessment is warranted.  Although EPA has

8  determined that this site does not qualify for Superfund listing, the State of California may require

9  further assessment or cleanup of this site under State law.  You may wish to contact [DTSC

10  personnel] for information pertaining to State assessment and cleanup requirements."  Id.  M&M

11  understood this letter to mean that EPA was not going to be contacting it any further regarding

12  additional work, but that EPA was turning things over to DTSC.  See J. Martin Depo. 73:5-15.

13

14  **SUMMARY JUDGMENT FRAMEWORK**

15    Summary judgment is proper when it is demonstrated that there exists no genuine issue as

16  to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R.

17  Civ. P. 56; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  The party seeking summary

18  judgment bears the initial burden of informing the court of the basis for its motion and of

19  identifying the portions of the declarations (if any), pleadings, and discovery that demonstrate an

20  absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986);

21  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it

22  might affect the outcome of the suit under the governing law.  See Anderson v. Liberty Lobby,

23  Inc., 477 U.S. 242, 248-49 (1986); United States v. Kapp, 564 F.3d 1103, 1114 (9th Cir. 2009).  A

24  dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to

25  return a verdict for the non-moving party.  Anderson, 477 U.S. at 248; Freecycle Sunnyvale v.

26  Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010).

27    Where the moving party will have the burden of proof on an issue at trial, the movant must

28  affirmatively demonstrate that no reasonable trier of fact could find other than for the movant.

Soremekun, 509 F.3d at 984.  Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim.  See James River Ins. Co. v. Herbert Schenk, P.C., 523 F.3d 915, 923 (9th Cir. 2008); Soremekun, 509 F.3d at 984.  If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion."  Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000).  If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210 F.3d at 1103.  The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'"  Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

The opposing party's evidence is to be believed, and all justifiable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Anderson, 477 U.S. at 255; Narayan v. EGL, Inc., 616 F.3d 895, 899 (9th Cir. 2010).  While a "justifiable inference" need not be the most likely or the most persuasive inference, a "justifiable inference" must still be rational or reasonable.  See Narayan, 616 F.3d at 899.  "If conflicting inferences may be drawn from the facts, the case must go to the jury."  Holly D. v. Cal. Inst. of Tech., 339 F.3d 1158, 1175 (9th Cir. 2003).  Inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal. 2008); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial."  Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).  Further, a "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or

1   'is not significantly probative.'" <u>Anderson</u>, 477 U.S. at 249-50; <u>Hardage v. CBS Broad. Inc.</u>, 427

2   F.3d 1177, 1183 (9th Cir. 2006).  If the nonmoving does not produce evidence that is sufficient to

3   creates a genuine issue of material fact, the moving party is entitled to summary judgment.  <u>Nissan</u>

4   <u>Fire</u>, 210 F.3d at 1103.

5

6                              **DEFENDANT'S MOTION**

7   **1.      CERCLA Claims – First & Second Causes of Action**

8          *Defendant's Arguments*

9          M&M argues that summary judgment on the CERCLA claim is proper because M&M is

10  an "innocent landowner."  Prior to its purchase of 110 N. Willis in 1995, M&M reviewed

11  environmental investigative reports (the PSA and SIR), made physical site inspections, and had

12  interviews with the seller, local business owners, and financial consultants regarding the past use

13  and history of 110 N. Willis.  PCE was not detected, Miller's Dry Cleaners' prior operation at 110

14  N. Willis was not found, and no potential for PCE contamination was discovered.  M&M

15  purchased 110 N. Willis for the appraised value, and operated the property for the next 13 years

16  without knowledge or indication of PCE contamination.  In late 2008, M&M received

17  correspondences from EPA and DTSC regarding Millers Dry Cleaning.  It was not until 2008 that

18  M&M learned of the dry cleaning operation and the potential for PCE contamination.  M&M fully

19  cooperated with EPA and DTSC, and provided reports, written responses to inquiries, and consent

20  for EPA and DTSC to enter 110 N. Willis.  In 2009, EPA determined that there was no evidence

21  of release of PCE from 110 N. Willis, and that no further assessment was needed.  Thus, M&M

22  did not cause a release, it exercised due care before purchasing the Property, fully cooperated with

23  EPA and DTSC, and had neither knowledge nor reason to know of any PCE contamination.  This

24  is sufficient to establish the innocent landowner defense and defeat Coppola's CERCLA claims.

25         In reply, M&M argues in part that it is the continuation of Martin LP.  In 2006, Martin LP

26  converted to an LLC pursuant to Delaware law.  Under Delaware law, when an entity converts to

27  an LLC, it is not a new entity.  Martin LP and M&M are not separate entities, and the acts of

28  Martin LP are those of M&M, including the pre-purchase investigation of the Property.

*Plaintiff's Opposition*

Coppola argues that M&M is not an "innocent landowner."  M&M conducted no investigation prior to acquiring the Property in 2006 from its predecessor in interest, Martin LP, which was a distinct and separate entity that purchased the Property in 1995.  Moreover, Martin LP's investigation was insufficient.  The PSA stated that it could not offer conclusions about the environmental conditions of the soil and groundwater at the Property.  The PSA stated that it was for conditions then existing and that changed conditions could render the report invalid.  Further, the PSA stated that PCE had been found less than a half mile from the Property, and that a gap between 1958 and 1972 existed for which the historical use of the Property could not be determined.  The PSA also was not conducted in conformity with the standards set in 1993 by the American Society for Testing and Materials.  The SIR has not been produced, and its contents cannot be fully explored.  Martin LP simply relied on reports done in 1991 from Benart, and did not retain an engineer, a geologist, a real estate professional, or an environmental professional.  Further, Martin LP did not conduct a professional investigation into neighboring properties, a physical inspection of the Property prior to purchase, or an appraisal prior to purchase.[10]

Additionally, although M&M appears to be borrowing aspects of the "third party" defense in asserting its "innocent landowner" defense, M&M is not entitled to the "third party" defense.  First, that defense only applies when a third party is the "sole cause" of contamination.  Here, there are multiple parties that allegedly contributed to the contamination.  M&M must show that only one of these parties caused the PCE contamination, and M&M has not done so.  Second, M&M has a contractual relationship with a responsible party (Millers Dry Cleaning) and thus, cannot assert the defense.  Finally, as argued above, M&M did not exercise due care based on the pre-purchase investigation of the Property.

*Legal Standard*

As a potentially responsible party ("PRP"), the current owner of any "facility" at the time

---

[10] Coppola also argues that it is reasonably inferred that M&M had knowledge of potential PCE contamination in 2005 or 2006, based on a CERCLIS listing and on the 2006 Assessment.  These arguments have been addressed in prior footnotes.  See Footnotes 6, 7 & 8 *supra*.  The evidence presented suggests that neither the Property nor 110 N. Willis was added to CERCLIS in 2005, and the 2006 Assessment does not indicate or reflect that any interaction with M&M and the EPA or DTSC occurred.  See id.

1    of cleanup is strictly liable for any "release" of hazardous substances from the "facility," unless

2    the owner of the "facility" can satisfy one of CERCLA's "narrowly applicable" defenses.

3    Anderson Bros., Inc. v. St. Paul Fire & Marine Ins. Co., 729 F.3d 923, 929 (9th Cir. 2013).

4    CERCLA provides for *inter alia* the "'third party' and 'innocent landowner' defenses, by which a

5    PRP may show that the release of hazardous substances was caused solely by 'an act or omission

6    of a third party,' 42 U.S.C. § 9607(b)(3), or that 'the disposal or placement of the hazardous

7    substance' occurred before the PRP acquired the property.  42 U.S.C. § 9601(35)(A)."  Carson

8    Harbor Vill., Ltd. v. Unocal Corp., 270 F.3d 863, 871 (9th Cir. 2001).

9         Under the "third party" affirmative defense of § 9607(b)(3),[11] a PRP must show:  (1) the

10    release or threat of release of a hazardous substance and the resulting damages were caused solely

11    by an act or omission of a third party; (2) the third party's act or omission did not occur in

12    connection with a contractual relationship (either direct or indirect), employment relationship, or

13    agency relationship with the PRP; (3) the PRP exercised due care with respect to the hazardous

14    substance; and (4) the PRP took precautions against the third party's foreseeable acts or omissions

15    and the foreseeable consequences resulting therefrom.  See 42 U.S.C. § 9607(b)(3); United States

16    v. Iron Mt. Mines, 987 F. Supp. 1263, 1273 (E.D. Cal. 1997); United States v. Pacific Hide & Fur

17    Depot, Inc., 716 F. Supp. 1341, 1346-47 (D. Idaho 1989).  A "contractual relationship" is defined

18    to include "land contracts, deeds, easements, leases, or other instruments transferring title or

19    possession . . . ."  42 U.S.C. § 9601(35)(A); Iron Mt. Mines, 987 F.Supp. at 1275.  Because of the

20    definition of "contractual relationship," a person who purchases contaminated real property cannot

21    meet the plain requirements of § 9607(b)(3).  See Carson Harbor, 270 F.3d at 887 (". . . one who

22    purchases land from a polluting owner or operator cannot present a third-party defense . . . .");

23

24    [11] 42 U.S.C. § 9607(b)(3) reads:  "(b) Defenses. There shall be no liability under subsection (a) of this section for a
      person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a
25    hazardous substance and the damages resulting therefrom were caused solely by -- . . . (3) an act or omission of a third
      party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a
26    contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual
      arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant
27    establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance
      concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and
28    circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the
      consequences that could foreseeably result from such acts or omissions."

1    United States v. CDMG Realty Co., 96 F.3d 706, 716 (3d Cir. 1996) ("The defense is generally

2    not available if the third party causing the release is in the chain of title with the defendant.").

3         Despite § 9601(35)(A) creating a "contractual relationship" bar within § 9607(b)(3),

4    § 9601(35)(A) also establishes the "innocent land owner" defense for those who purchase

5    contaminated real property.  See 42 U.S.C. § 9601(35)(A); Carson Harbor, 270 F.3d at 887;

6    Pacific Hide, 716 F.Supp at 1347.  If a PRP purchased property after a disposal or placement of a

7    hazardous substance occurred, but the PRP did not know or have reason to know of the disposal or

8    placement, then the PRP may be able to avoid liability if he otherwise meets the requirements of

9    § 9607(b)(3)(a) and (b).  See 42 U.S.C. § 9601(35)(A);[12] Carson Harbor, 270 F.3d at 887;

10   Kaufman & Broad-South Bay v. Unisys Corp., 868 F.Supp. 1212, 1216 (N.D. Cal. 1994).

11   CERCLA provides standards for determining whether a PRP "had reason to know" of

12   contamination.  See 42 U.S.C. § 9601(35)(B).  A PRP "had no reason to know" of contamination

13   if:  (1) on or before the date on which the PRP acquired the real property, he carried out all

14   "appropriate inquiries" into the previous ownership and uses of the property in accordance with

15   generally accepted good commercial and customary standards and practices; and (2) the PRP took

16   reasonable steps to stop any continuing "release" of hazardous substances, prevent any threatened

17   future release of hazardous substances, and prevent or limit any human, environmental, or natural

18   resource exposure to any previously released hazardous substance.  42 U.S.C. § 9601(35)(B)(i);

19   see Walnut Creek Manor, LLC v. Mayhew Ctr., LLC, 622 F.Supp.2d 918, 931 (N.D. Cal. 2009).

20   In determining whether an "appropriate inquiry" was made in accordance with "customary

21

22   [12] 42 U.S.C. § 9601(35)(A) reads in pertinent part:

23   "(A)  The term 'contractual relationship', for the purpose of section 107(b)(3) [42 USCS § 9607(b)(3)], includes, but
     is not limited to, land contracts, deeds, easements, leases, or other instruments transferring title or possession, unless
     the real property on which the facility concerned is located was acquired by the defendant after the disposal or

24   placement of the hazardous substance on, in, or at the facility, and one or more of the circumstances described in
     clause (i) . . . is also established by the defendant by a preponderance of the evidence:  (i) At the time the defendant

25   acquired the facility the defendant did not know and had no reason to know that any hazardous substance which is the
     subject of the release or threatened release was disposed of on, in, or at the facility. . . .  In addition to establishing the

26   foregoing, the defendant must establish that the defendant has satisfied the requirements of [42 USCS § 9607(b)(3)(a)
     and (b)], provides full cooperation, assistance, and facility access to the persons that are authorized to conduct

27   response actions at the facility (including the cooperation and access necessary for the installation, integrity,
     operation, and maintenance of any complete or partial response action at the facility), is in compliance with any land
     use restrictions established or relied on in connection with the response action at a facility, and does not impede the

28   effectiveness or integrity of any institutional control employed at the facility in connection with a response action."

1   standards and practices," five factors are considered if the property was purchased prior to May

2   31, 1997.  See 42 U.S.C. § 9601(35)(B)(iv)(I).  Those factors are:  (1) any specialized knowledge

3   or experience on the part of the purchaser; (2) the relationship of the purchase price to the value of

4   the property, if the property was not contaminated; (3) commonly known or reasonably

5   ascertainable information about the property; (4) the obviousness of the presence or likely

6   presence of contamination at the property; and (5) the ability of the defendant to detect the

7   contamination by appropriate inspection.  Id.  The "innocent landowner" defense applies only to

8   "wholly innocent" landowners, i.e. landowners who did not contribute, actively or passively, to

9   the "release" of the hazardous substance.  See Carson, 270 F.3d at 887; United States v.

10  Honeywell Int'l, Inc., 542 F. Supp.2d 1188, 1201 (E.D. Cal. 2008).

11          In order to establish the "innocent landowner" defense in § 9601(35)(A), a PRP must show

12  that:  (1) he acquired the property after the disposal or placement of the hazardous substances

13  occurred; (2) at the time of acquisition, he did not know and "had no reason to know," i.e. made

14  all "appropriate inquiries" in accordance with customary "standards and practices," that any

15  hazardous substance was disposed of or placed at the facility; (3) he did not actively or passively

16  contribute to the "release" of the hazardous substance; and (4) once contamination was found, he

17  exercised due care with respect to the hazardous substance concerned, took precautions against

18  foreseeable acts or omissions of third parties and the foreseeable corresponding consequences, and

19  acted in compliance with land use regulations and governmental responders.  See 42 U.S.C. §§

20  9601(35)(A) and (B), 9607(b)(3); CDMG Realty, 96 F.3d at 716; United States v. Domenic

21  Lombardi Realty, Inc., 290 F.Supp.2d 198, 208-09 (D. R.I. 2003); Kaufman, 868 F.Supp. at 1216.

22          *Discussion*

23          There are numerous issues raised by the parties in connection with the first cause of action.

24  The Court will address these issues separately.

25          a.      Reliance By M&M On Investigation By Martin LP

26          Coppola argues that Martin LP is a separate and distinct entity from M&M, and that

27  Martin LP ceased to exist and was wound down in 2006.  As Martin LP and M&M were separate,

28  M&M cannot rely on any investigations performed by Martin LP.  The Court disagrees.

1    Martin LP was converted from a Limited Partnership to a Limited Liability Company in

2   2006.  See Hsu Dec. ¶ 3 & Ex. A.  The conversion was accomplished pursuant to Delaware law.

3   See id.  Under Delaware law, when a business converts to a limited liability company, the

4   converting business and the resulting limited liability company are deemed to be the same entity.

5   See 6 Del. Code § 18-214(g); Hoch v. Eli Lilly & Co., 736 F.Supp.2d 219, 222 (D. D.C. 2010);

6   Premium Allied Tool, Inc. v. Zenith Elecs. Corp., 2009 U.S. Dist. LEXIS 12199, *10 (N.D. Ill.

7   Feb. 17, 2009); Purina Mills, LLC v. Less, 295 F.Supp.2d 1017, 1028 (N.D. Iowa 2003).  There is

8   no winding up, and there is no dissolution of the converting entity.  See 6 Del. Code § 18-214(g).

9   There is no transfer of assets or liabilities from the converting entity to the resulting limited

10   liability company, rather all assets and obligations of the converting entity remain the assets and

11   liabilities of the limited liability company.  See 6 Del. Code § 18-214(f).[13]  Therefore, as applied

12   here, by operation of Delaware law Martin LP never dissolved, never wound up, and never

13   transferred any assets to M&M because Martin LP and M&M are the same entity.  See 6 Del.

14   Code § 18-214(f), (g).  As the same entity, the acts of Martin LP were the acts of M&M.  Cf. id.

15    Coppola relies on Seven Springs L.P. v. Fox Capital Mgmt. Corp., 2007 U.S. Dist. LEXIS

16   95670 (E.D. Cal. Apr. 26, 2007) to argue that each entity must separately satisfy the elements of

17   the innocent landowner defense.  In Seven Springs, a general partner transferred real property from

18   herself to a limited partnership.  See Seven Springs, 2007 U.S. Dist. LEXIS 95670 at *5.  The

19   limited partnership attempted to utilize the general partner's actions when she originally obtained

20   the property in order to establish an innocent landowner defense.  See id.  That theory was rejected

21   because the partner and the partnership were separate legal entities with separate rights and

22   responsibilities.  See id.

23    Seven Springs is distinguishable from this case.  First, unlike Seven Springs, this case does

24   not involve dealings between separate entities.  As discussed above, by operation of Delaware law,

25   Martin LP and M&M were the same entity.  See 6 Del. Code § 18-214 (g); cf. also Cal. Corp.

26

27   _____

[13] California law is to the same effect.  "An entity that converts into another entity pursuant to this article is . . . the
28   same entity that existed before the conversion and the conversion shall not be deemed a transfer of property."  Cal
Corp Code § 17710.09(a).   Upon a conversion taking effect, the rights and property, and all debts and obligations, of
the converting entity vested in the converted limited liability company.  Cal . Corp Code § 17710.09(b).

1   Code § 17710.09.  Second, unlike *Seven Springs*, this case does not involve a transfer of real

2   property (excluding of course the transfer between Benart and Martin LP).  Upon conversion of

3   Martin LP to M&M, the Property vested with M&M and was expressly not transferred.  See 6 Del.

4   Code § 18-214 (f); cf. also Cal. Corp. Code § 17710.09.  Therefore, *Seven Springs* is inapposite

5   and has no application to this case.

6          Because Martin LP and M&M are the same entity, M&M may rely on the actions of

7   Martin LP in connection with Martin LP's purchase of the Property.  Summary adjudication on

8   this issue in favor of M&M is appropriate.

9          b.      Sole Cause

10         The evidence does not show that M&M placed or disposed of PCE after it obtained the

11  Property, and no evidence has been presented that M&M contributed in any way to the release of

12  PCE from the Property.  William Martin's declaration shows that M&M had no actual knowledge

13  of PCE contamination from the time the Property was purchased until 2008, when M&M was

14  contacted by EPA and DTSC.  The evidence suggests that Millers Dry Cleaners, or another former

15  owner of the Property, was responsible for releases, placements and disposals of PCE at the

16  Property.  Thus, the releases and threatened releases appear to have been caused by the acts of

17  other third parties, and not the result of M&M's conduct.

18         Coppola contends that M&M cannot utilize the "third party" defense of § 9607(b)(3)

19  because that defense applies to damage caused solely by the acts of a single third party.

20  Technically, M&M is not asserting the "third party" defense of § 9607(b)(3), rather it is asserting

21  the "innocent landowner" defense of § 9601(35)(A).  Under the innocent landowner defense, the

22  hazardous substance must have been placed or disposed of on the property before M&M

23  purchased the property and M&M must not have contributed to the release of PCE.  See Carson

24  Harbor, 270 F.3d at 887.  These requirements mirror the "sole cause" requirement of the third

25  party defense.

26         To the extent that Coppola is arguing that M&M cannot utilize the innocent landowner

27  defense because multiple parties allegedly caused the release of PCE, such an argument is

28  unavailing.  Although § 9706(b)(3) is written in the singular, i.e. the release was caused solely by

*a third party*, the key is that the particular defendant did not cause the release or threatened release of hazardous substances.  Cases in which "a number of acts by several third parties" results in the release or threatened release of hazardous substances still fall within the purview of § 9607(b)(3). New York v. Lashins Arcade Co., 91 F.3d 353, 360 (2d Cir. 1996); see also Dedham Water Co. v. Cumberland Farms Dairy, Inc., 805 F.2d 1074, 1079 n.10  (1st Cir. 1986) (noting that release or threatened release must be caused by acts or omissions of "third *parties*"); PC Int'l, Inc. v. Aerojet-General Corp., 777 F. Supp. 549, 581 (W.D. Mich. 1991) (holding that hazardous substance contamination must be caused solely by "other *parties*");[14] New York v. Exxon Corp., 766 F. Supp. 177, 195 (S.D. N.Y. 1991) (holding that defendant needed to show that the release of hazardous substances was caused "solely by *others*"); United States v. Allied Corp., 1990 U.S. Dist. LEXIS 20061, *15 & n.8 (N.D. Cal. Apr. 24, 1990) (holding that "other *parties*" were responsible for contamination).  Therefore, that multiple third parties allegedly caused a release of PCE from the Property will not prevent M&M from utilizing the innocent landowner defense.

The evidence presented shows that M&M purchased the Property after a placement or disposal of PCE occurred, and that M&M did not contribute to the release of PCE from the Property.  Summary adjudication on this issue in favor of M&M is appropriate.

c.      Due Care

The due care requirement of the innocent landowner defense is taken from the § 9607(b) third party defense.  See 42 U.S.C. § 9601(35)(A) (in part incorporating the requirements of § 9706(b)(3)(a) and (b)).  The "due care" requirement of § 9607(b)(3) applies after an owner becomes aware of the presence of a hazardous substance on the property.  See Lashins Arcade, 91 F.3d at 361; Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 263 F. Supp. 2d 796, 864 (D. N.J. 2003); HRW Systems, Inc. v. Washington Gas Light, Co., 823 F.Supp. 318, 349 (D. Md. 1993). Generally, where an owner has cooperated with state or federal environmental authorities, "it has satisfied the 'due care' and 'reasonable precautions' requirements of [§ 9607(b)(3)]." Interfaith, 263 F.Supp. at 864; see also 1325 "G" St. Assocs. v. Rockwood Pigments NA, Inc., 2004 U.S. Dist. LEXIS 19178, *30 (D. Md. Sept. 7, 2004); Town of New Windsor v. Tesa Tuck, Inc., 935

---

[14] Reversed on other grounds *sub nom*. United States v. Bestfoods, 524 U.S. 51 (1998).

1   F.Supp. 310, 314 (S.D.N.Y. 1996).

2          Here, the evidence indicates that once M&M was contacted by EPA and DTSC in 2008,

3   M&M fully cooperated.  See DUMF 13, 14.  There is no evidence that M&M was evasive or

4   obstructive with respect to any requests from or efforts by EPA or DTSC, nor is there evidence

5   that M&M failed to follow any directives from EPA or DTSC.  Further, after EPA concluded its

6   investigation, it determined that there was no evidence of a release of PCE from the Property to

7   the surface water, that no further assessment was needed, and that no remedial action from the

8   Superfund was necessary.  See FAC Ex. C at p.6; Wm. Martin Dec. Ex. F.  Although EPA stated

9   that DTSC may continue to investigate, there is no evidence that DTSC has conducted any further

10   investigation of the Property or requested that M&M perform any testing or remediation.

11   Moreover, Coppola has not explained what additional steps M&M should have taken or explained

12   how M&M did not exercise due care once it was made aware of possible PCE contamination.

13          Coppola argues that M&M did not exercise due care because it did not conduct an

14   adequate pre-acquisition investigation, did nothing after the Property was placed on the CERCLIS

15   list in 2005/2006, and did nothing when DTSC conducted a screening of the Property in 2006.

16   Coppola's arguments are not persuasive.

17          With respect to Martin LP's pre-acquisition investigation of the Property, this argument

18   actually relates to a separate requirement of the innocent landowner defense.  For a party to invoke

19   the innocent landowner defense, he must both conduct an appropriate pre-acquisition inquiry and

20   exercise due care under § 9607(b)(3) once contamination is found.  See 42 U.S.C. § 9601(35)(A).

21   The appropriate pre-acquisition inquiry is a requirement that is separate and different from the

22   § 9607(b)(3) due care requirement.  See id.; 1325 "G" St., 2004 U.S. Dist. LEXIS 19178 at *31.

23   Pre-acquisition inquiries are not relevant to the § 9607(b)(3) due care requirement.  1325 "G" St.,

24   2004 U.S. Dist. LEXIS 19178 at *31; see also HRW Sys., 823 F. Supp. at 349.

25          As for the Property being placed on the CERCLIS list, as discussed previously, the

26   evidence does not indicate that Millers Dry Cleaners or the Property was placed on the CERCLIS

27   list in 2005 or pre-August 2006.  In any event, the facility that was eventually placed on the

28   CERCLIS list was "Millers Dry Cleaners" at "110 N. Willis."  The Property's address is 520 W.

Main.  There has been no evidence to contradict Joshua Martin's declaration that the Property has always been known by the address of 520 W. Main, and that 110 N. Willis is not an address that M&M had ever seen with respect to the Property.  See DUMF 26; J. Martin Dec. ¶ 5 & Ex. J. There is no evidence that M&M knew about the 110 N. Willis address, or that M&M should have been aware of any CERCLIS listing for 110 N. Willis.

Finally, as for DTSC conducting a preliminary investigation in 2006, i.e. the 2006 Assessment, the Court has previously addressed this issue.  There is no evidence that M&M was actually contacted by DTSC as part of any preliminary study, or that there was any explanation by DTSC to M&M that DTSC was investigating PCE contamination at the Property.  The 2006 Assessment does not state that any contact was made with M&M, states that there was no site visit made in connection with the Assessment, and the "sampling" that is referenced in the Assessment is sampling of wells, not the Property.  See Footnote 7 *supra*.  While the 2006 Assessment indicates that there was a site visit as part of the Visalia Dry Cleaners Project, there is no elaboration about when the visit occurred, what actions were performed during the visit, or what was said to M&M.  See id.

The evidence shows that M&M exercised due care once it was made aware of the potential of PCE contamination at the Property by fully cooperating with governmental agencies.  Summary judgment in favor of M&M on the issue of due care under § 9607(b)(3) is appropriate.

d.    Appropriate Inquiries In Accordance With Customary Standards & Practices

The innocent landowner defense requires a defendant to show that he had no reason to know of contamination on the property at the time of purchase.  See Carson Harbor, 270 F.3d at 887.  As relevant here, M&M had "no reason to know" of PCE contamination if it can demonstrate that before purchasing the Property, it carried out all "appropriate inquiries," in accordance with generally accepted good commercial and customary standards and practices, into the previous ownership and uses of the property.  See 42 U.S.C. § 9601(35)(A)(iv); Walnut Creek, 622 F.Supp.2d at 931.  The "good commercial and customary standards and practices" are generally those prevailing commercial standards for the relevant locale.  See S.S. & G, LLC v. California, 2005 WL 2016843, *2 (E.D. Cal. Aug. 19, 2005) (finding genuine dispute where an

1    expert opined that a report complied "with generally accepted and local standards of professional

2    practice in effect at the time"); United States v. Serafini, 791 F. Supp. 107, 108 (M.D. Pa. 1990)

3    (holding that the issue was "whether the customary or good commercial practice in the Scranton,

4    Pennsylvania area in 1969 included . . . that a prospective purchaser . . . actually view land before

5    purchasing."); see also Domenic Lombardi, 290 F. Supp. 2d 198, 211 (D.R.I. 2003) (noting that

6    the defendant "presented no evidence as to what constituted 'good commercial or customary

7    practices' for purchasing property in Rhode Island in 1986 . . . .").  Further, if property was

8    purchased prior to May 31, 1997, the Court is to consider five factors:  (1) any specialized

9    knowledge or experience on the part of the purchaser; (2) the relationship of the purchase price to

10   the value of the property, if the property was not contaminated; (3) commonly known or

11   reasonably ascertainable information about the property; (4) the obviousness of the presence or

12   likely presence of contamination at the property; and (5) the ability of the defendant to detect the

13   contamination by appropriate inspection.  See 42 U.S.C. § 9601(35)(B)(iv)(I).

14        Here, the key is whether M&M made appropriate inquiries that were in accordance with

15   the generally accepted commercial practices in the Visalia area around March 1995, including

16   consideration of the five § 9601(B)(iv)(I) factors.  See 42 U.S.C. § 9601(35)(B); S.S. & G, 2005

17   WL 2016843 at *2; Serafini, 791 F.Supp. at 108.

18        In terms of the § 9601(35)(B)(iv)(I) factors, first, M&M was in the business of purchasing

19   real estate, but their experience up until March 1995 was limited to farmland.  See Wm. Martin

20   Depo. 41:20-42:24.  The March 1995 purchase of the Property appears to have been M&M's first

21   foray into purchasing commercial real estate and reviewing environmental site assessments.  See

22   id. & 96:23-97:1.  Given the nature of M&M's prior experience, it is not appropriate to consider

23   M&M to have been an expert in the purchase of commercial property in March 1995.  Second, the

24   Property was sold for about $1.4 million.  An appraisal report (which made no reference to

25   contaminants other than asbestos) found that the fair market value of the Property was the same as

26   the purchase price.[15]  See Wm. Martin Dec. Ex. D.  Thus, the purchase price was not so

27

28   [15] The Court realizes that the appraisal report post-dates the purchase.  Nevertheless, the appraisal confirms that fair
     market value was paid for the Property and thus, the report has relevance.

1  disproportionate from the assessed value as to suggest undetected problems with the Property.

2  Third, William Martin spoke with local business owners, spoke with Benart, inspected the site,

3  and reviewed investigative reports. See Wm. Martin Dec. 5. None of these efforts revealed the

4  presence of a dry cleaning business. See id. Coppola's expert indicates that a review of Sanborn

5  maps would have revealed the presence of Millers Dry Cleaners. See Krasnoff Dec. ¶ 13.

6  However, there is no evidence that Sanborn maps were generally well known or accessible to the

7  public or to an entity like M&M around March 1995. That is, there is no evidence that Sanborn

8  maps were reasonably known and available. Fourth, the PCE at issue is subterranean. There is no

9  evidence that PCE was obviously present either above or below the Property. Fifth, the Property

10 was visually inspected by William Martin, and had been inspected earlier by Twining. See Wm.

11 Martin Dec. ¶ 5 & Ex. B. No evidence of PCE contamination was apparent, and it appears that the

12 only way to detect PCE on the Property would have been through soil sampling. There is no

13 evidence that the physical inspection of the Property by Martin was inappropriate. Without more,

14 the indication is that M&M did not have the ability to detect PCE. Rather, the indication is that a

15 specific type of inspection that was designed to detect PCE would have been necessary.

16 Accordingly, the five § 9601(35)(B)(iv)(I) factors weigh in M&M's favor.

17      Next, the Court is required to consider the generally accepted commercial practices for the

18 Visalia area around March 1995. M&M understood in 1995 (though its financial consultant) that

19 it was necessary to review an environmental assessment for commercial/non-farmland property.

20 See Wm. Martin Depo. 42:12-24. M&M focuses largely on the PSA prepared by Twining.

21 However, as Coppola points out, there are concerns with this report. By its own terms, the PSA

22 states that it is prepared pursuant to a standard of care that is time sensitive. See Wm. Martin Dec.

23 Ex. B. By the time M&M reviewed the PSA, the PSA was already between three and four years

24 old. M&M has offered no evidence that reliance on the PSA after this passage of time was

25 reasonable. Second, the PSA stated that it was prepared for Benart and that others who may rely

26 on its findings have a duty to determine the adequacy of the report for their own intended use. See

27 id. There is no evidence regarding M&M's determination that the PSA was adequate for their

28 purchase of the Property. Third, the PSA noted that PCE was detected in nearby wells. It is true

1   that the PCE was within the applicable MCL, which may mean that no further investigation was

2   warranted.  However, because PCE is the hazardous substances at issue in this case, additional

3   testimony regarding the significance of the amount of PCE detected would be helpful.  Fourth, the

4   PSA stated that "environmental concerns to soil and groundwater at the Property from on-site

5   sources cannot be evaluated with information made available to Twining," and no soil and

6   groundwater samples appear to have been taken by Twining from the Property.  See id. at 23, 26.

7   It is the results of soil and groundwater sampling which would have yielded the most useful

8   information regarding the environmental condition of the Property in terms of underground

9   contaminants such as PCE.  It is true that the SIR included the results of soil samples, but the

10  content of the SIR or the nature of the sampling is not entirely clear at this time.

11         Coppola has offered the expert opinion of Peter Krasnoff, and that opinion indicates that

12  reliance on the PSA was unreasonable because the PSA did not meet the applicable American

13  Society for Testing and Materials ("ATSM") standard, Designation E 1527-93.  See Krasnoff Dec.

14  ¶¶ 9-12.  Krasnoff is an environmental engineer who has extensive experience in preparing

15  environmental reports.  However, the Court does not find Kransoff's opinions to be dispositive at

16  this point.  First, Kransoff does not purport to be familiar with the generally accepted commercial

17  standards in the Visalia area around March 1995.  Second, Kransoff's opinion is based almost

18  entirely on compliance with ATSM Designation E 1527-93.  As indicated above, for property

19  purchased prior to May 31, 1997, the Court is to consider five factors, as well as the relevant

20  accepted commercial practices.  See 42 U.S.C. § 9601(35)(B)(iv)(I).  No mention is made of the

21  ATSM or their standards and designations.  This is significant because § 9601(35)(B)(iv)(II) deals

22  with property purchased after May 1997.  For property purchase after May 31, 1997, but before

23  EPA establishes criteria for determining whether an appropriate inquiry has been made, Congress

24  determined that compliance with the applicable ATSM standards would constitute an appropriate

25  inquiry.  See id.  This shows that Congress chose not to express an opinion on ATSM standards

26  for property purchased prior to May 31, 1997.  While there is no doubt that compliance with the

27  ATSM would go far to showing that an appropriate inquiry was made for pre-May 1997

28  purchases, given § 9601(35)(B)(iv)(I)'s failure to mention the ATSM and § 9601(35)(B)(iv)(II)'s

adoption of the ATSM, the Court cannot hold that a failure to comply with an applicable ATSM standard for pre-May 1997 purchases is fatal.  See R.E. Goodson Constr. Co. v. Int'l Paper Co., 2006 U.S. Dist. LEXIS 39850, *19-*20 (D. S.C. June 14, 2006) (finding that compliance with ATSM Designation E 1527-93 is not the exclusive method for making "all appropriate inquiries").

An appropriate inquiry is one that complies with the accepted commercial standards around March 1995 in the Visalia area, considering the five factors of § 9601(35)(B)(iv)(I).  It may be that reliance on the PSA, the SIR, and the inquiries and inspections made by William Martin were within the accepted standards.  However, M&M has offered no evidence from someone who purports to be familiar with this standard.  Viewed in the light most favorable to Coppola as the non-moving party, the PSA's content raises significant concerns and prevents the Court from determining as a matter of law that M&M made all appropriate inquiries.  Summary judgment in favor of M&M on the issue of whether an "appropriate inquiry" was  made is improper at this time.

**2.**     **Fifth & Sixth Causes of Action – Private Nuisance & Continuing Trespass**[16]

*Defendant's Argument*

M&M argues *inter alia* that nuisance liability under Restatement (Second) of Torts § 839 is not possible.  Under Restatement (Second) § 839, a possessor of land may be liable if it knows or has reason to know of the nuisance but does not take steps to abate the condition.  The Court previously noted that Coppola needed to allege that M&M was in possession of the property at the time the nuisance was created.  M&M argues that it was not in possession of 110 N. Willis until 1995, when the conditions that allegedly caused the nuisance were no longer in existence.

With respect to continuing trespass, M&M argues that summary judgment is appropriate for the same reasons as the private nuisance claim.  M&M did not create the nuisance, assist in the nuisance's creation, or have any involvement in the contamination of Coppola's property, or have knowledge of the PCE until it was contacted by EPA and DTSC.

---

[16] The parties make no material distinctions between the fifth and sixth causes of action.  The Court will follow the parties' lead and assume that the issues associated with the nuisance claim parallel those associated with the trespass claim.

1    *Plaintiff's Opposition*

2          Coppola argues that summary judgment on the Restatement (Second) § 839 theory is not

3    appropriate.  M&M does not address the elements of a Restatement (Second) § 839 claim.

4    Instead, M&M merely states that it was not in possession of the Property while the dry cleaner

5    was in operation.  There is a question whether M&M had knowledge of the PCE contamination in

6    2005 or 2006, yet did nothing about it.

7          With respect to continuing trespass, M&M failed to conduct an adequate pre-acquisition

8    investigation into the Property, and without an adequate investigation, there is no basis for arguing

9    against constructive knowledge of the PCE.

10   *Legal Standard*

11         A defendant who unreasonably fails to abate a nuisance when he is in possession of land

12   may be liable for the nuisance.  See Redevelopment Agency v. BNSF, 643 F.3d 668 675-77 (9th

13   Cir. 2011); City of Los Angeles v. San Pedro Boat Works, 635 F.3d 440, 452-53 (9th Cir. 2009);

14   Coppola v. Smith, 935 F.Supp.2d 993, 1018 (E.D. Cal. 2013); Restatement (Second) of Torts §

15   839 (hereinafter "Restatement § 839").  Under the Restatement § 839:

16         A possessor of land is subject to liability for a nuisance caused while he is in
17         possession by an abatable artificial condition on the land, if the nuisance is
           otherwise actionable, and

18         (a) the possessor knows or should know of the condition and the nuisance or
19         unreasonable risk of nuisance involved, and

20         (b) he knows or should know that it exists without the consent of those affected by
           it, and

21         (c) he has failed after a reasonable opportunity to take reasonable steps to abate the
22         condition or to protect the affected persons against it.

23   Restatement § 839; BNSF, 643 F.3d at 675; San Pedro, 635 F.3d at 453; Coppola, 935 F.Supp.2d

     at 1019; Leslie Salt Co. v. San Francisco, 153 Cal.App.3d 605, 619-20 (1984).  To be in violation
24
     of Restatement § 839, a defendant must: (1) be in possession of the land; (2) know or should know
25
     of an artificial condition and the nuisance (or an unreasonable risk of nuisance); (3) know or
26
     should know that the nuisance exists without the consent of the afflicted persons; and (4) after a
27
     reasonable opportunity, fail to take reasonable steps to abate the condition or protect those
28

1   afflicted against the nuisance.  See BNSF, 643 F.3d at 675-77; San Pedro, 635 F.3d at 452-53;

2   Coppola, 935 F.Supp.2d at1019; Restatement § 839.

3   *Discussion*[17]

4       Too much has been read into the Court's prior order.  It is true that the Court stated that

5   Coppola needed to allege that M&M "was actually in possession of 110 N. Willis while the

6   nuisance was created."  Coppola, 935 F.Supp.2d at 1019-20.  However, the Court was reacting to

7   Coppola's argument that M&M had created a nuisance and to the indication that M&M was not in

8   possession of the Property.  See id. at 1017, 1019-20.  The Court did not mean to imply that if a

9   defendant was not in possession of land at the time a nuisance was created, then there could be no

10  liability.  To the contrary, liability can attach under Restatement § 839 if there exists an abatable

11  nuisance on the possessor's land, irrespective of whether the possessor created the nuisance.  See

12  BNSF, 643 F.3d at 675; Coppola, 935 F.Supp.2d at 1019; Restatement § 839.  Therefore, that

13  M&M may not have been in possession of 110 N. Willis or the Property when PCE was allegedly

14  released by Millers Dry Cleaners does not alone justify granting summary judgment.

15      To recover under Restatement § 839, Coppola basically must show that M&M possessed

16  the Property at a time in which an abatable nuisance on the Property existed, that M&M knew or

17  should have known of the nuisance, there was no consent to the nuisance, and M&M failed to take

18  reasonable steps to abate or protect after a reasonable opportunity to do so.  See BNSF, 643 F.3d

19  at 675-77; San Pedro, 635 F.3d at 452-53; Coppola, 935 F.Supp.2d at1019; Restatement § 839.

20  Comment *l* to Restatement § 839 indicates that the duty to take reasonable steps to abate or protect

21  is triggered either at the time of actual knowledge or at the time the possessor should have known

22  of the nuisance, whichever is earlier.  See Restatement § 839 cmt. *l*; cf. BNSF, 643 F.3d at 675-76

23  (citing with approval Restatement § 839 cmt. *i*).

24      Here, the evidence and arguments presented are not sufficient to resolve Coppola's claims.

25  Instead, the evidence and arguments touch on critical issues that the parties do not adequately

26  address.  First, it is not clear whether a nuisance exists or existed on the Property at a time when

27
28  [17] M&M's motion addressed three theories of nuisance, but Coppola only defended the Restatement § 839 nuisance theory.  The Court construes Coppola's opposition as an acknowledgement that the only nuisance theory being pursued against M&M by Coppola is the Restatement § 839 theory

1    M&M was in possession of the Property.  The indication is that Millers Dry Cleaners caused the

2    release of PCE, but Millers Dry Cleaners ceased operations 40 years ago, and M&M did not

3    purchase the Property until approximately 25 years after Millers Dry Cleaners closed.  Depending

4    on migration patterns and the quantities of PCE released by Millers, it is unclear what condition

5    the Property was in at any time when M&M possessed it.  This is especially true in light of the

6    EPA's 2009 Site Report which found that a release of PCE from the Property to the groundwater

7    had not been shown, and EPA's 2009 Remedial Decision that there was no evidence of a release

8    of PCE from the Property to the surface water and that no further assessment or action was

9    planned.[18]  See FAC Ex. C at pp.6, 27.  Second, there has been no evidence concerning whether

10    any nuisance on the Property (assuming one exists) is abatable.  See BNSF, 643 F.3d at 675;

11    Mangini v. Aeroject-Gen. Corp., 12 Cal.4th 108, 1099-1100 (1996).  Third, the state of M&M's

12    knowledge of the PCE is unclear.  In terms of actual knowledge, the evidence shows that M&M

13    did not actually know of possible migrating PCE until 2008 when it was contacted by EPA and

14    DTSC.  What is less clear is whether there was a time prior to 2008 in which M&M should have

15    known of migrating PCE.[19]   Whether M&M should have known of migrating PCE in turn

16    depends on inter alia whether M&M was under a duty to check for subsurface contamination,

17    whether M&M met such a duty (for example through its pre-purchase investigation of the

18    Property), or when M&M actually should have known of possible migrating PCE (if different

19    from the time of actual knowledge).  Cf. BNSF, 643 F.3d at 675-76; Restatement § 839 cmt. i.

20    Because these issues have not been adequately addressed, the Court cannot grant summary

21    judgment.[20]

22

---

23    [18] The Court notes that the FAC alleges that high levels of PCE were detected in 2012 in downgradient water samples

24    near the Property.  See FAC ¶ 42.  Such evidence is relevant to whether a nuisance exists on the Property, but it is not
necessarily dispositive.  Additional evidence and argument is needed on this issue.

25    [19] For purposes of nuisance, there must be an indication that the PCE interfered with Coppola's property rights/use
and enjoyment of its property.  Cf. Martin Marietta Corp. v. Insurance Co. of N.A., 40 Cal.App.4t h 1113, 1132

26    (1995); Judicial Council of Cal., Civil Jury Instructions § 2021 (2014).  The parties have not addressed the issue, but it
is unclear at this time how such interference could occur without migration of the PCE from the Property.

27

28    [20] The Court is merely identifying several outstanding issues, it is not holding that that these are the only issues that
remain.  In future motions or proceedings, the parties shall address any issues that they believe are germane the fifth
and sixth causes of action, whether identified in this order or not.

1    In sum, M&M's argument is highly dependent upon a reading of the Court's prior order

2    that was not intended.  While it is apparent that M&M did not create a nuisance, that is not a

3    sufficient reason to grant summary judgment.  Because there are critical unresolved issues,

4    summary judgment on the fifth and sixth causes of action is inappropriate.

5

6    **3.**      **Tenth & Eleventh Causes of Action – Declaratory Judgment & Contribution**

7            *Parties' Arguments*

8            M&M argues that these causes of action are dependent on Coppola's other causes of

9    action.  Because the other causes of action fail, the declaratory relief and contribution claims fail

10   as well.  Coppola argues that because summary judgment is improper with respect to each of the

11   claims challenged by M&M, summary judgment on the declaratory relief and contribution causes

12   of action is also improper.

13           *Discussion*

14           The Court has granted summary adjudication on various issues, but it has not granted full

15   summary judgment on the causes of action against M&M.  Because causes of action remain

16   against M&M, summary judgment on the tenth and eleventh causes of action is not appropriate.

17

18   **4.**      **Additional Summary Judgment Motion**

19           A review of the docket shows that although discovery is proceeding, a scheduling order

20   has not been entered.  Scheduling orders include deadlines for discovery and filing dispositive

21   motions.  Given the resolution of this motion, the Court will not preclude M&M from filing an

22   additional summary judgment motion after entry of a scheduling order and in accordance with any

23   requirements that may be set forth therein.  See Hoffman v. Tonnemacher, 593 F.3d 908, 911-12

24   (9th Cir. 2010).

25

26                              **CONCLUSION**

27           With respect to the CERCLA cause of action, the evidence demonstrates that M&M and

28   Martin LP are the same entity and that M&M may rely on Martin LP's pre-purchase investigation,

27

that M&M did not dispose of, place, or contribute to the release of PCE at the Property (i.e. other parties are the sole cause of the PCE release at the Property), and that M&M exercised "due care" for purposes of § 9607(b)(3).  Summary adjudication of these issues in favor of M&M will be granted.  However, there is a genuine issue of disputed material fact with respect to whether M&M made all appropriate inquiries before purchasing the Property.  In particular, it is unclear whether M&M's reliance on the PSA and the SIR was in accord with the good and accepted commercial practices.  Therefore, summary judgment on the CERCLA cause of action as a whole is denied.

With respect to the nuisance and trespass causes of action, M&M relies on a reading of the Court's prior order that was not intended, and there remain critical issues that have not been adequately addressed by the parties.  Summary judgment on these causes of action is denied.

Finally, Coppola's claim for declaratory relief and contribution are dependent upon the viability of other causes of action.  Because the Court is denying summary judgment on the other causes of action, summary judgment on these causes of action is also denied.


**<u>ORDER</u>**

Accordingly, IT IS HEREBY ORDERED that:

1.   Defendant's motion for summary judgment is GRANTED in part in that summary adjudication is GRANTED on the issues of: (a) M&M may rely on the pre-purchase investigation of Martin LP, (b) other parties are the sole cause of any release of PCE from the Property, and (c) M&M exercised due care for purposes of 42 U.S.C. § 9607(b)(3);

2.   Defendant's motion for summary judgment is otherwise DENIED; and

3.   Defendant is not precluded from filing a successive summary judgment motion.


IT IS SO ORDERED.

Dated:   January 15, 2015                        _____

SENIOR  DISTRICT  JUDGE

28